## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:14-cv-20726-JAL

HOWARD BRAYNEN, TONI MURRAY,
and RONALD HUTCHINGS on behalf of
themselves and all others similarly situated,

        Plaintiffs,

v.

                                          **CLASS ACTION**
                                          **JURY DEMAND**

NATIONSTAR MORTGAGE, LLC, HARWOOD
SERVICE COMPANY, LLC, NATIONSTAR
MORTGAGE HOLDINGS INC., ASSURANT,
INC., and AMERICAN SECURITY INSURANCE
COMPANY, VOYAGER INDEMNITY INSURANCE
COMPANY and STANDARD GUARANTY
INSURANCE COMPANY

        Defendants.
_____/

### FIRST AMENDED CLASS ACTION COMPLAINT

     Plaintiffs HOWARD BRAYNEN, TONI MURRAY, and RONALD HUTCHINGS file

this class action complaint on behalf of themselves and all others similarly situated against

NATIONSTAR MORTGAGE, LLC ("Nationstar"), HARWOOD SERVICE COMPANY, LLC

("Harwood Service"), and NATIONSTAR MORTGAGE HOLDINGS INC. (collectively the

"Nationstar Defendants"), ASSURANT, INC. ("Assurant"), AMERICAN SECURITY

INSURANCE COMPANY ("American Security" or "ASIC"), VOYAGER INDEMNITY

INSURANCE COMPANY ("VIIC"), and STANDARD GUARANTY INSURANCE

COMPANY ("SGIC") (collectively "the Assurant Defendants").

## INTRODUCTION

### The Force-Placed Insurance Industry

1.      Lenders and servicers force place insurance when a borrower fails to obtain or maintain proper hazard, flood, or wind insurance coverage on property that secures a loan. Under the typical mortgage agreement, if the insurance policy lapses or provides insufficient coverage, the lender has the right to "force place" a new policy on the property and then charge the premiums to the borrower.

2.      However, mortgage lenders and servicers, like Nationstar, have set up questionable and often illegal practices related to force-placed insurance.  The lenders and servicers have entered into exclusive and collusive relationships with certain force-placed insurance providers, here Assurant and ASIC, that result in exceptional profits to both the servicers or lenders and the force-placed insurers.

3.      The arrangements comprise an extremely lucrative profit-making scheme that reaps hundreds of millions of dollars annually for its participants.  There are just two insurance companies that control nearly the entire market for forced-placed policies in the country— Assurant and QBE.  Assurant works through its subsidiaries, including ASIC.  These companies and their affiliates enter into exclusive relationships with the major mortgage lenders and servicers to provide the policies.  To maintain their exclusive relationships with these lenders, the insurers pay them unearned "kickbacks," in the form of direct payments (disguised as "commissions" or reimbursements for certain costs) or in the form of a percentage of the force-placed policy premiums, charged to the borrower, offer them subsidized or discounted administrative services, and/or enter into lucrative captive reinsurance deals with them.

4.      The money to finance the force-placed insurance schemes comes from unsuspecting borrowers who are charged inflated charges for the force-placed insurance by lenders or servicers – Nationstar, here.  In many instances, borrowers are required to pay for backdated insurance coverage to cover periods during which no claims were made, or coverage that exceeds the legal requirements, and are charged additional improper fees.

5.      The Defendants' force-placed insurance scheme takes advantage of the broad discretion afforded the lenders and/or servicers in standard form mortgage agreements.  The agreements typically require the borrower to carry hazard insurance sufficient to cover the lender's interest in the property against fire and other perils.  If a homeowner's "voluntary" policy lapses, the mortgage agreement allows the lender to "force place" a new policy on the property at the borrower's expense.

6.      Although force-placed insurance is designed to protect the lender's interest in the property that secures the loan and thus should not exceed that interest, lenders often purchase coverage from their exclusive insurers in excess of that required to cover their own risk.  And, as a matter of practice, the major lenders and servicers collude with the two major force-placed insurers to manipulate the force-placed insurance market, which leads to artificially inflated premiums and charges to consumers that result in premiums up to ***ten times*** greater than those available to the consumer in the open market.  Lenders, servicers, force-placed insurers, and their affiliates reap these unconscionable profits entirely at the expense of the unsuspecting borrower.

7.   At a recent hearing on force-placed insurance held by the National Association of Insurance Commissioners ("NAIC"), Birny Birnbaum, the foremost expert on the force-placed insurance market, illustrated the staggering growth in profits that Defendants' schemes have reaped in recent years:[1]

### LPI Premiums Have Quadrupled Since 2004

| Year | Gross Written Premium ($ Millions) | Net Written Premium ($ Millions) |
|------|------|------|
| 2004 | $1,485 | $796 |
| 2005 | $1,832 | $919 |
| 2006 | $2,163 | $1,074 |
| 2007 | $3,058 | $1,647 |
| 2008 | $4,000 | $2,209 |
| 2009 | $5,181 | $3,049 |
| 2010 | $5,915 | $3,223 |
| 2011 | $5,692 | $3,450 |
| 2004-2011 | $29,326 | $16,368 |

2009-2011 GWP Understated, Reporting Errors by QBE

CEJ LPI Presentation to NAIC                    13                    August 9, 2012

8.    Assurant, a named defendant here, is one of the two major insurance companies that control virtually the entire market for force-placed insurance. As shown below, Assurant held 58.6% of the nationwide market share for force-placed insurance in 2011.  Together, Assurant and QBE/Balboa, the other major insurer with a significant market share, controlled 99.7% of the market in the same year, and held no less than 96.1% of the market between 2004 and 2011.  Large mortgage lenders and servicers sustain the insurers' monopoly by agreeing to purchase all force-placed insurance from the two insurers in exchange for kickbacks and other benefits.

---

[1] This graph and the ones that follow were taken from Mr. Birnbaum's presentation to the NAIC on August 9, 2012.  The presentation is available at:
http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance_presentation_birnbaum.pdf.

## Assurant and QBE Are the Market for LPI: Countrywide Market Share

| Year | Assurant | QBE/Balboa | Assurant + QBE/Balboa |
|------|----------|------------|------------------------|
| 2004 | 68.2% | 29.8% | 98.0% |
| 2005 | 69.7% | 26.4% | 96.1% |
| 2006 | 79.2% | 19.5% | 98.7% |
| 2007 | 74.0% | 25.4% | 99.4% |
| 2008 | 74.2% | 25.5% | 99.7% |
| 2009 | 57.2% | 42.4% | 99.7% |
| 2010 | 56.2% | 43.5% | 99.7% |
| 2011 | 58.6% | 41.1% | 99.7% |

CEJ LPI Presentation to NAIC                              18                              August 9, 2012

9.      It is no surprise that these Defendants' practices have come under increased scrutiny in recent years by the government and regulators.  For example:[2]

- On March 21, 2013, the New York Department of Financial Services' ("NYDFS"), investigation into force-placed insurance practices "produced a major settlement with the country's largest 'force-placed' insurer, Assurant, Inc. . . . [The settlement] includes restitution for homeowners who were harmed, a $14 million penalty paid to the State of New York, and industry-leading reforms that will save homeowners, taxpayers, and investors millions of dollars going forward through lower rates."[3]  Further, under the Consent Order entered, Assurant and its subsidiaries (including ASIC and SGIC), are prohibited from paying commissions to any servicers or entity affiliated with a servicer on force-placed insurance

---

[2] The Defendants' practices have also come under increased scrutiny by the courts.  This Court has already certified a Florida class against Wells Fargo Bank, N.A. and Wells Fargo Insurance, Inc. (as well as their exclusive force-placed insurance carrier, QBE) – on many of the same practices described here. *See Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233, 280 F.R.D. 665 (S.D. Fla. 2012).

[3] *See Cuomo Administration Settles with Country's Largest Force-Placed Insurer, Leading Nationwide Reform Effort and Saving Homeowners, Taxpayers, and Investors Millions of Dollars*, Dep't of Fin. Servs., Mar. 21, 2013, *available at*, http://www.dfs.ny.gov/about/press2013/pr1303211.htm.

policies obtained by the servicer.   *See* Assurant & NYDFS Consent Order, Mar. 21, 2013, at 9.

- At NYDFS hearings on May 17, 2012 related to the force-placed insurance market, the Superintendent of Financial Services, Benjamin Lawsky, stated that the Department's initial inquiry uncovered "serious concerns and red flags" which included: 1) exponentially higher premiums, 2) extraordinarily low loss ratios, 3) lack of competition in the market, and 4) tight relationships between the banks, their subsidiaries, and insurers.  He went on to state:

  > In sum when you combine [the] close and intricate web of relationships between the banks and insurance companies on the one hand, with high premiums, low loss ratios, and lack of competition on the other hand, it raises serious questions . . . .

- After August 2012 NAIC hearings on force-placed insurance, the state regulator from Louisiana, James Donelon, referred to the force-placed insurance market as a "monopoly" and stated that stricter regulations may be needed.[4]

- On December 18, 2013, Fannie Mae issued its Servicing Guide Announcement related to force-placed insurance that, among other things, prohibits servicers from including any commissions, bonuses, or other incentive compensation in the amounts charged to borrowers for force-placed insurance and further requires that the force-placed insurance carrier cannot be an affiliated entity of the servicer.[5]

10.    Florida has now become the epicenter for these force-placed insurance schemes.

In his presentation to the NAIC, Mr. Birnbaum illustrated the astounding rise in force-placed

insurance policies in Florida:

---

[4] *See* Z. Tracer & D. Beasley, *U.S. Regulators to Examine Forced-Place Insurance*. BLOOMBERG BUSINESSWEEK, Aug. 10, 2012, *available at*,  http://www.bloomberg.com/news/2012-08-10/u-s-regulators-to-examine-forced-place-insurance.html.

5 *See* https://www.fanniemae.com/content/announcement/svc1327.pdf

**LPI Premium by State:  Florida Has Become Ground Zero**

|  | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|
| FL | 10.6% | 10.8% | 13.3% | 17.9% | 22.9% | 34.3% | 36.7% | 35.1% |
| CA | 20.8% | 19.3% | 21.2% | 23.5% | 24.3% | 14.0% | 11.1% | 10.2% |
| TX | 10.6% | 10.7% | 8.8% | 8.7% | 7.0% | 5.6% | 5.6% | 6.1% |
| NY | 3.6% | 3.6% | 4.5% | 4.4% | 4.3% | 4.7% | 5.4% | 5.6% |
| IL | 3.0% | 3.3% | 3.9% | 3.7% | 3.9% | 4.4% | 4.1% | 4.6% |
| NJ | 2.9% | 2.7% | 2.9% | 2.7% | 2.7% | 2.9% | 3.4% | 4.0% |
| MI | 4.2% | 4.4% | 4.4% | 5.8% | 3.6% | 2.7% | 2.2% | 2.0% |
| OH | 3.6% | 3.8% | 3.5% | 2.7% | 2.4% | 2.2% | 2.3% | 2.9% |
| GA | 3.4% | 3.2% | 3.2% | 2.4% | 2.3% | 2.3% | 2.3% | 2.3% |
| PA | 2.6% | 2.6% | 2.7% | 1.8% | 1.8% | 1.8% | 1.7% | 1.8% |

CEJ LPI Presentation to NAIC                                   15                                        August 9, 2012

11.     Defendants' self-dealing and collusion in the force-placed insurance market has caused substantial harm to the named Plaintiffs and the proposed class they seek to represent. This class action seeks to redress that harm on behalf of these classes of consumers and to recover all improper costs they have incurred related to the forced placement of insurance by the Nationstar Defendants, Assurant, and ASIC.

## **PARTIES**

### **Plaintiffs**

12.     Plaintiff HOWARD BRAYNEN is a citizen of the State of Florida.  He is a natural person over the age of 21 and otherwise *sui juris*.

13.     Plaintiff TONI MURRAY is a citizen of the State of Florida.  She is a natural person over the age of 21 and otherwise *sui juris*.

14.     Plaintiff RONALD HUTCHINGS is a citizen of the State of Ohio.  He is a natural person over the age of 21 and otherwise *sui juris*.

**Defendants**

15.    Defendant ASSURANT, INC. is a Delaware corporation with its principal office in New York, New York.  Assurant participates in the force-placed insurance market through its trade name, Assurant Specialty Property, and its business strategy "is to pursue long term growth in lender placed homeowner's insurance . . . .  The largest product line within Assurant Specialty Property is homeowners insurance consisting principally of fire and dwelling hazard insurance offered through [Assurant's] lender placed program." [6]

16.    Upon information and belief, Assurant owns the "Assurant Specialty Property" trade name and allows its subsidiaries (including ASIC) to operate their force-placed insurance business under that name.

17.    Defendant AMERICAN SECURITY INSURANCE COMPANY is a Delaware corporation and an indirect subsidiary of Assurant, writing force-placed insurance policies in all fifty states and the District of Columbia with its principal address in Atlanta, Georgia.  American Security often operates under the trade name "Assurant Specialty Property."  American Security contracts with the lenders to act as a force-placed insurance vendor.  Its duties include, but are not limited to, tracking loans in their mortgage portfolio, handling all customer service duties related to force-placed insurance, and securing force-placed insurance policies on properties when a borrower's insurance has lapsed.  Defendant VOYAGER INDEMNITY INSURANCE COMPANY is a Georgia corporation and an indirect subsidiary of Assurant, Inc., writing force-placed insurance policies in many states with its principal address in Atlanta, Georgia.  Defendant STANDARD GUARANTY INSURANCE COMPANY is a Delaware corporation and an indirect subsidiary of Assurant, Inc., writing force-placed insurance policies in many

---

[6] *See* Assurant Form 10-K for the fiscal year ending December 31, 2011, at 5, *available at* http://www.sec.gov/Archives/edgar/data/1267238/000119312512075371/d257568d10k.htm.

states with its principal address in Atlanta, Georgia.

18.     Upon information and belief, American Security, Standard Guaranty and Voyager pass much of their profits from force-placed insurance to its corporate parent Assurant.

19.     Defendant NATIONSTAR MORTGAGE, LLC is a Delaware limited liability company with its principal place of business in Lewisville, Texas.  Nationstar does business in Florida and throughout the United States.  During the relevant time period, Nationstar was the servicer of the loans of Plaintiffs and the Class members.  Defendant NATIONSTAR MORTGAGE HOLDINGS INC. is the parent company and owner of Defendant Nationstar MORTGAGE, LLC.  Defendant Nationstar Holdings, a Delaware company, is a publicly-traded company on the New York Stock Exchange under ticker symbol "NSM."  Defendant Nationstar Holdings does business in Florida, where its property portfolio is heavily concentrated, as well as throughout the United States via its subsidiaries.  Nationstar Holdings exercises control over the force placed insurance activities of NATIONSTAR MORTGAGE, LLC.  Nationstar increased its servicing portfolio by 94% last year to $198 billion.

20.     Defendant HARWOOD SERVICE COMPANY, LLC is an affiliate of Nationstar with its principal place of business in Lewisville, Texas and upon information and belief is the captive insurance broker for Nationstar.  Harwood Service performs no functions related to the procurement of force-placed insurance coverage for individual borrowers and yet collects a "commission" tied to a percentage of the cost of each force-placed insurance premium.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.).

22.     Plaintiffs are citizens of Florida and Ohio.  Defendants are citizens of various other states but are registered to do business in the aforementioned states.  The amount in controversy exceeds $5,000,000 and there are at least one hundred members of the putative class.

23.     This Court has jurisdiction over Defendants because they are foreign corporations authorized to conduct business in Florida, are doing business in Florida and have registered with the Florida Secretary of State, or do sufficient business in Florida, have sufficient minimum contacts with Florida, or otherwise intentionally avail themselves of the Florida consumer market through the promotion, marketing, sale, and service of mortgages or other lending services and insurance policies in Florida.  This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

24.     In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between Plaintiffs and the Defendants.  28 U.S.C. § 1332(d)(2).  Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated.  28 U.S.C. § 1332(d)(6).

25.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business and may be found in this District.  Venue is also proper here because at all times relevant hereto, Plaintiff Braynen resided in the Southern District of Florida and a substantial portion of the practices complained of herein occurred in the Southern District of Florida.

26.     All conditions precedent to this action have occurred, been performed, or have been waived.

### FACTUAL ALLEGATIONS

27.     Permitting a lender to forcibly place insurance on a mortgaged property and charge the borrower the full cost of the premium is neither a new concept nor a term undisclosed to borrowers in mortgage agreements.  The standard form mortgage agreements serviced by Nationstar include a provision requiring the borrower to maintain hazard insurance coverage, flood insurance coverage if the property is located in a Special Flood Hazard Area as determined by the Federal Emergency Management Agency, and wind insurance on the property securing the loan, and, in the event the insurance lapses, permit the lender or servicer to obtain force-placed coverage and charge the amounts to the borrower rather than declare the borrower in default.

28.     What is unknown to borrowers and not disclosed in the mortgage agreements is that Nationstar has exclusive arrangements with Assurant and its affiliates, including ASIC, to manipulate the force-placed insurance market and artificially inflate the premiums and then pass the improperly inflated amounts onto the borrowers.  The premiums are inflated to provide the Nationstar Defendants and affiliates with kickbacks in the form of "commissions" or direct payments, or to provide the Nationstar Defendants with lucrative reinsurance arrangements, or are inflated to cover the cost of discounted services, as well as to include other unmerited charges.  The borrower is then forced to pay the inflated amounts.

### The Force-Placed Insurance Scheme

29.     The Assurant Defendants have exclusive arrangements with Nationstar to monitor its mortgage portfolio and provide force-placed insurance.  In addition to the subsidized mortgage services they receive from the Assurant Defendants, Nationstar and/or its affiliate Harwood Service are kicked back a percentage of the force-placed premium or are paid direct

payments for the exclusive relationship often disguised as expense reimbursements. The Nationstar Defendants receive additional compensation through captive reinsurance arrangements.

30.    The scheme works as follows. Nationstar purchases master or "umbrella" insurance policies that cover its entire portfolio of mortgage loans. In exchange, the Assurant Defendants are given the exclusive right to force insurance on property securing a loan within the portfolio when the borrower's insurance lapses or the lender determines the borrower's existing insurance is inadequate. Assurant and its affiliates monitor Nationstar's entire loan portfolio for lapses in borrowers' insurance coverage. Once a lapse is identified, an Assurant affiliate, (in Mr. Braynen's case, ASIC), sends notice to the borrower that insurance will be "purchased" and force-placed if the voluntary coverage is not continued. If a lapse continues, the insurer notifies the borrower that insurance is being force-placed at his or her expense.

31.    No individualized underwriting ever takes place for the force-placed coverage. Insurance is automatically placed on the property and the premium charged to the borrower. In many instances, the insurance lapse is not discovered for months or even years after the fact. Despite the absence of any claim or damage to the property during the period of lapse, retroactive coverage is placed on the property and the borrower is charged for the "cost" of the past premiums.

32.    Once coverage is forced on the property, Nationstar pays the insurer for the premium and then charges the borrower for the payment, which is either deducted from the borrower's mortgage escrow account or added to the balance of the borrower's loan.[7]   The borrower's escrow account is depleted irrespective of whether other escrow charges, such as

---

[7] Often, when a borrower does not have an escrow account, an escrow account with a negative balance is created and the borrower is charged to bring the balance to zero.

property taxes, are also due and owing.

33.     After Nationstar pays the premiums to the Assurant and ASIC, they kick back a set percentage to Nationstar and/or its affiliate Harwood Service as a "commission."  Upon information and belief, Harwood Service shares a percentage of that payment with Nationstar, sometimes in the form of "soft dollar" credits.

34.     The money paid back to the Nationstar Defendants is not given in exchange for any services provided by them; it is simply grease paid to keep the force-placed machine moving.  In an attempt to mask the kickback as legitimate, Assurant and ASIC disclose to the borrower (on Nationstar letterhead) that Nationstar or its affiliate Harwood Service may earn commissions or income as a result of the forced placement of coverage.  In reality, however, no work is ever done by Nationstar or Harwood Service to procure insurance for that particular borrower because the coverage comes through the master or umbrella policy already in place due to the exclusive relationship in place.  As a result, no commission or income is "earned."

35.     Under this highly profitable force-placed insurance scheme, the Nationstar Defendants are incentivized to purchase and force place insurance policies with artificially inflated premiums on a borrowers' properties because the higher the cost of the insurance policy, the higher the kickback they receive.

36.     Assurant and the Nationstar Defendants also enter into agreements for ASIC to provide servicing activities on Nationstar's entire loan portfolio at below cost.  The servicing costs are added into the force-placed premiums which are then passed on to the borrower.  The insurers are able to provide these services at below cost because of the enormous profits they make from the hyper-inflated premiums charged for force-placed insurance.  However, because insurance-lapsed mortgaged property comprises only 1-2% of the lenders' total mortgage

portfolio, the borrowers who pay these premiums unfairly bear the entire cost to service the entire loan portfolio.   These charges, passed on to Plaintiffs and the proposed Class, are not properly chargeable to the borrower because they are expenses associated with the servicing of all the loans and the loan servicers are already compensated for these activities.

37.    The small percentage of borrowers who are charged for force-placed insurance shoulder the costs of monitoring Nationstar's entire loan portfolio, effectively resulting in a kickback to Defendants.

38.     In addition, the Assurant Defendants enter into essentially riskless "captive reinsurance arrangements" with the Nationstar Defendants to "reinsure" the property insurance force-placed on borrowers.   A recent *American Banker* article illustrated this reinsurance problem using JPMorgan Chase's program by way of example:

> JPMorgan and other mortgage servicers reinsure the property insurance they buy on behalf of mortgage borrowers who have stopped paying for their own coverage. In JPMorgan's case, 75% of the total force-placed premiums cycle back to the bank through a reinsurance affiliate. This has raised further questions about the force-placed market's arrangements. . . .

> Over the last five years, Chase has received $660 million in reinsurance payments and commissions on force-placed policies, according to New York's DFS. . . .

> Of every hundred dollars in premiums that JPMorgan Chase borrowers pay to Assurant, the bank ends up keeping $58 in profit, DFS staff asserted. The agency suggested the bank's stake in force-placed insurance may encourage it to accept unjustifiably high prices by Assurant and to avoid filing claims on behalf of borrowers, since that would lower its reinsurer's returns.

> The DFS staff also questioned the lack of competition in the industry, noting that Assurant and QBE have undertaken acquisitions that give them long-term control of 90% of the market.  Further limiting competition are the companies' tendency to file identical rates in many states, Lawsky and his staff argue.

J. Horwitz, *Chase Reinsurance Deals Draw New York Regulator's Attacks*, AM. BANKER, May 18, 2012, *available at* http://www.americanbanker.com/issues/177_97/chase-reinsurance-deals-regulator-attack-1049460-1.html.

39.     Upon information and belief, Nationstar's reinsurance program, like those of other servicers or lenders, is simply a way to funnel profits, in the form of ceded premiums, to Nationstar at borrowers' expense.  While reinsurance can, and often does, serve a legitimate purpose, here it does not.  The Nationstar Defendants and/or their affiliates enter into reinsurance agreements with the Assurant Defendants that provide that the insurer will return to the Nationstar Defendants significant percentages of the premiums charged borrowers by way of ceded reinsurance premiums to the Nationstar Defendants or their affiliates or subsidiaries.  The ceded premiums are nothing more than a kickback to the Nationstar Defendants and a method for Defendants to profit from the forced placement of new coverage.  Indeed, while the Nationstar Defendants and/or their affiliates purportedly provided reinsurance, they did not assume any real risk.

40.     Nationstar also overcharges borrowers by disregarding the Standard Mortgage Clause or the Lender's Loss Payable Endorsement ("LLPE") in the standard form mortgage agreement.  Either of these clauses typically protects the lender for a period of at least ten days after the termination of the homeowner's voluntary insurance policy.  Force-placed policies, however, take effect on the date of termination, and "double-cover" the property unnecessarily during the period covered by the LLPE or Standard Mortgage Clause.  This means the borrower is charged for coverage for which the lender or servicer has no exposure.

41.     The amounts charged borrowers are also inflated by the interest that accrues on the amounts owed for force-placed coverage; when Nationstar adds the cost of the high-priced

premium to a homeowner's mortgage balance, it thereby increases the interest paid over the life of the loan by the homeowner to Nationstar.

42.     The actions and practices described above are unconscionable and undertaken in bad faith with the sole objective to maximize profits.  Borrowers who for whatever reason have stopped paying for insurance or are under-insured on mortgaged property are charged hyper-inflated and illegitimate noncompetitive amounts for force-placed insurance.  These charges are inflated to include undisclosed kickbacks to the Defendants or their affiliates (who, as described above, perform little to no functions related to the force-placement of the individual policies), as well as the cost of captive reinsurance arrangements, and discounted administrative services.

43.     Borrowers have no say in the selection of the force-placed insurance carrier or the terms of the force-placed insurance policies.  Force-placed policies are commercial insurance policies and are intended for the servicer – Nationstar.  The terms are determined by the Nationstar and Assurant Defendants and provide less coverage than a standard voluntary policy – for example, force-placed policies do not provide borrowers with coverage for personal property or liability.

44.      Plaintiffs here do not challenge the Nationstar's right to force place insurance in the first instance.  They challenge Defendants' manipulation of the force-placed insurance market with an eye toward artificially inflating premiums and placing unnecessary coverage, which Nationstar purchases from the Assurant Defendants and then chooses to pass on to the borrower. Servicers, like Nationstar, are financially motivated to utilize the insurer, like the Assurant Defendants here, that offers them the best financial benefit in the terms of "commissions," direct payments, discounted tracking services, or ceded reinsurance premiums. This action is brought to put an end to Defendants' exclusive, collusive, and uncompetitive

arrangements, and to recover for Plaintiffs and the putative Class the excess amounts charged beyond the true cost of insurance coverage.

### **Plaintiff Howard Braynen**

45.     Plaintiff Braynen obtained a mortgage loan through Fremont Investment & Loan that at all relevant times was serviced by Nationstar.

46.     Mr. Braynen's mortgage agreement includes a provision that states as follows:

**5. Property Insurance**.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  The insurance shall be maintained in the amounts … and for the periods that Lender requires.

***

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability, and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of the Borrower secured by this Security Instrument ….

47.     Mr. Braynen had a voluntary insurance policy with Citizens Property Insurance Corporation.  In July 2013, Mr. Braynen's voluntary insurance with Citizens lapsed because Citizens asked that certain repairs be made before it would renew the insurance.  It took Mr. Braynen several months to complete the repairs to his home.

48.     On October 6, 2013, the Assurant Defendants, by way of Nationstar letterhead, sent a Notice of Placement informing Mr. Braynen that Nationstar had force-placed a hazard insurance policy on his property and that the annual premium for that policy - $11,027.94 - would be charged to his escrow account.

49.     The letter from the Nationstar and Assurant Defendants states that the force-placed insurance coverage "will be obtained with the assistance of Harwood Service Company LLC" and that Harwood Service "will receive a commission on the insurance we obtain."

50.     In fact, Harwood Service provides no services related to the procurement of individual policies as they are issued pursuant to the master or umbrella policy and the "commission" is essentially a kickback to the Nationstar Defendants.

51.     Mr. Braynen secured voluntary insurance coverage through People's Trust Insurance Company on October 18, 2013.  The annual premium for that policy was $6,909 and included coverages that the force-placed insurance policy did not, including personal property and liability.

52.     Mr. Braynen was charged and/or ultimately paid approximately $ 2,700 for the near three-month lapse in insurance.

53.     At no time did any defendant disclose to Mr. Braynen that the amounts charged him covered kickbacks to the Nationstar Defendants, reinsurance profits, bundled administrative costs, or any of the other impermissible charges described in this complaint.

54.     There are no material differences between the Defendants' actions and practices, including the sending of the form letters and the placement of the insurance, directed to Mr. Braynen and their actions and practices directed to the Class.

**<u>Plaintiff Toni Murray</u>**

55.     On or about June 28, 2006, Plaintiff Murray and Clarence Murray, Teir Morris, and Rosella Murray took out a mortgage with Your-Best-Rate Financial, LLC in the amount of $ 177,000 for a home located at 438 Raymond Avenue, Longwood, Florida 32750 (the "Property") [hereinafter the "Murray Mortgage"].

56.     Paragraph 5 of the Murray Mortgage states:

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. …  If borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower ….

Murray Mortgage at 6, ¶ 5.

57.     On or about March 30, 2013, Plaintiff Murray received a notice from Nationstar that it had acquired the servicing rights to the Murray Mortgage from Bank of America, N.A. A second notice followed outlining the same on or about April 8, 2013.

58.     On or about April 29, 2013, Plaintiff Murray received a letter from Nationstar, dated April 23, 2013, acknowledging receipt of proof a hazard insurance policy on the Property in the name of Plaintiff Murray and questioning why it was not in the name of Clarence Murray. Plaintiff Murray followed up with a phone call to Nationstar to discuss this notice, and the Nationstar representative told her that she was not one of the property owners and that Nationstar required permission to speak with Plaintiff Murray for the life of the loan. Plaintiff Murray explained that she was a property owner. The Nationstar representative instructed Plaintiff Murray to send verification to their attention demonstrating her ownership of the Property. Plaintiff Murray sent a certified letter, dated May 4, 2013, which contained the requested verification in the form of a certified copy of the general warranty deed for the Property.

59.     Plaintiff Murray renewed the hazard insurance policy on the Property with her insurer on July 13, 2013.

60.     On or about August 4, 2013, Plaintiff Murray received another letter from Nationstar, dated July 29, 2013, stating that the hazard policy provided to them was in Plaintiff Murray's name and that she was not an owner of the Property.

61.     On or about August 4, 2013, Plaintiff Murray received notification from Nationstar, dated July 31, 2013, that incorrectly noted that the hazard insurance policy on the Property lapsed on July 13, 2013. Subsequently, on or about August 30, 2013, Plaintiff Murray received another notice from Nationstar entitled "final notice" regarding the purported lapse in hazard insurance coverage on the Property. Such notice contained force-placed insurance coverage in the form of a 60-day binder through ASIC at annual premium cost of $2,530.90.

62.     Plaintiff Murray responded to Nationstar by certified letter on September 9, 2013 and explained her past calls and correspondence with Nationstar and she again attached a certified copy of the general warranty deed for the Property in order to conclusively prove to Nationstar that she was a Property owner.

63.     On or about September 16, 2013, Plaintiff Murray filed a complaint with the Consumer Financial Protection Bureau ("CFPB") about her problems with Nationstar in an attempt to receive help in resolving the ongoing dispute over her contested ownership of the Property.

64.     On or about September 18, 2013, Plaintiff Murray received a call from Nationstar asking her to fax proof of her hazard insurance policy to them. Plaintiff Murray contacted her insurance agent and he sent the requested evidence to Nationstar.

65.     On or about October 2, 2103, Plaintiff Murray received a letter from Nationstar, dated September 25, 2013, regarding Plaintiff Murray's above letter to Nationstar, dated September 9, 2013. This letter stated that Plaintiff Murray was not an authorized party on the

account and that Nationstar could not provide Plaintiff Murray with any information on the account.

66.     On or about October 7, 2013, Plaintiff Murray received a call from Nationstar. The representative asked to speak with Clarence Murray. Plaintiff Murray explained that he had passed away three years prior. Plaintiff Murray explained that all of this information was on file with Bank of America, N.A., the entity from which Nationstar acquired the servicing rights to the Murray Mortgage. Nationstar claimed that they did not have any of this information and asked Plaintiff Murray to forward along a copy of the death certificate for Clarence Murray. Plaintiff Murray sent the requested information.

67.     On or about October 11, 2013, Plaintiff Murray received notice from Nationstar, dated October 6, 2013, that an ASIC hazard insurance policy had been force-placed on the Property at a cost of $2,530.90. This policy was backdated to July 13, 2013 and was effective through July 13, 2014. Also, the ASIC policy covered substantially less than Plaintiff Murray's hazard policy, which remained in effect (the ASIC policy only covered the dwelling in contrast to Plaintiff Murray's policy, which covered, *inter alia*, the dwelling along with other structures, personal property, loss of use, personal liability, medical payments, and mold/fungus).

68.     On or about October 15, 2013, Plaintiff Murray sent a certified letter to Nationstar to the attention of a representative whose name she obtained through the filing of her CFPB complaint in an effort to resolve Nationstar's continued refusal to accept her hazard insurance policy.

69.     On or about November 4, 2013, Plaintiff Murray received a letter from Nationstar stating that the name on her mortgage loan account had been updated to "Estate of Clarence

Murray." Nationstar continued to refuse to accept Plaintiff Murray's hazard insurance policy, however, which remained in effect.

70.     As set forth *supra*, charging Plaintiff Murray for unnecessary force-placed insurance at inflated premiums that contain kickbacks, commissions, and other forms of compensation to the Nationstar Defendants and/or their subsidiaries or affiliates from the Assurant Defendants, is not necessary to protect the Lender's interest in the Property, especially given that Plaintiff Murray, a Property owner, had a hazard policy that was already in effect and fully complied with the terms of the Murray Mortgage.

71.     At no time did any defendant disclose to Ms. Murray that the amounts charged her covered kickbacks to the Nationstar Defendants, reinsurance profits, bundled administrative costs, or any of the other impermissible charges described in this complaint.

72.     There are no material differences between the Defendants' actions and practices, including the sending of the form letters and the placement of the insurance, directed to Ms. Murray and their actions and practices directed to the Class.

**<u>Plaintiff Hutchings</u>**

73.     Plaintiff Hutchings owns a home in North Ridgeville, Ohio. On or around August 24, 2011, Plaintiff executed a mortgage with American Financial Resources, Inc., currently serviced by Nationstar, secured by his residence in North Ridgeville, Ohio [hereinafter "Hutchings Mortgage"].

74.     Prior to the re-financing, Plaintiff was not required to maintain flood insurance. The rights were then assigned to Nationstar.

75.     Paragraph 4 of the Hutchings Mortgage states the following:

4.     Fire, Flood and Other Hazard Insurance. Borrower shall insure all improvements on the Property, whether now in existence or subsequently

erected, against any hazards, casualties, and contingencies, including fire, for which Lender required insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. . . . The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

76.     Paragraph 7 of the Hutchings Mortgage states the following:

7.     Charges to Borrower and Protection of Lender's Rights in the Property.

* * *

If Borrower fails to make these payments required by Paragraph 2 [i.e., taxes and/or insurance], or fails to perform any other covenants and agreements contained in this Security Instrument, . . . then Lender may do and pay whatever is necessary to protect the value of the property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2.

77.     In July and August of 2012, Plaintiff Hutchings telephoned Nationstar on multiple occasions attempting to determine the charges and adjustments Nationstar was making to his escrow account totaling over three thousand dollars. Nationstar could not provide an explanation. Finally, after multiple telephone calls for days, Plaintiff was told he should send $3,210 for escrow payments. While there is no reasonable basis for the charges, Plaintiff paid $3,210 on August 6, 2012.

78.     On or around September 13, 2012, Plaintiff received a letter from Nationstar [hereinafter "Binder Letter"] wherein Nationstar informed Plaintiff that he did not have sufficient flood insurance coverage and that Nationstar had purchased a force-placed sixty-day binder through ASIC for flood insurance [hereinafter "Binder"].  The Binder stated that the annual premium cost for this policy was $1,188.00, which was unilaterally charged to Hutchings escrow account.  The Binder Letter referenced a previous request, but Hutchings has no record of ever receiving a prior force-placed letter from Nationstar and made multiple calls to Nationstar upon

receiving the September 13, 2012 letter to understand the charges and his escrow account, without any reasonable explanation from Nationstar.

79.     On September 24, 2012, Nationstar withdrew $2,204.76 from Plaintiff's bank account at PNC Bank. On October 15, 2012, Hutchings also contacted Nationstar to inform Nationstar that a representative from FEMA had indicated Hutchings was not in a flood zone and flood insurance was not required. Nationstar then responded to Hutchings by sending Hutchings a letter, backdated to July 30, 2012 and prior to the date Hutchings actually made his request, that stated in pertinent part as follows:

> This is in response to your request dated 10/15/2012 on your account . . . .  We regret to advise you that your account has a lender-placed flood insurance policy and is not eligible to remove Flood insurance. Please fax your proof of flood insurance (Declaration Page) to our hazard insurance processing center . . . .

80.     Upon information and belief, the Nationstar "hazard insurance processing center" is actually an insurance processing center maintained by Assurant. Further, Nationstar represents to the public through its website that it operates an "Insurance Department" at "PO Box 7729, Springfield, OH 45501"; however, upon information and belief, Nationstar does not rent, lease, own, or otherwise maintain an office in Springfield, Ohio, and the "Insurance Department" listed on Nationstar's website is deceptively maintained by Assurant. *See* Nationstar, http://www.nationstarmtg.com/CustomerCenter/ContactUs.aspx (last visited May 21, 2013).

81.      Subsequently, Hutchings contacted FEMA who again indicated that a surveyor was going to conduct a new survey of Hutchings' property with accurate data that reflected it was not in a flood zone. Plaintiff made a verbal request to a Nationstar representative to remove him from the force-placed insurance requirement and to return monies paid and charged as he was allegedly not in a flood zone per a FEMA agent's statement. FEMA ultimately issued a certification saying he was actually in a 1% chance of a flood zone, thus Nationstar refused to

refund any of the force-placed flood insurance paid by and charged to the Plaintiff. FEMA indicated it was going to redo the survey to make sure Mr. Hutchings was not in the flood zone because they said the square footage was wrong on the original map upon which FEMA relied. Nationstar backdated a letter to July 30, 2012 to Mr. Hutchings in response to his request of October 15, 2012 seeking a refund of the force-placed insurance partially paid and charged to his escrow account. Instead, Nationstar deducted funds from Mr. Hutchings escrow account for force placed insurance.

82.     During this time, Hutchings continued to faithfully pay his mortgage payments; however, his payments were wrongfully rejected by Nationstar and placed by them in a "suspense account". Nationstar made deductions from Hutchings escrow account for payments of force-placed insurance. Hutchings continued to call in September, October, and November to try to understand the reported charges by Nationstar projected to be over $5,875 to his escrow account shown as of September 18, 2012. Hutchings could not get an explanation from anyone at Nationstar despite multiple phone call attempts and substantial efforts.

83.     While awaiting an amended determination document from FEMA, Hutchings purchased flood insurance from NFIP Direct on January 16, 2013, and immediately provided the proof of such flood insurance to Nationstar.

84.     Nationstar responded with a letter, dated January 18, 2013, acknowledging receipt of evidence of flood insurance from Hutchings [hereinafter "January Flood Insurance Acknowledgement Letter"].  However, the letter stated in pertinent part that "[t]he policy issued by AMERICAN SECURITY INSURANCE COMPANY was cancelled effective 12:01 a.m., 02/15/2013[,]" nearly one month after Hutchings provided proof of flood insurance to

Nationstar, and also nearly one month after the date of the January Flood Insurance Acknowledgement Letter.

85.     The letter then continued to state in pertinent part that "[i]f you have evidence of insurance coverage between 07/09/2012 and 02/15/2013, please forward this information to our office at the following address:" but the letter omits any address following this statement. Plaintiff Hutchings continued to call Nationstar to understand his escrow account charges and why Nationstar refused to even credit his account or refund even his unearned premium even after he sent written proof of insurance on January 18, 2013, which Nationstar concedes.

86.     Despite having provided proof of insurance coverage to Nationstar effective on January 16, 2013, Nationstar continues to attempt to collect premiums from Hutchings for force-placed insurance during a time for which such insurance was unnecessary, duplicative, and backdated to a period which has already passed and for which no risk of loss exists. Further, the premiums unilaterally charged by Nationstar to Hutchings escrow account for the force-placed insurance policy contain costs for commissions and/or kickbacks between Nationstar and ASIC, which are subsequently refunded or "kicked back" to Nationstar by ASIC, and also contain unlawful costs for servicing and/or tracking Nationstar's loan portfolio.

87.     This force-placed flood insurance coverage was also backdated by approximately three months to reflect an effective policy period beginning on July 9, 2012, notwithstanding the fact that there had been no damage to the property, no claims arising out of the property during that time period, and impossibility for any flood to occur during this time as it has already passed.

88.     As Mr. Hutchings continued to call Nationstar in the winter of 2013, most times not being able to reach anyone with any knowledge, some Nationstar representatives began

telling Mr. Hutchings that Nationstar now had a policy of modification of loans and he had to enter into a loan modification before they would accept any further mortgage payments from him. Other representatives told him that was not the case and he was current in all respects.

89.     Nationstar purchased its force-placed flood insurance policy from ASIC, and entered into a pre-arranged undisclosed agreement pursuant to which ASIC agreed to pay Nationstar a kick-back for purchasing this force-placed insurance policy charged to Plaintiff, consistent with ASIC's standard business practice with Nationstar.

90.     While the Hutchings Mortgage may authorize Nationstar to charge plaintiff for certain costs necessary to protect its financial interest in Plaintiff's property, it does not authorize Nationstar to charge Hutchings' account for fees or costs that are not actually incurred by Nationstar or that are later refunded to Nationstar in the form of kickbacks, commissions, or reinsurance payments. It also does not allow for force-placement after proof of insurance has been provided. The Hutchings Mortgage also does not authorize Nationstar to charge Hutchings for an insurance policy that contains duplicative coverage or for an insurance policy that has been backdated to cover a period for which a loss cannot occur as such coverage is not necessary to protect Nationstar's financial interest in the property. The mortgage also does not allow for the charges Nationstar added to Hutchings escrow account or to place Hutchings mortgage funds he paid into a "suspense account", resulting in threatened default and foreclosure.

91.     Nationstar has breached the mortgage in multiple ways, including inter alia, by refusing to accept Hutchings mortgage payments sent for March, April, May, and June and refusing to pay back any portion of the force placed insurance after proof of insurance was submitted.

92.     At no time did any defendant disclose to Mr. Hutchings that the amounts charged him covered kickbacks to the Nationstar Defendants, reinsurance profits, bundled administrative costs, or any of the other impermissible charges described in this complaint.

93.     There are no material differences between the Defendants' actions and practices, including the sending of the form letters and the placement of the insurance, directed to Mr. Hutchings and their actions and practices directed to the Class.

## CLASS ALLEGATIONS

**A.     Class Definitions**

94.     Plaintiffs bring this action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all other persons similarly situated.  Plaintiffs seek to represent the following classes:

> All borrowers in the United States who from January 1, 2008 to the present, were charged by the Nationstar Defendants under a hazard, flood, flood gap or wind-only LPI Policy issued by the Assurant Defendants for residential property, and who, within the Class Period, either (i) paid to the Nationstar Defendants the Net Premium[8] for that LPI Policy or (ii) did not pay to and still owe the Nationstar Defendants the Net Premium for that LPI Policy.

> Excluded from the Class are:  (i) individuals who are or were during the Class Period officers or directors of the Defendants or any of their respective affiliates; (ii) any justice, judge, or magistrate judge of the United States or any State, their spouses, and persons within the third degree of relationship to either of them, or the spouses of such persons; (iii) borrowers whose LPI Policy was cancelled in its entirety such that any premiums charged and/or collected were fully refunded to the borrower or the borrower's escrow account; and, (iv) all borrowers who file a timely and proper request to be excluded from the Class.

---

8 "Net Premium" means the amount of premium charged to a Class Member for an LPI Policy during the Class Period less any refund paid or credited to the Class Member.

95.     Plaintiffs reserve the right to modify or amend the definitions of the proposed classes before the Court determines whether certification is appropriate.

96.     Defendants subjected Plaintiffs and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

**B.      Numerosity**

97.     The proposed Classes are so numerous that joinder of all members would be impracticable.  Defendants sell and service millions of mortgage loans and insurance policies in the state of Florida, as well as nationwide.  The individual class members are ascertainable, as the names and addresses of all class members can be identified in the business records maintained by Defendants.  The precise number of Class members for each class numbers at least in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually.  Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

**C.      Commonality**

98.     There are questions of law and fact that are common to Plaintiffs' and Class members' claims.  These common questions predominate over any questions that go particularly to any individual member of the Class.  Among such common questions of law and fact are the following:

> a.  Whether Defendants charged borrowers for unnecessary insurance coverage including, but not limited to, insurance coverage that exceeded the amount required by law or the borrowers' mortgages and/or backdated coverage that covered periods of time for which Defendants had no risk of loss;
>
> b.  Whether Nationstar breached the mortgage contracts with Plaintiffs and the Class by charging them for force-placed insurance that included illegal kickbacks (including unwarranted commissions and reinsurance payments)

and by charging Plaintiffs and the Class for servicing their loans;

c.  Whether Defendants have been unjustly enriched at the expense of the Plaintiffs and the Class;

d.  Whether Nationstar breached the implied covenant of good faith and fair dealing by entering into exclusive arrangements with selected insurers and/or their affiliates, which resulted in amounts for inflated insurance premiums being charged to Plaintiffs and the Class;

e.  Whether Defendants manipulated forced-placed market in order to maximize their profits to the detriment of Plaintiffs and the Class;

f.  Whether the Nationstar Defendants or their affiliates perform any work or services in exchange for the "commissions" or other "compensation" they collect;

g.  Whether Nationstar's charges to Plaintiffs and the Class are inflated to include kickbacks and unwarranted "commissions;"

h.  Whether Nationstar's charges are inflated to include amounts for bundled administrative services that the vendors provide to the lenders or mortgage servicers, and which are not chargeable to Plaintiffs and the Class under the terms of their mortgages;

i.  Whether the charges are inflated to include the cost of a captive reinsurance arrangement;

j.  Whether Nationstar violated the federal Truth in Lending Act ("TILA") by conditioning their extensions of credit on the purchase of insurance through an affiliate, in direct contravention of the anti-coercion disclosures included in borrowers' mortgages;

k.  Whether Nationstar violated TILA by failing to disclose kickbacks charged to class members in their mortgages;

l.  Whether an objective consumer would be deceived by Nationstar's arrangement, which incentivizes Defendants to charge inflated and unnecessary fees for force-placed insurance, and therefore violates FDUTPA;

m.  Whether the Assurant Defendants intentionally and unjustifiably interfered with Plaintiffs' and the Class's rights under the mortgage contracts by paying kickbacks to the lenders/mortgage servicers or their affiliates and by charging for administering the loan portfolio; and

n. Whether Plaintiffs and the Class Members are entitled to damages and/or injunctive relief as a result of Defendants' conduct.

**D.    Typicality**

99.    Plaintiffs are members of the Class they seeks to represent.  Plaintiffs' claims are typical of the respective classes' claims because of the similarity, uniformity, and common purpose of the Defendants' unlawful conduct.  Each class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Defendants' wrongful conduct.

**E.    Adequacy of Representation**

100.    Plaintiffs are adequate representatives of the class they seek to represent and will fairly and adequately protect the interests of that class.  Plaintiffs are committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent him.  There is no hostility between Plaintiffs and the unnamed class members.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

101.    To prosecute this case, Plaintiffs have chosen the undersigned law firms, which are very experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

**F.    Requirements of Fed. R. Civ. P. 23(b)(3)**

102.    The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the class.  All claims by Plaintiffs and the unnamed Class members are based on the force-placed insurance policies that Defendants unlawfully secured and their deceptive and egregious actions involved in securing the force-placed policy.

103.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

104.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

**G.     Superiority**

105.     A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

> (a) Joinder of all class members would create extreme hardship and inconvenience for the affected customers as they reside all across the states;
>
> (b) Individual claims by class members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake.  As a result, individual class members have no interest in prosecuting and controlling separate actions;
>
> (c) There are no known individual class members who are interested in individually controlling the prosecution of separate actions;
>
> (d) The interests of justice will be well served by resolving the common disputes of potential class members in one forum;
>
> (e) Individual suits would not be cost effective or economically maintainable as individual actions; and
>
> (f) The action is manageable as a class action.

**H.     Requirements of Fed. R. Civ. P. 23(b)(1) & (2)**

106.     Prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

107.    Defendants have acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## <u>COUNT I</u>

### <u>BREACH OF CONTRACT</u>
### <u>(against Nationstar)</u>

108.    Plaintiffs re-allege and incorporate paragraphs 1-107 above as if fully set forth herein and further allege as follows.

109.    Plaintiffs and all similarly situated class members have mortgages that are serviced and/or owned by Nationstar.

110.    Plaintiffs and these class members' mortgages are written on uniform mortgage forms and contain substantially similar provisions regarding force-placed insurance requirements and its placement by Nationstar.  The force-placed provision from Plaintiffs' mortgages are set forth above.

111.    Plaintiffs' mortgages require that they maintain insurance on their properties and provide that if they fail to do so, then the servicer or lender may obtain insurance coverage to protect its interest in the property, "force place" the coverage, and charge the borrowers the cost.

112.    Nationstar charges borrowers amounts for force-placed insurance that include unearned "commissions" or kickbacks, reinsurance premiums, as well as discounted administrative, servicing, and other impermissible costs.  These costs are not costs of coverage, and are not applied to protecting Nationstar's rights or risk in the collateral for borrowers' mortgage loans.  Nationstar breached the mortgage agreements by, among other things, charging Plaintiffs and class members the amounts beyond the actual cost of coverage.

113.    Nationstar has also breached Plaintiffs' and the Class members' mortgage agreements by charging Plaintiffs and the Class for excess and unnecessary force-placed insurance coverage, including retroactive coverage, as such coverage does not protect Nationstar's rights in their collateral or cover their risk.

114.    Plaintiffs and the Class members have suffered damages as a result of the Nationstar' breaches of contract.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class members, seek compensatory damages resulting from the Nationstar's breach of contract, as well as injunctive relief preventing them from further violating the terms of the mortgages.  Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

### COUNT II

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (against Nationstar)

115.    Plaintiffs re-allege and incorporate paragraphs 1-107 above as if fully set forth herein and further allege as follows.

116.    A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance.  Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

117.    Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

118.    Plaintiffs' and the Class Members' mortgage contracts allow Nationstar to force place insurance coverage on the borrower in the event of a lapse in coverage, but do not define standards for selecting an insurer or procuring an insurance policy.

119.   Nationstar is afforded substantial discretion in force-placing insurance coverage. It is permitted to unilaterally choose the company from which it purchases force-placed insurance and negotiates any price for the coverage it procures.  Servicers, like Nationstar, have an obligation to exercise the discretion afforded it in good faith, and not capriciously or in bad faith.  Plaintiffs do not seek to vary the express terms of the mortgage contract, but only to insure that Nationstar exercise its discretion in good faith.

120.   Nationstar breached the implied covenant of good faith and fair dealing by, among other things:

> (a) Manipulating the force-placed insurance market by selecting insurers (here, Assurant and its affiliates) that will artificially inflate premiums to include kickbacks to Nationstar or its affiliates and issue excess insurance coverage not necessary to cover Nationstar's risk, and by failing to seek competitive bids on the open market and instead contracting to create "back room" deals whereby insurance coverage is routinely purchased from Assurant and its affiliates without seeking a competitive price;

> (b)  Exercising their discretion to choose an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting commercial force-placed insurance policies with artificially inflated premiums to maximize their own profits;

> (c)  Assessing inflated and unnecessary commercial insurance policy charges against Plaintiffs and the Class and misrepresenting the reason for the cost of the policies;

> (d)  Allowing Nationstar or its affiliates to collect a percentage of the amounts charged to Plaintiffs and the Class as a kickback and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced force-placed policies possible;

> (e)  Charging Plaintiffs and the Class for commissions when the insurance is prearranged and no commission is due;

> (f)  Charging Plaintiffs and the Class the cost of having the vendor perform its obligation of administering its mortgage portfolio, which is not properly chargeable to Plaintiffs or the Class;

(g)  Force placing insurance coverage in excess of what is required by law or borrowers' mortgage agreements;

(h)  Force placing insurance coverage in excess of that required to cover the servicer's or lender's interest in the property, or the balance owed on the loan; and

(i)  Charging Plaintiffs and the Class an inflated charge for the force-placed insurance due to direct payments from the Assurant Defendants or the captive reinsurance arrangement.

121.    As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the Class have suffered damages.

**WHEREFORE**, Plaintiffs, on behalf of themselves and similarly situated Class members, seek a judicial declaration that the premiums charged and the terms of the force-placed insurance policies violate the duties of good faith and fair dealing.  Plaintiffs also seek compensatory damages resulting from the Nationstar's breaches of its duties.  Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

### COUNT III

### UNJUST ENRICHMENT
### (against the Nationstar Defendants)[9]

122.    Plaintiffs re-allege and incorporate paragraphs 1-107 above as if fully set forth herein and further allege as follows.

123.    The Nationstar Defendants received from Plaintiffs and Class members benefits in the form of percentages of the inflated insurance premiums related to force-placed insurance policies, including unwarranted kickbacks and commissions, captive reinsurance arrangements, and subsidized loan servicing costs.

---

[9] Plaintiff pleads his unjust enrichment claim against the Nationstar Defendants in the alternative to their contractual claims against them.

124.    The Nationstar Defendants entered into an agreement whereby the insurance vendor—here, Assurant's subsidiary, American Security—would provide force-placed insurance policies to Nationstar for the portfolio of loans monitored on behalf of the Nationstar Defendants.  The Nationstar Defendants would then charge Plaintiffs and the Class amounts for the force-placed insurance that had been artificially inflated to include costs not properly chargeable to the borrower.  The force-placed policies imposed on borrowers were therefore far more expensive than those available to borrowers in the open market that provide even more coverage.

125.    The Nationstar Defendants also collected amounts for the force-placed policies that provided coverage in excess of that required by law or the borrowers' mortgage agreement, and in excess of that required to protect the lender's interest in its collateral.

126.    The Assurant Defendants paid and collected significant monies in premiums, kickbacks, commissions, and reinsurance profits tied directly to the cost of the force-placed insurance premium (as a percentage).  Commissions or kickbacks were paid directly to the Nationstar Defendants in order to be able to exclusively provide force-placed insurance policies. The Assurant Defendants were mere conduits for the delivery of the kickbacks, "commissions," and other charges to the Nationstar Defendants.

127.    These payments directly benefitted the Nationstar Defendants and were taken to the detriment of the borrower.  The kickbacks and commissions, reinsurance profits, and subsidized costs were subsumed into the price of the insurance premium and ultimately paid by the borrowers.  Therefore, the Nationstar Defendants had the incentive to charge and collect unreasonably inflated prices for the force-placed policies.

128.    Further, Nationstar received financial benefits in the form of increased interest income, duplicative insurance based upon the Lender Loss Payable Endorsement or the Standard Mortgage Clause, and/or "soft-dollar" credits.

129.    As a result, Plaintiffs and the Class have conferred a benefit on the Nationstar Defendants.

130.    The Nationstar Defendants had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on it.

131.    The Nationstar Defendants will be unjustly enriched if allowed to retain the aforementioned benefits, and each class member is entitled to recover the amount by which these Defendants were unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class members, demand an award against the Nationstar Defendants in the amounts by which it has been unjustly enriched at Plaintiffs' and the Class Members' expense, and such other relief as this Court deems just and proper.

## COUNT IV

### UNJUST ENRICHMENT
### (against Assurant and American Security)

132.    Plaintiffs re-allege and incorporate paragraphs 1-107 above as if fully set forth herein and further allege as follows.

133.    The Assurant Defendants received from Plaintiffs and the Class members benefits in the form of funds for insurance premiums related to force-placed insurance policies.

134.    The Assurant Defendants received below-cost payments from Nationstar for providing tracking services but included the entire cost of that tracking service in the premiums for force-placed insurance that were ultimately charged by Nationstar to the borrowers.  The

Assurant Defendants knew that the amounts would be ultimately charged to the borrower and passed through to them but did reduce the charges by the amounts paid to them from Nationstar for the tracking services.  Thus, the Assurant Defendants were unjustly enriched.

135.    The Assurant Defendants paid significant monies to the Nationstar Defendants in kickbacks, commissions, and reinsurance profits tied directly to the cost of the force-placed insurance premium (as a percentage).  Commissions or kickbacks were paid directly to the Nationstar Defendants in order to be able to exclusively provide force-placed insurance policies and receive the corresponding insurance premiums.

136.    Nationstar also collected amounts for premiums on force-placed policies that provided coverage in excess of that required by law or the borrowers' mortgage agreement, and in excess of that required to protect the lender's interest in its collateral.

137.    Nationstar acted as a mere conduit for the delivery of insurance premiums to the Assurant Defendants.

138.    As a result, Plaintiffs and the Class have conferred a benefit on the Assurant Defendants.

139.    These Defendants had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on them.

140.    These Defendants will be unjustly enriched if they are allowed to retain the aforementioned benefits, and each class member is entitled to recover the amount by which these Defendants were unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class members, demand an award against the Assurant Defendants in the amounts by which these Defendants have been unjustly enriched at Plaintiffs' and the Class Members' expense, and such

other relief as this Court deems just and proper.

## COUNT V

## VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (on behalf of Plaintiffs Braynen and Murray against Nationstar)

141.    Plaintiffs re-allege and incorporate paragraphs 1-107 above as if fully set forth herein and further allege as follows.

142.    FDUTPA, section 501.201, *et seq*., Florida Statutes, prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204, Fla. Stat.

143.    Plaintiffs are "consumers" as that term is defined in section 501.203(7), Florida Statutes.

144.    Nationstar has engaged in, and continues to engage in, unconscionable acts or practices and has engaged in unfair or deceptive acts in the conduct of its trade and/or commerce in the State of Florida.

145.    The policies, acts, and practices alleged herein were intended to result and did result in the payment of inflated charges for force-placed insurance policies by the above-named Plaintiffs and the Class, which in turn were intended to generate unlawful or unfair compensation for Nationstar.

146.    Specifically, Nationstar had an exclusive relationship with its vendor and preferred insurance carrier – Assurant and ASIC, whereby it would pay unreasonable and inflated premiums for force-placed insurance policies, charge that amount to Plaintiffs and the Class, and then receive compensation through kickbacks, discounted services, or captive reinsurance arrangements.

147.    Nationstar's conduct of charging inflated amounts for their force-placed insurance to Plaintiffs and members of the class violates FDUTPA and was conceived, devised, planned, implemented, approved, and executed within the State of Florida, which has an interest in prohibiting violations of FDUTPA.

148.    Nationstar is not a bank or savings and loan association regulated by the Florida Office of Financial Regulation of the Financial Services Commission.  Further, it is not a bank or savings and loan association regulated by federal agencies.

149.    Plaintiffs and the class have sustained damages as a direct and proximate result of Nationstar's unfair and unconscionable practices.  Section 501.211(2), Florida Statutes, provides Plaintiffs and the class a private right of action against these Defendants and entitles them to recover their actual damages, plus attorneys' fees and costs.

150.    Plaintiffs and the class have suffered and will continue to suffer irreparable harm if Nationstar continues to engage in such deceptive, unfair, and unreasonable practices.

**WHEREFORE,** Plaintiffs Braynen and Murray, on behalf of themselves and other similarly situated, demand judgment against Nationstar for compensatory damages, pre- and post-judgment interest, attorneys' fees, injunctive and declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

**COUNT VI**
**VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1601, *et seq.***
**(against Nationstar)**

151.    Plaintiffs re-allege and incorporate paragraphs 1-107 above as if fully set forth herein and further allege as follows.

152.    Plaintiffs' and the Class Members' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of TILA, 15 U.S.C.

§ 1601, *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

153.    Nationstar is a "creditor" as defined by TILA because it owned or serviced Plaintiffs' and the Class's mortgages and changed the terms of the mortgages so as to create a new mortgage obligation, of which Nationstar was the creditor.

154.    Pursuant to TILA, Nationstar was required to accurately and fully disclose the terms of the legal obligations between the parties. *See* 12 C.F.R. § 226.17(c).

155.    Nationstar violated TILA, specifically 12 C.F.R. § 226.17(c), when it: (i) added force-placed insurance to Plaintiffs' and the Class's mortgage obligations and failed to provide new disclosures; and (ii) failed at all times to disclose the amount and nature of the kickback, reinsurance, discount loan monitoring, and/or other profiteering involving Nationstar and/or its affiliates as a result of the purchase of force-placed insurance.

156.    When Nationstar changed the terms of Plaintiffs' and the Class member's mortgages to allow previously unauthorized kickbacks and insurance amounts in excess of Nationstar's interests in the property, it changed the finance charge and the total amount of indebtedness, extended new and additional credit through force-placed insurance premiums, and thus created a new debt obligation.  Under TILA, Nationstar was then required to provide a new set of disclosures showing the amount of the insurance premiums (*i.e.* finance charges) and all components thereof.  On information and belief, Nationstar increased the principal amount under the mortgages when it force-placed the insurance, which was a new debt obligation for which new disclosures were required.

157.    Nationstar adversely changed the terms of Plaintiffs' and the Class members' loans after origination in order to receive a kickback on force-placed insurance premiums.  These

kickbacks are not authorized in the mortgage in any clear and unambiguous way.  Nationstar has never disclosed to borrowers the amount of the "commissions" or other unearned profits paid to itself or its affiliate.

158.    Nationstar also violated TILA by adversely changing the terms of the loans after origination by requiring and threatening to force-place more insurance than necessary to protect its interest in the property securing the mortgages.

159.    Acts constituting violations of TILA occurred within one year prior to the filing of the original Complaint in this action, or are subject to equitable tolling because Nationstar's kickback, reinsurance, and other unearned revenue-generating scheme was the subject of secret agreements among Nationstar and its affiliates and was concealed from borrowers.

160.    Plaintiffs and Class Members have been injured and have suffered a monetary loss arising from the Nationstar's violations of TILA.

161.    As a result of Nationstar's TILA violations, Plaintiffs and Class Members are entitled to recover actual damages and a penalty of $500,000.00 or 1% of the Defendant's net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

162.    Plaintiffs and Class Members are also entitled to recovery of attorneys' fees and costs to be paid by Nationstar, as provided by 15 U.S.C. § 1640(a)(3).

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class members similarly situated, seek a judgment in their favor against Nationstar awarding actual damages and a penalty of $500,000.00 or 1% of Nationstar's net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2), as well as of attorneys' fees and costs to be paid by Nationstar, as provided by 15 U.S.C. § 1640(a)(3).

## COUNT VII

## TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
### (against Assurant and ASIC)

163.    Plaintiffs re-allege and incorporate paragraphs 1-107 above as if fully set forth herein and further allege as follows.

164.    Plaintiffs and the Class members have advantageous business and contractual relationships with Nationstar pursuant to the mortgage contracts.  Plaintiffs and the Class have legal rights under these mortgage contracts.  For example, Plaintiffs and the Class have a right not to be charged exorbitant charges in bad faith for forced-place insurance.

165.    Assurant and its subsidiaries, including ASIC, have knowledge of the mortgage contracts and the advantageous business and contractual relationships between Plaintiffs and the Class and Nationstar.  Assurant and ASIC are not parties to the mortgage contracts, nor are they third-party beneficiaries of the mortgage contracts.  Further, Assurant and ASIC do not have any beneficial or economic interest in the mortgage contracts.

166.    Assurant and ASIC intentionally and unjustifiably interfered with Plaintiffs' and the Class's rights under the mortgage contracts, as described above, by, *inter alia*, entering into an exclusive relationship with Nationstar and its affiliate, Harwood Services, whereby they provide compensation (kickbacks, reinsurance, and low cost services) to the Nationstar Defendants in exchange for the exclusive right to force-place inflated and unnecessary premiums which are purposefully and knowingly charged to Plaintiffs and the Class.

167.    Plaintiffs and the Class have been damaged as a result of the Assurant's and ASIC's interference with their mortgage contracts by being charged bad faith, exorbitant, and illegal charges for force-placed insurance in contravention of their rights under the mortgages.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class Members similarly situated, seek a judgment in their favor against the Assurant Defendants for the actual damages suffered as a result of their tortious interference.  Plaintiffs also seek all costs of litigating this action, including attorneys' fees.

## COUNT VIII

## BREACH OF FIDUCIARY DUTY
### (against Nationstar)

168.    Plaintiffs re-allege and incorporate paragraphs 1-107 above as if fully set forth herein and further allege as follows.

169.    Nationstar hold funds in escrow on behalf of borrowers whose mortgages it services.  These funds are designated for the purpose of paying insurance premiums as they come due, and any excess funds are to be returned to Plaintiffs and members of the Class under the terms of the mortgage agreements.

170.    Nationstar is in a fiduciary relationship with Plaintiffs and the Class because Nationstar receives a greater economic benefit from these transactions than they would from a typical escrow transaction.   Specifically, the debtor-creditor relationship transformed into a fiduciary relationship when Nationstar took it upon itself to manage borrowers' escrow accounts and then withdrew money from borrowers' escrow accounts for force-placed insurance charges, not properly chargeable to the borrower.  Nationstar violated its fiduciary duties when it arranged to receive unlawful kickbacks or other compensation under the kickback scheme, which is clearly a greater economic benefit than what was contemplated under the mortgages.

171.    Nationstar breached its fiduciary duties to Plaintiffs and other members of the proposed class by: (1) not acting in borrowers' best interest when it profited from force-placed insurance policies that were purchased using escrow funds it held for the benefit of Plaintiffs and

Class members at the expense of Plaintiffs and Class members; and (2) not disclosing the kickback scheme to Plaintiffs and Class Members.

172.    These actions were undertaken by Nationstar in bad faith for its own benefit and were not intended to benefit Plaintiffs or other proposed Class members.

173.    As a direct result of Nationstar's actions and subversion of Plaintiffs' interest to its own in reaping extravagant and outrageous fees, Plaintiffs and all others similarly situated have suffered injury in the form of unnecessary and inflated escrow charges and a loss of funds from their escrow accounts.

**WHEREFORE**, Plaintiffs and the proposed class are entitled to damages for Nationstar's breaches of its fiduciary obligations and misappropriation of escrow funds.  In addition, Plaintiffs and the proposed class are entitled to punitive damages because Nationstar acted in bad faith in deliberate or reckless disregard of both their rights and Nationstar's obligation to hold their escrow funds in trust.

## COUNT IX

### Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) (Plaintiff Braynen against All Defendants)

174.    Plaintiff Braynen re-alleges and incorporates paragraphs 1-107 above as if fully set forth herein and further alleges as follows.

175.    At all relevant times, Defendants were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).

176.    The RICO enterprise which engaged in and the activities of which affected interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included the Nationstar Defendants, Assurant, and ASIC.

177.    The members of the RICO enterprise had a common purpose: to increase and maximize their revenues by forcing Plaintiff and Class Members to pay unreasonably high charges for force-placed insurance through a scheme that inflated the premiums to cover kickbacks and expenses associated with monitoring Nationstar's entire loan portfolio. Defendants shared the bounty of their enterprise, i.e., by sharing the premiums generated by the joint scheme.

178.    The RICO enterprise functioned over a period of years as a continuing unit and had a maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

179.    The Nationstar Defendants, Assurant, and ASIC conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that lasted more than one year, at a minimum, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

180.    As part of and in furtherance of the scheme to defraud, Defendants made numerous material omissions and misrepresentations to Plaintiff and Class members with the intent to defraud and deceive Plaintiff and Class members.

181.    For example, on October 6, 2013 Assurant and/or ASIC, with the approval of Nationstar, sent Plaintiff a form letter on Nationstar letterhead, stating that Nationstar had purchased force-placed insurance policy to protect its interest in Plaintiff's property, the annual

premium for the coverage was $11,027.94, and the premium had been advanced on Plaintiff Braynen's behalf "as provided in your loan documents." In making these statements, Nationstar and the Assurant Defendants knowingly and intentionally fostered the mistaken impression that the premium Plaintiff Braynen was to be charged for the insurance policy was for the cost of the policy, when in fact the premium also included a kickback to Nationstar and/or Harwood Services. Defendants had a duty to correct this mistaken impression. The omission was material, as it gave Defendants a colorable reason to charge Plaintiff unreasonably high charges for the force-placed insurance and would have influenced Plaintiff's decisions whether to pay the charges or contest them.

182.    In stating that its actions were "as provided in your insurance contract," the October 6, 2013 letter to Plaintiff also misrepresented that the loan documents gave Nationstar the right to charge Plaintiff for the cost of insurance tracking and for kickbacks to the Nationstar Defendants. Nationstar and the Assurant Defendants knew that the loan documents did not give Nationstar that authority. This misrepresentation was material, as it gave Nationstar and the Assurant Defendants a colorable reason to charge Plaintiff unreasonably high premiums and would have influenced Plaintiff's decision whether to pay the premiums or contest them.

183.    The October 6, 2013 form letter misleads Plaintiff and borrowers in several other respects. First, the notice misrepresents that insurance "*will be obtained*" with the assistance of Harwood Service. A master policy was already in place, therefore there was nothing for Harwood Service to "obtain" moving forward. Second, Harwood Service would do no work to "assist" with the procurement of force-placed insurance, nor was this ever Defendants' intention. Third, the payment made to Harwood Service in connection with Defendants' force-placed insurance program was not a true "commission" because it did not compensate Harwood Service

for any work performed.  The letter, that is, omitted to disclose that the payment was in fact a kickback to Harwood Service.

184.     Assurant and ASIC, with the approval of Nationstar and on Nationstar letterhead also sent Plaintiff force-placed insurance form letters stating that Nationstar would purchase the required coverage and charge the borrower the premium or the cost of the insurance "coverage." In making these statements, Defendants knowingly and intentionally fostered the mistaken impression that the force-placed insurance premiums that Plaintiff was charged represented the cost of the policies when in fact such premiums cost more because they were inflated to include kickbacks, reinsurance profits, discounts, or subsidized costs returned to Nationstar or its affiliates, including Harwood Service.

185.     For the purpose of executing the scheme to defraud, Defendants sent, mailed and transmitted, or caused to be sent, mailed or transmitted, in interstate or foreign commerce numerous materials, including but not limited to the notices and letters described above informing Plaintiff and Class Members that they could charge Plaintiff and Class Members unreasonably high force-placed insurance premiums. Defendants also transferred sums among themselves, including but not limited to kickbacks, in furtherance of their scheme to defraud Plaintiff and Class Members, in violation of the wire fraud statutes.

186.     By reason and as a result of Defendants' conduct and participation in the racketeering activity alleged herein, Defendants have caused damages to Plaintiff and Class Members in the form of unreasonably high force-placed insurance premiums.

**WHEREFORE**, Plaintiff and Class Members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

CASE NO.: 1:14-cv-20726-JAL

## COUNT X

### Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d)
### (Plaintiff Braynen against all Defendants)

187.    Plaintiff Braynen re-alleges and incorporates paragraphs 1-107 and 175-186 of this complaint as if fully set forth herein.  Plaintiff further alleges as follows.

188.    At all relevant times, Defendants were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(d).  Defendants agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

189.    Defendants agreed that ASIC and Assurant would be Nationstar's exclusive force-placed insurance providers and would extract the unreasonably high premiums from Nationstar's customers.  Defendants also agreed that the Assurant Defendants would pay kickbacks to Nationstar or its affiliates, including Harwood Service.

190.    Nationstar's affiliates – like, Harwood Service – pass much of these profits from this scheme to Nationstar.

191.    ASIC passes much of its profits from this scheme to Assurant.

192.    Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

193.    As a result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiff and Class Members suffered damages in the form of unreasonably high charges for force-placed insurance premiums.

**WHEREFORE,** Plaintiff and Class members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

CASE NO.: 1:14-cv-20726-JAL

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated individuals, demand judgment against Defendants as follows:

(1)     Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2), or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiff and his counsel to be representatives of the Class and the Florida Subclass;

(2)     Enjoining Defendants from continuing the acts and practices described above;

(3)     Awarding damages sustained by Plaintiffs and the Class as a result of Nationstar's breaches of the subject mortgage contracts and the implied covenant of good faith and fair dealing, together with pre-judgment interest;

(4)     Finding that Defendants have been unjustly enriched and requiring Defendants to refund all unjust benefits to Plaintiffs and the Class, together with pre-judgment interest;

(5)     Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class's counsel and experts, and reimbursement of expenses;

(6)     Awarding Plaintiffs and the Class damages, injunctive relief, declaratory relief, attorneys' fees, and costs under FDUTPA;

(7)     Awarding damages sustained by Plaintiffs and the Class as a result of the Assurant Defendants' interference;

(8)     Awarding actual damages and a penalty of $500,000.00 or 1% of Nationstar's net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2), and attorneys' fees and costs, as provided by 15 U.S.C. § 1640(a)(3);

(9)     Awarding compensatory and treble damages, and attorneys' fees and costs under the federal RICO statute; and

(10)    Awarding such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted this 7th day of July, 2014.

By: /s/ Lance A. Harke

<table>
<tr><td>

Adam M. Moskowitz, Esq.
amm@kttlaw.com
Thomas A. Tucker Ronzetti, Esq.
tr@kttlaw.com
Rachel Sullivan, Esq.
rs@kttlaw.com
Robert J. Neary, Esq.
rn@kttlaw.com
**KOZYAK, TROPIN, &**
**THROCKMORTON P.A.**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL 33134
Telephone:  (305) 372-1800
Facsimile:   (305) 372-3508
*Counsel for Plaintiffs*

</td><td>

Aaron S. Podhurst, Esq.
apodhurst@podhurst.com
Peter Prieto, Esq.
pprieto@podhurst.com
John Gravante, III, Esq.
jgravante@podhurst.com
Matthew Weinshall
mweinshall@podhurst.com
**PODHURST ORSECK, P.A.**
City National Bank Building
25 West Flagler Street, Suite 800
Miami, Florida 33130
Telephone: 305-358-2800
Facsimile: 305-358-2382
*Counsel for Plaintiffs*

</td></tr>
<tr><td>

Lance A. Harke, Esq.
lharke@harkeclasby.com
Sarah Engel, Esq.
sengel@harkeclasby.com
Howard M. Bushman, Esq.
hbushman@harkeclasby.com
**HARKE CLASBY & BUSHMAN LLP**
9699 NE Second Avenue
Miami Shores, Florida 33138
Telephone:     (305) 536-8220
Facsimile:      (305) 536-8229
*Counsel for Plaintiffs*

</td><td>

Chip Merlin, Esq.
cmerlin@merlinlawgroup.com
**MERLIN LAW GROUP, P.A.**
777 S. Harbour Island Blvd., Suite 950
Tampa, FL 33602
Telephone: 813-229-1000
Facsimile: 813-229-3692
*Counsel for Plaintiffs*

</td></tr>
</table>

CASE NO.: 1:14-cv-20726-JAL

Hector Pena, Esq.
hpena@247alawfirm.com
**HECTOR PENA, P.A.**
11110 SW 88th , Street, Suite 102
Miami, FL. 33176
Tel: (305) 888-4404
*Counsel for Plaintiffs*

Joseph Gurian, Esq.
joseph@guriangroup.com
**GURIAN GROUP, P.A.**
2525 Ponce de Leon Blvd.,  Suite 300
Coral Gables, FL 33134
Tel: (305) 521-8879
Fax: (305) 340-2655
*Counsel for Plaintiffs*

Kenneth G. Gilman, Esq.
kgilman@gilmanpastor.com
GILMAN LAW LLP
Florida Bar No. 340758
Beachway Professional Center Tower
3301 Bonita Beach Road, Suite 202
Bonita Springs, FL 34134
Telephone: (239) 221-8301
Facsimile: (239) 676-8224
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was filed electronically via CM/ECF on

the 7th day of July, 2014 and served by the same means on all counsel of record.

By:  /s/ Lance A. Harke