**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No: 14-cv-20726-GOODMAN [BY CONSENT]**

HOWARD BRAYNEN, TONI MURRAY, and
RONALD HUTCHINGS, on behalf of
themselves and all others similarly situated,

       Plaintiffs,

v.

NATIONSTAR MORTGAGE, LLC; HARWOOD
SERVICE COMPANY, LLC; NATIONSTAR
MORTGAGE HOLDINGS, INC.; ASSURANT,
INC.; AMERICAN SECURITY INSURANCE
COMPANY; VOYAGER INDEMNITY
INSURANCE COMPANY; and STANDARD
GUARANTY INSURANCE COMPANY,

       Defendants.

_____/

**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS
ACTION SETTLEMENT, APPLICATION FOR SERVICE AWARDS, CLASS
COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES,
AND INCORPORATED MEMORANDUM OF LAW**

## INTRODUCTION

Class counsel are proud to present for final approval a class action settlement that will provide more than $54 million in meaningful monetary relief to the 380,404-member settlement class and put an end to the controversial force-placed insurance ("FPI" or "LPI") practices that are the subject of this lawsuit for Nationstar borrowers nationwide.[1]  This settlement follows final approval of six similar FPI settlements in this district and a seventh in the Northern District of New York,[2] all of which earned approval after many years of hard-fought litigation of largely the same claims and defenses that were at issue in this case.  Like those settlements, this settlement will provide near-complete monetary relief to Nationstar borrowers who had hazard, flood, flood-gap, or wind insurance coverage forced on their properties during the class period.  This settlement will make available more than $54 million in monetary relief to the settlement class, which constitutes 50% to 100% of their best-case scenario damages had the parties proceeded to trial.  The injunctive portion mandates an end to the FPI practices that were the subject of this litigation, including the termination of commission payments to Nationstar and its affiliates that totaled tens of millions of dollars during the class period.  The parties have to date received only two objections and 26 opt-outs.  This is an extraordinary result.

This result is all the more extraordinary because it involved the resolution of complex issues against a rising tide of adverse decisions from federal district and appellate courts— decisions Class Counsel would certainly distinguish, but their opponents would just as vigorously assert.  For this achievement, Class Counsel are asking the Court to award them $5 million in fees and expenses, negotiated only after all class benefits had been secured under the

---

[1] Capitalized terms have the meanings given in the Settlement Agreement attached as **Exhibit A**.

[2] *See Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla.); *Saccoccio v. JPMorgan Chase Bank, N.A.*, No. 13-cv-21107 (S.D. Fla); *Fladell v. Wells Fargo Bank, N.A.*, No. 13-cv-60721 (S.D. Fla.); *Diaz v. HSBC Bank (USA), N.A.*, No. 13-cv-21104 (S.D. Fla.); *Hall v. Bank of America, N.A.*, No. 12-cv-22700 (S.D. Fla.); and *Hamilton v. SunTrust Mortgage, Inc.*, No. 13-cv-60749 (S.D. Fla.); *Casey v. Citibank, N.A.*, No. 13-cv-820 (N.D.N.Y.).

1

direct supervision of a nationally recognized mediator.  Such a fee would amount to only 9.26% of the monetary recovery to the class, and is well within the Eleventh Circuit's parameters.

Plaintiffs respectfully request that the Court grant final approval of the settlement, and approve the application for attorneys' fees and Plaintiffs' service awards.

## FACTUAL BACKGROUND

### 1.    Defendants' FPI Practices

Nationstar's standard form mortgage agreements require the borrower to maintain hazard, wind, and, where applicable, flood insurance on the property securing his or her mortgage loan, and provide that the lender or servicer may force new coverage on the property at the borrower's expense in the event of a lapse.  (D.E. 45 ¶ 27.)  The mortgage agreement advises the borrower that the cost of the coverage obtained might significantly exceed the cost of the borrower's voluntary coverage.  (*Id.* ¶ 46.)  Plaintiffs had insurance coverage force placed on their properties by Nationstar, and challenge Nationstar's alleged arrangement with Assurant Defendants and their subsidiaries or affiliates, to artificially inflate borrowers' premiums with costs well beyond the cost of coverage.  (*Id.* ¶¶ 27-44, 108-193.)  Plaintiffs allege that these costs include kickbacks to Nationstar or its affiliates, subsidies for below-cost servicing, and other costs unrelated to the procurement of new coverage.  (*Id.* ¶¶ 33-42.)

### 2.    The *Braynen*, *Hutchings*, and *Murray* Litigation and the *Braynen* Mediation

Plaintiff Braynen filed suit in February 2014, bringing claims for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and violations of the federal Truth in Lending Act ("TILA") and Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), against Nationstar, a tortious interference claim against the Assurant Defendants, and claims for unjust enrichment and violations of the federal RICO statute against all defendants.  (D.E. 1.)  All of these claims arose from the FPI scheme described above.  (*Id.*)

These claims had been sustained multiple times by Courts in this district against Assurant and similar FPI defendants, including a very thorough opinion by Judge Cohn against another

2

362484.1

insurance company and lender. *See Hamilton*, No. 13-cv-60749, 2014 U.S. Dist. LEXIS 41668 (S.D. Fla. Mar. 25, 2014); *Popkin v. Citibank, N.A.*, No. 13-cv-60722 (S.D. Fla.) (D.E. 40); *Fladell*, No 13-cv-60721 (S.D. Fla.) (D.E. 43); *Diaz*, No. 13-cv-21104 (S.D. Fla.) (D.E. 43); *Saccoccio*, No. 13-cv-21107 (S.D. Fla.) (D.E. 49); *Hall*, No. 12-cv-22700 (S.D. Fla.) (D.E. 226); *Williams*, No. 11-cv-21233, 2011 U.S. Dist. LEXIS 119136, at *10-11 (S.D. Fla. Oct. 14, 2011).

On April 10, 2014, the parties moved to stay all proceedings pending mediation, and the Court soon granted the motion. (D.E. 23, 24.)   Once the case had been stayed, counsel for Plaintiff Braynen coordinated with counsel from the *Murray* and *Hutchings* matters who had been litigating similar claims against Nationstar and Assurant in the Northern District of Ohio and Southern District of Florida since early 2013.   Motions to dismiss were briefed in both *Hutchings v. Nationstar Mortgage, LLC,* No. 13-cv-00569 (N.D. Ohio) and *Murray v. Nationstar Mortgage, LLC*, No. 13-cv-24280 (S.D. Fla), with the *Hutchings* court denying the motions.[3]

All counsel agreed to mediate with Defendants toward a global, nationwide settlement, and moved forward with a First Amended Complaint brought on behalf of all of their clients, addressing hazard, flood, flood-gap, and wind LPI, and bringing suit against all Assurant subsidiaries that had cooperated with Nationstar during the class period.   (D.E. 45.)   Class Counsel had numerous discussions with Defendants' counsel regarding the details of a possible settlement.   These discussions were based, in part, on the prior seven nationwide settlements that undersigned counsel had already reached with Defendants' counsel in this case, as well as the specific information regarding Nationstar that was produced in this matter.   (Joint Declaration of Class Counsel ¶¶ 14-15 ("Joint Decl.") attached hereto as **Exhibit B**.)

On April 24, 2014, the Defendants began producing documents and providing information to Class Counsel regarding Defendants' FPI program.

On May 13, 2014, Plaintiffs' and Defendants' counsel mediated this matter with mediator Rodney Max.  (Joint Decl. ¶ 12.)  In advance of and during the mediation, Defendants provided

---

[3] The parties moved for a stay pending mediation before the *Murray* motions to dismiss were ruled upon. (D.E. 18.)

Class Counsel with additional information concerning Nationstar's hazard, flood, and wind FPI programs, including, but not limited to, details of the contractual arrangements and economic transactions between the Nationstar and Assurant Defendants, the number of policies in effect, and aggregate LPI premium information for all three programs.  (*Id.* ¶ 14.)  Defendants also provided Plaintiffs' counsel with details about the functions and capabilities of the systems on which they house borrowers' financial data, including their capacity to query those systems for information on which borrowers had paid or still owed amounts for FPI.  (*Id.*)  Class Counsel discovered that the limitations on Nationstar's systems were similar to those on the systems used by other major mortgage lenders, such as Wells Fargo and Chase.  (*Id.* ¶ 36.)  This information was later verified by a corporate representative of Nationstar in a sworn deposition taken on June 24, 2014.

On May 13, 2014, the parties reached a settlement-in-principle and executed a term sheet that identified the material terms.  (Joint Decl. ¶ 16.)  The parties announced their settlement on May 23, 2014, (D.E. 37), and finalized the terms of on June 27, 2014.  (Ex. A.)

**4.** **The Settlement Terms and Agreement**

   **A.** ***The Proposed Class***

The Settlement Agreement provides relief to all borrowers who had mortgage loans serviced by Nationstar and were charged amounts for LPI hazard, flood, flood-gap, or wind coverage issued by Assurant or its subsidiaries between January 1, 2008 and January 30, 2015. (Ex. A ¶¶ 3.2; D.E. 88.)  This class will include borrowers with homes in foreclosure, negotiated short sales, deeds in lieu of foreclosure, or modified loan terms.[4]

   **B.** ***Monetary and Prospective Relief***

The Settlement Agreement affords these class members significant monetary relief, and prohibits Nationstar from engaging in certain practices alleged to inflate the insurance premium

---

[4] By contrast, the court in *Williams* specifically excluded numerous categories that are included in this settlement from the class that it certified in February 2012. *See Williams*, (D.E. 211).

362484.1

charges imposed on mortgagors for a period of five years.  (*Id.* ¶¶ 4.2-4.6.)  The monetary relief will compensate class members for a significant part of the allegedly inflated portion of the LPI premiums that they either paid or were charged, either by crediting their Nationstar escrow accounts for their recovery amount or by direct payment by check.  (*Id.* ¶ 4.6.)  Class members who paid the amounts charged them for LPI between January 1, 2008 and January 30, 2015 will receive a check in an amount equal to 12.5% of the net premium charged them for lender-placed hazard, flood, or wind insurance.  (*Id.* ¶ 4.6.3.)  Class members who were charged, but did not pay and still owe Nationstar for the amounts charged them will either receive a credit to their Nationstar escrow account of 12.5% of the net premium charged them, or a check for the same amount.  (*Id.* ¶ 4.6.2.) The 12.5% payment is calculated based on the entire premium, rather than that portion that is alleged to have been inflated, since a considerable portion of the premiums charged, in fact, were applied to pay for insurance to cover the borrower's property.

The prospective relief provided by the settlement will ensure that Nationstar does not engage in the practices that are the subject of this lawsuit.  The Settlement Agreement prohibits Nationstar from charging what Plaintiffs allege are inflated premiums for LPI.  For a period of five years following the Final Settlement Date, Nationstar will accept no financial interest in the placement of LPI policies other than the protection afforded it by LPI coverage.  (Ex. A ¶ 4.2.1.) The Settlement Agreement prohibits Nationstar from accepting commissions for LPI; entering into quota-share reinsurance arrangements with Assurant or any other insurer; and using Nationstar affiliates to place LPI coverage.  (*Id.*)  This relief is significant as Nationstar collected tens of millions of dollars in commissions and other benefits during the class period. (Declaration of Thomas E. Scott ("Scott Decl."), ¶ 23, 31 attached as **Exhibit C**).  The Assurant Defendants will similarly be prohibited for five years from providing LPI commissions to Nationstar-affiliated agents or brokers, quota-share reinsurance arrangements, and payments for any administrative or other service associated with force-placed policies, and from accepting from Nationstar payments for below-cost or free outsourced services.  (Ex. A. ¶ 4.3.1.)

The Settlement also binds Nationstar to establish LPI coverage at the last-known coverage amount, replacement cost value, or the unpaid principal balance on a borrower's loan, so that lender-placed coverage bears some relation to the value of the interest being protected. (*Id*. ¶ 4.2.1)  Nationstar will also advance funds to continue coverage under the borrower's voluntary policy in the event the policy is eligible to be renewed, Nationstar receives notice of a lapse for nonpayment of premium, and if the borrower's loan is escrowed for insurance, (*id*.), thus further ensuring that the cost of coverage bears some relation to the collateral's value and also reducing the number of LPI policies issued to Nationstar borrowers.  Finally, the settlement requires Nationstar to refund any amounts due the borrower once voluntary insurance is put back in place within fifteen days of receipt of evidence of the voluntary coverage.  (*Id*.)

**C.   *Release of Claims against Defendants***

Settlement Class members will release Defendants and their former and current subsidiaries, affiliates, divisions, parents, and other affiliated companies, among others, from all claims, defenses, obligations, or damages that were or could have been sought in this litigation or that relate, concern, arise for or pertain in any way to Defendants' conduct, policies, or practices concerning LPI Policies placed or charged by Nationstar during the Class Period.  (*Id*. ¶ 10.)

**D.   *Class Notice and Claims Process***

The Settlement Agreement provides that class members will receive notice of the settlement by first-class mail at their last known mailing address in the form of notice attached to the Settlement Agreement.  (*Id*. ¶ 6.1.)  The notice will be mailed no less than ninety days before the final approval hearing.  (*Id*.)  The Settlement Administrator will establish a website on which class members can download or print a claim form and review the Settlement Agreement and its accompanying exhibits, and upload and file a claim form electronically.  (*Id*. ¶¶ 6.2, 7.1.)  The Settlement Administrator will also establish a toll-free number that class members can call for information, or to raise any questions or concerns. (*Id*. ¶ 7.2.1.)  In addition, the Settlement Administrator will publish notice of the settlement in *USA Today* no fewer than forty-five days

before the Final Fairness Hearing.  (*Id.* ¶ 6.3.)  Class members may opt out of the settlement by sending a request for exclusion to the Settlement Administrator.  (*Id.* ¶ 11.1.)

To obtain relief from Defendants, the Settlement Agreement requires class members to submit a claim form before a deadline set by the Court, but that will fall no later than sixty days after the final approval hearing.  (*Id.* ¶¶ 2.8, 7.1.)  The claims will be reviewed by the Settlement Administrator, who will then make the final determination of the amount owed each class member using Defendants' electronic records, and have 180 days after the Final Settlement Date to distribute checks to borrowers who paid the amounts owed them for LPI.  (*Id.* ¶¶ 7.3, 7.3.3.)  Defendants will have 180 days after the Settlement Administrator provides a list of valid claims within which to either credit the appropriate amount or to cause the Settlement Administrator to issue checks to class members who still owe amounts for LPI.  (*Id.* ¶ 7.3.4.)

### E.  *Class Counsel Fees and Expenses and Named Plaintiff Service Award*

The Court has already appointed the undersigned to serve as Class Counsel.  (D.E. 88 ¶ 7.)  Pursuant to Section 15.1 of the Settlement Agreement, Class Counsel's application for fees and expenses shall not exceed $5,000,000.  (*Id.* ¶¶ 15.1, 15.2.)  Defendants also will not oppose a Case Contribution Award to each named plaintiff not to exceed $5,000.00.  (*Id.* ¶ 15.4.)  The Court will consider whether to grant or deny these awards separate and apart from its analysis of the fairness, reasonableness, and adequacy of the settlement.  (*Id.* ¶ 15.5.)

### 5.    Preliminary Approval and Settlement Administration

The Court preliminarily approved the settlement and certified the proposed Settlement Class on January 30, 2015.  (D.E. 88.)  The Court approved all terms and ordered the parties to mail the Notice, Claim Instructions, and Claim Form to all class members.  (*Id.*)

The Settlement Administrator, Heffler Claims Group ("Heffler"), obtained 380,404 class member records from Defendants, including the last-known names and mailing addresses for all persons within the class definition.  (Declaration of Sandy Pappas ("Pappas Decl.") ¶ 5 attached as **Exhibit D**.)  On April 10, 2015, Heffler mailed notice packets to 380,404 class members.  (*Id.*

¶ 6.)  Heffler updated addresses and re-mailed notice packets to class members for whom it received a change of address notification.  (*Id.* ¶ 10.)  Heffler also activated the settlement website, published notice in *USA Today* on April 16, 2015, and established a toll-free telephone line that is accessible 24 hours a day, 7 days a week for class members who seek additional information.  (*Id.* ¶¶ 7, 8, & Ex. A.)

The deadline for opt-outs is June 15, 2015.  (D.E. 88 ¶ 11.)  As of May 28, 2015, Heffler had received only 26 valid requests, representing only .0001% of the settlement class.  (Pappas Decl. ¶ 10.)  As of the date of this Motion, only two objections have been filed with the Court.[5]

## LEGAL ARGUMENT

## I.      THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT.

Settlement "has special importance in class actions with their notable uncertainty, difficulties of proof, and length.  Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources, and achieve the speedy resolution of justice[.]" *Turner v. Gen. Elec. Co.*, No. 2:05-CV-186-FTM-99DNF, 2006 WL 2620275, at *2 (M.D. Fla. Sept. 13, 2006) (citation omitted).  For these reasons, "there exists an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex." *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1314 (S.D. Fla. 2005) (citation omitted).  Courts in this circuit consider the following factors:  (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense and duration of litigation; (3) the stage of proceedings at which the settlement was achieved and the amount of discovery completed; (4) the probability of the plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of class counsel, class representatives, and the substance and amount of opposition received.  *See Leverso v. SouthTrust Bank of Ala., N.A.*, 18 F.3d 1527, 1530 n.6 (11th Cir. 1994). "In assessing these factors, the Court 'should be hesitant to substitute

---

[5] Class members Andrew and Twila Urquhart filed an objection soon after Plaintiffs filed the motion for preliminary approval (D.E. 49, 73), but the Court overruled the objection as premature.  (D.E. 88.)  To date, the Urquharts have not renewed their objection.  Class member Gladys Coleman filed an objection after the Court's Order on preliminary approval. (D.E. 90).

... her own judgment for that of counsel.'" *Lipuma*, 406 F. Supp. 2d at 1315 (quoting *In re Smith*, 926 F.2d 1027, 1028 (11th Cir. 1991)).

**A. The *Braynen* Settlement Is the Product of Good Faith, Informed, and Arms'-Length Negotiations among Experienced Counsel.**

The Court must first consider whether the settlement was obtained by fraud or collusion. Courts begin with a presumption of good faith. *See Saccoccio* Order at 9 ("Where the parties have negotiated at arm's length, the Court should find that the settlement is not the product of collusion")*; Hemphill v. San Diego Ass'n of Realtors, Inc.*, 225 F.R.D. 616, 621 (S.D. Cal. 2004) ("the courts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement").

The settlement in this case is the product of significant give and take by the parties, and was negotiated at arms' length over the course of many weeks.  (Joint Decl. ¶¶ 12, 14, 18, 19.) The parties met in person, and had regular telephonic sessions and email communications, negotiating first the terms of a memorandum of understanding and then a final settlement agreement.   Mr. Max has significant experience mediating complex commercial suits to resolution, and was involved at every step of the process.  (Joint Decl. ¶¶ 14-20).  The very fact of his involvement weighs in favor of approval.  *See, e.g., Lobatz v. U.S. In re Educ. Testing Serv. Praxis Principles of Learning & Teaching, Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 619-20 (E.D. La. 2006) (use of special master evidenced procedural fairness of negotiating process); *In re WorldCom, Inc. ERISA Litig.*, 2004 WL 2338151, at *6 (S.D.N.Y. 2004) (fact that "[a] respected and dedicated judicial officer presided over the lengthy discussions from which this settlement emerged" belied any suggestion of collusion).

The parties' extensive negotiations were also informed by considerable discovery and institutional knowledge obtained litigating FPI claims against the Assurant Defendants in at least eight class actions over the last four years.  (Joint Decl. ¶¶ 15, 42); *see, e.g., Fladell*, No. 13-cv-60721 (S.D. Fla.); *Diaz*, No. 13-cv-21104 (S.D. Fla.); *Saccoccio*, No. 13-cv-21107 (S.D. Fla.).

**B. The Issues Presented Were Highly Complex, and Settlement Approval Will Save the Class Years of Extremely Costly Litigation in this Court and on Appeal.**

This case involves complex legal claims and defenses. (Scott Decl. ¶¶ 11, 12, 15-18). Litigating these claims would have undoubtedly proven difficult and consumed significant time, money, and judicial resources.  Even if Plaintiffs were ultimately to have prevailed (which Defendants contest), their success would likely have borne fruit for the Class only after years of trial and appellate proceedings and the expenditure of millions of dollars by both sides.  (Scott Decl. ¶¶ 17-18); *see, e.g., In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex., on April 20, 2010*, 910 F. Supp. 2d 891, 932 (E.D. La. 2012) *aff'd* 2014 WL 103836 (5th Cir. Jan. 10, 2014) ("Even assuming litigation could obtain the results that this Settlement provides, years of litigation would stand between the class and any such recovery. Hence, this second … factor weighs strongly in favor of granting final approval to the Settlement Agreement.").

By contrast, the settlement provides immediate and substantial monetary relief to the Settlement Class, with cash payments and credits approximating 50%-100% of class members' actual damages.  (Joint Decl. ¶¶ 56-60; Scott Decl. ¶ 13.)  This range is extremely favorable, and constitutes an excellent result.  *See, e.g., Hamilton*, No. 13-cv-60749 (S.D. Fla.) (D.E. 178); *Saccoccio* Order at 12-13 (return of 12.5% of premiums charged for FPI with injunctive relief "very likely exceeds what Plaintiffs could have won at trial"); *Checking Account Overdraft Litig.*, 2011 WL 5873389, at *10 (range of 9% to 45% of damages was an "exemplary" result). These benefits come without the expense, uncertainty, and delay of continued and indefinite litigation. In light of the costs, uncertainties, and delays of litigating through trial—to say nothing of an appeal—"the benefits to the class of the present settlement become all the more apparent." *See Ressler v. Jacobson*, 822 F. Supp. 1551, 1555 (M.D. Fla. 1992).

**C. The Factual Record Was Sufficiently Developed to Enable Class Counsel to Make a Reasoned Judgment Regarding the Settlement.**

Courts consider "the degree of case development that class counsel have accomplished prior to settlement" to ensure that "counsel had an adequate appreciation of the merits of the case before negotiating." *In re Gen. Motors Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768,

10

813 (3d Cir. 1995).  At the same time, "[t]he law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations." *Ressler*, 822 F. Supp. at 1555.

Prior to settlement, Class Counsel and their co-counsel had been litigating claims against the Assurant Defendants for almost four years, and had familiarized themselves thoroughly with the mechanics of its FPI program.  (Joint Decl. ¶ 41.)  Further, before, during, and after mediation, counsel confirmed details of Defendants' FPI program, the class affected, and amount at stake to ensure that the settlement was fair and complete and confirm the value of the relief made available to the class.  (*Id.* ¶¶ 14, 15, 55.)  Plaintiffs also confirmed through discussions with Defendants and the deposition of Nationstar's corporate representative that a claims-made structure would provide optimal relief to settlement class members.  (Joint Decl. ¶¶ 37-39.)

### D.    Plaintiffs Would Have Faced Significant Obstacles to Obtaining Relief.

"[T]he likelihood and extent of any recovery from the defendants absent … settlement" must be considered in assessing the reasonableness of a settlement. *See In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 314 (N.D. Ga. 1993).  Class Counsel and Plaintiffs believe they have a compelling case, but also recognize that Defendants would have raised significant defenses to all claims, including lack of standing, application of the filed-rate doctrine, failure to exhaust administrative remedies, and reverse-preemption of Plaintiffs' RICO claims under the McCarran-Ferguson Act ("MFA").  *See, e.g., Montoya v. PNC Bank, N.A.*, No. 14-cv-20474 (S.D. Fla.);  (D.E. 56, 57, 132, 133; Scott Decl. ¶¶ 11, 16.)  Although Plaintiffs and Class Counsel maintain that these defenses lack merit, Plaintiffs and class members would have faced the risk of not prevailing on their claims had litigation continued.  (Scott. Decl. ¶¶ 11, 12, 24, 42.); *see Hall*, No. 12-cv-22700 (D.E. 225 at 12:23-25, 21:17-21, 92:2-3, 74:4-9, 92:21-23); *see also, e.g., Kunzelmann*, 2013 WL 139913 (noting obstacles created by application of multistate law, among other things).  Further, the courts have noted the headwinds created by the Eleventh Circuit in *Feaz v. Wells Fargo,* 2014 WL 503149 (11th Cir. 2014) and the Seventh

Circuit in *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 611 (7th Cir. 2013). *See, e.g., Montoya*, 2014 U.S. Dist. LEXIS 119464, at *1, *9-10 (S.D. Fla. Aug. 27, 2014), and the Second Circuit is now considering the application of the filed-rate doctrine in the FPI context. *See Rothstein v GMAC Mortg. Corp.*, No. 14-2250 (2d Cir.). Had the parties continued to litigate, and the tide turned against Plaintiffs, they could have stood to recover nothing at all for the nationwide class.

### E.   The Benefits Provided by the Settlement Are Fair, Reasonable, and Adequate When Considered Against the Possible Range of Recovery.

As explained above, the settlement offers more than $54 million in monetary benefits to the class, as well as injunctive relief and separately paid attorneys' fees. This will provide 50%-100% recovery of claimants' actual monetary damages, which far exceeds the standards established by this and other courts. (Scott Decl. ¶ 13; Joint Decl. ¶¶ 60-62); *see, e.g., Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("the very essence of settlement is … a yielding of absolutes and an abandoning of highest hopes")*; Behrens*, 118 F.R.D. at 542 ("the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair and inadequate … A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery[.]").

For example, in *Saccoccio*, this Court approved a similarly structured settlement with payments to the class amounting to 12.5% of the net premium charged to them. *See Saccoccio* Order at 12-13. The Court noted that the alleged illegal commissions charged to class members were 12.5% of the net premium and that "the maximum rate premium would fall without the 'commissions' between Assurant and Chase is 12.5%." *Id.* The Court therefore reasoned that "the Class recovery is 50-100% of the damages." *Id.* The same reasoning applies here.

Similarly, in *LiPuma*, this Court approved a settlement that recovered 8.1% of the possible damages. When valuing the total recovery, this Court included the cash fund, the proposed value of the injunctive relief, and the costs of notice and administration. 406 F. Supp. 2d at 1322. The Court focused on "the possible recovery at trial" and evaluated the settlement in its "totality" and not on a "claim-by-claim" basis, and reasoned that the presence of "strong

12

defenses" makes lower recoveries more reasonable. *Id.*[6] "[W]hen settlement assures immediate payment of substantial amounts to class members, even if it means sacrificing speculative payment of a hypothetically larger amount years down the road, settlement is reasonable[.]" *Johnson v. Brennan*, No. 10-cv-4712, 2011 WL 4357376, at *12 (S.D.N.Y. Sept. 16, 2011).

Here, the settlement class fares far better than in *LiPuma*. All class members are eligible to receive 12.5% of the net premium paid or charged for FPI, less any refunds, in the form of either a check or a credit to their Nationstar escrow accounts. (Ex. A ¶ 4.6.) This amount will be 12.5% of the entire premium charged, some of which legitimately went to purchasing insurance coverage to which Nationstar was entitled to protect its interest in the borrower's property—*not* 12.5% of the premium charged in excess of the actual or competitive cost of coverage. (*Id.*) Moreover, all class members who file valid claims will recover 12.5% of the net premium charged regardless of whether the class members paid any portion of that premium to Nationstar. (*Id.*) Thus, a mortgagor who paid premiums for four months of a given year will receive 12.5% of the annual premium without any deduction for the amount paid. (Scott Decl. ¶ 27.)

The 12.5% made available to class members by the settlement is roughly the amount of the unwarranted "commission" or kickback paid by borrowers subject to other lenders' FPI schemes with Assurant. *See, e.g., Kunzelmann*, No. 11-cv-81373 (S.D. Fla.) (D.E. 115 at 2) (citing evidence that Wells Fargo and Assurant charged an 11% "commission"); *Fladell*, No. 13-cv-60721 (S.D. Fla.) (D.E. 139-6 at 3, 25) (same). It was also recently approved as a reasonable rate reduction by more than forty-five state regulators as a new lender-placed product. (Joint Decl. ¶ 57.) These regulators have approved as reasonable a new lender-placed hazard insurance

---

[6] *See also Bennett*, 737 F.2d at 986 (holding a 5.6% recovery was fair and adequate in view of the risks of further litigation and litigation objectives); ; *Checking Account Overdraft Litig.*, 2011 WL 5873389, at *10 ("standing alone, nine percent or higher constitutes a fair settlement even absent the risks associated with prosecuting these claims"); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001) (noting that since 1995, class action settlements have typically "recovered between 5.5% and 6.2% of the class members' estimated losses").

product developed by Assurant that would reduce the rates used to calculate the premiums charged to lenders (and then passed on to borrowers) by *up to* 12.5% if the lender agrees to forego the commissions and reinsurance profits that are the subject of this lawsuit.  (*Id*.)  This Settlement provides 100% of the full savings from this new, approved product.  State regulators' approval of this product with regard to both straight commission and reinsurance lender-placed hazard programs supports a finding of reasonableness here.

The settlement will also provide significant injunctive relief, effectively prohibiting the Nationstar Defendants from continuing the challenged practices.  (Joint Decl. ¶¶ 24-26; Scott Decl. ¶¶ 28-30); *see* pp. 4-6 *supra*.  Certain of these practices were proscribed by a settlement with New York state regulators before the parties here settled, but the New York injunction applies only to New York borrowers and binds only Assurant, leaving Nationstar free to continue its practices with another insurer.  *See* Consent Order, *In the Matter of Am. Sec. Ins. Co., et al.* (N.Y.D.F.S. 2013), available at http://www.dfs.ny.gov/about/press2013/assur-order-130321.pdf ("NYDFS Consent Order").  There can be no question that this result is more than reasonable.

The fact that the parties agreed to a "claims-made" settlement does not render its terms unreasonable.  *See, e.g., Saccoccio* Order at 18-19 (overruling objections to the claims-made process and stating "[t]here is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment."); (citation omitted); *Hamilton*, No. 13-cv-60749 (S.D. Fla.) (D.E. 178) ("The Court agrees that an LPI class settlement that offers significant monetary relief, as this one does, 'requiring only that class members submit a claim form,' can be 'fair and reasonable independent of the number of claims filed.'"); *Casey*, No. 12-cv-820 (N.D.N.Y.) (D.E. 222 at ¶ 6) (in LPI settlement, regardless of the take rate, "[t]he settlement confers substantial benefits upon the Settlement Class members, is in the public interest, and will provide the parties with repose from litigation."); *Shames v. Hertz Corp.*, 07-CV-2174-MMA WMC, 2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) ("there is nothing inherently

objectionable with a claims-submission process, as class action settlements often include this process, and courts routinely approve claims-made settlements") (citations omitted).

Discovery taken by Class Counsel in this action, specifically the sworn deposition of Nationstar's corporate representative, confirmed that Nationstar's systems have limitations similar to those used by other lenders. (Joint Decl. ¶¶ 15, 36-38.)   In *Williams*, for example, a Wells Fargo representative testified that "[w]ithout a borrower-by-borrower manual examination of each loan file, [Wells Fargo's systems] cannot accurately determine the universe of borrowers who were 'charged' for lender placed insurance, those who 'paid' for lender placed insurance, those who still owe Wells Fargo Bank for lender placed insurance premiums, and those who may have entered into loan modification, short sale, refinance, or other agreements with Wells Fargo Bank." *See Williams*, No. 11-cv-21233-RNS (S.D. Fla.) (D.E. 307 Ex. A at 2). Wells Fargo's 30(b)(6) representative testified that the review could range from "maybe a few hours" to "four to five hours" per loan. *See Williams*, (D.E. 307 at Exhibit B at 46:16-19).

Like Wells Fargo, Nationstar's systems cannot determine such information on a classwide basis, a manual review of each of the 380,404 class members' files would be required to determine who paid, how much they paid, and who currently owes premiums for lender placed insurance.   (Joint Decl. ¶¶ 36-38.)   Notably, Assurant's settlement with New York state regulators was also a claims-made settlement. *See* NYDFS Consent Order.

Plaintiff and the class faced significant hurdles in litigating their claims to resolution. Each class member stands to recover hundreds, if not thousands, of dollars as a result of the settlement. These results fall well within the range of reasonableness.

## D. The Opinions of Class Counsel, the Class Representative, and Absent Class Members Strongly Favor Settlement Approval.

A court should give "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation." *Warren v. Tampa*, 693 F. Supp. 1051, 1060 (M.D. Fla. 1988). This Court found that Class Counsel and Plaintiffs will adequately represent the class in this action, (D.E. 88 at 5(e)) and its conclusion was warranted.

362484.1

Class Counsel have been investigating FPI practices for more than four years, and fully support the Settlement.  They obtained certification of the first hazard FPI class in Florida in *Williams*, 280 F.R.D. 665 (S.D. Fla.), litigate class certification in *Kunzelmann*, briefed and argued two motions to centralize FPI litigation in a nationwide MDL, obtained final approval of the settlements in *Saccoccio*, *Hall*, *Fladell*, *Diaz*, and *Hamilton*, recently reached a settlement-in-principle in *Montoya*, No. 14-cv-20474 (S.D. Fla.), after briefing on class certification was complete, and are litigating six additional cases against major mortgage lenders in the Southern District of Florida.[7] Based on this experience, and decades more litigating consumer class action lawsuits, it is Class Counsel's opinion that the Settlement is fair, reasonable, adequate, and in the best interests of the Class.  (Joint Decl. ¶ 96; Scott Decl. ¶¶ 10, 47.)

To date, only two of the 380,404 class members have objected and only 26 have opted out.  This overwhelming class support is evidence of the settlement's fairness.  *See, e.g., Churchill Village LLC v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming settlement with 45 objections out of 90,000 notices sent); *Saccoccio* Order at 14 ("low resistance to the settlement" weighed in favor of approval); *Casey* Order (approving claims-made LPI class action where only 13 of 407,000 class members objected);. Viewed either independently or taken together, the above factors confirm that the settlement is fair, reasonable, and adequate.

## II.   CLASS COUNSEL SHOULD BE AWARDED REASONABLE FEES AND COSTS AND PLAINTIFFS THE REQUESTED SERVICE AWARD.

### The Court Should Award the Requested Attorney's Fees and Expenses.

Class counsel is entitled to an attorney's fee for the benefit obtained in a class settlement. In the Eleventh Circuit, "attorneys' fees awarded from a common fund shall be based upon a

---

[7] *See Lee v. Ocwen Loan Servicing, LLC*, No. 14-cv-60649 (S.D. Fla.) (final fairness hearing before this Court in June 2015); *Circeo-Loudon v. Green Tree Servicing, LLC*, No. 14-cv-21384 (motions to dismiss First Amended Complaint denied in entirety); *Jackson v. U.S. Bank, N.A.*, No. 14-cv-21252 (J. Moreno) (all claims survived motions to dismiss); *Wilson v. Everbank, N.A.*, No. 14-cv-22264 (J. Bloom) (TILA, breach of implied covenant, unjust enrichment and tortious interference claims survived motions to dismiss); *Soler v. IndyMac Mortgage*, No. 14-cv-22541 (motions to dismiss pending before Judge Cooke), and *Almanzar v. Select Portfolio Servicing, Inc.* No. 14-cv-22586 (J. Moreno) (all claims survived motions to dismiss).

reasonable percentage of the fund established for the benefit of the class." *Camden I Condo. Ass'n v. Dunkle,* 946 F.2d 768, 774 (11th Cir. 1991); *see also Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 676 (1980); *David v. Am. Suzuki Motor Corp.*, No. 08–CV–22278, 2010 WL 1628362 (S.D. Fla. Apr. 15, 2010) (settlement with ascertainable benefits may be treated as a common fund to which a percentage fee may be awarded, even if the fee is separately paid by the defendant). The percentage applies to the total benefits provided, even where the actual payments to the class following a claims process is lower. *See Waters v. Int'l Precious Metals Corp.,* 190 F.3d 1291, 1295-96 (11th Cir. 1999); *Saccoccio* Order at 15; *see also Casey*, No. 12-cv-00820 (N.D.N.Y.) (D.E. 221) (the amount of claims made is "irrelevant to the underlying issue; to wit, whether the proposed settlement agreement is fair, reasonable, and adequate").

"[F]ederal district courts across the country have, in the class action settlement context, routinely awarded class counsel fees in excess of the 25 percent 'benchmark,' even in so-called 'mega-fund' cases." *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1210 (S.D. Fla. 2006) (awarding fees of 31½% of settlement fund). Here, the requested percentage is easily below the Eleventh Circuit's range. *See Camden I,* 946 F. 2d at 774 (20%–50% of the value provided); *David*, 2010 WL 1628362 at *8 n.15 (20%-50% as customary in class actions).

The Eleventh Circuit's factors for evaluating the reasonable percentage to award class-action counsel are (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the client; and (12) awards in similar cases. *See Camden I,* 946 F.2d at 772 n.3. The Court may also consider the time required to reach settlement, the existence of substantial objections and non-monetary benefits, and the economics of prosecuting a class action. *Id.* at

775. As explained below, the factors set forth in *Camden I* support the full award requested.

**1. The Contingent Nature of the Fee, the Financial Burden Carried by Counsel, and the Economics of Prosecuting a Class Action Support the 9.26% Award.**

A determination of a fair fee for Class Counsel must include consideration of the fee's contingent nature, counsel's outlay of out-of-pocket expenses, and high risks of failure and nonpayment in a class action. *See Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334, 1339 (S.D. Fla. 2007). These factors weigh in favor of awarding Class Counsel 9.26% of the cash benefits obtained, not accounting for the value of the injunctive relief . Class Counsel have not yet received any compensation and have incurred expenses litigating on the Class's behalf, which they risked losing had Defendants prevailed. (Joint Decl. ¶¶ 81-92; Scott Decl. ¶ 42.)

**2. The Requested Fees Reflect the Market Rate in Complex, Contingent Litigation.**

A fee of 9.26% of the cash value is below market for class actions. *See Saccoccio* Order at 16 ("20-30% fee that is customary in common fund cases."). "The percentage method of awarding fees in class actions is consistent with, and is intended to mirror, practice in the private marketplace where attorneys typically negotiate percentage fee arrangements with their clients." *Pinto*, 513 F. Supp. 2d at 1340. In private litigation, attorneys regularly contract for contingent fees between 30% and 40% directly with their clients. (Scott Decl. ¶ 41.) These percentages are the prevailing American market rates for contingent representation. *See id.* at 1341 (citing, *inter alia*, *Kirchoff v. Flynn*, 786 F.2d 320, 323 (7th Cir. 1986)). In making a determination of what constitutes a fair fee, this Court should be guided by such awards.[8]

A fee of 9.26% of the total monetary benefits obtain falls below, the range of the customary fee awarded in common fund cases, many of which have awarded a higher percentage. *See, e.g., Hamilton*, No. 13-cv-60749 at [D.E. 178] (16% of the total monetary benefits); *Hall*, 2014 WL 7184039 (S.D. Fla. Dec. 17, 2014) (J. Moreno) (finding fee award of 7% of monetary benefit "well in line with the bulk of the fee awards in class action litigation.").

---

[8] *See also, e.g., Gutter v. E.I. Dupont De Nemours & Co.,* 95–2152–Civ–Gold (S.D. Fla. May 30, 2003) (33-1/3 %); *Waters,* 190 F.3d 1291 (affirming 33-1/3%).

### 3.   The Novelty and Difficulty of the Questions at Issue.

This case presents novel questions of law and complex issues of fact.  Class action matters are generally complex, but this one is particularly so, involving the analysis of loss ratios, calculation of premiums, and identification of costs permissibly charged to the borrower; and defenses that go to application of the filed-rate doctrine and MFA "reverse preemption," *inter alia.*  The difficulty of mastering and litigating these issues supports the full award requested.  (Scott. Decl. ¶¶ 24, 25, 34, 35, 43.)

### 4.   The Skill, Experience, and Reputation of Class Counsel.

Class Counsel have established their skill, experience, and reputation in the record, and in repeated cases before this court.  (Joint Decl. ¶¶ 78-80; Scott Decl. ¶ 36.)  Indeed, this Court stated that "class counsel has been at the forefront of lender-placed insurance litigation." *See Saccoccio* Order at 17.  Beyond that, Class Counsel's reputation, diligence, expertise, and skill are reflected in the results they have achieved.  They resolved this dispute efficiently despite the potential hurdles presented them and the arguments raised by Defendants detailed above.  (Scott Decl. ¶ 33.)  The quality of Class Counsel and their achievement in this case is equally shown by the strength of their opponents, all reputable firms known for the skill and achievements of their attorneys.  This factor thus also favors awarding the requested fee.

### 5.   The Result Achieved for the Class.

The result here is extraordinary, and perhaps best establishes the propriety of the requested fee award.  *See Hensley v. Eckerhart,* 461 U.S. 424, 436 (1983) ("critical factor is the degree of success obtained"); *Behrens,* 118 F.R.D. at 547-48 ("The quality of work performed in a case that settles before trial is best measured by the benefit obtained.").  In considering the results, courts examine the value of *both* monetary and injunctive relief.  *See Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360 (S.D. Fla. 2007); *LiPuma,* 406 F. Supp. 2d at 1323. The results here are excellent and support the proposed fee award.  (Scott Decl. ¶¶ 13, 26-31, 33.)

**6.   The Time and Labor of Class Counsel.**

Prosecuting and settling the claims demanded considerable time and labor. (Joint Decl. ¶¶ 71-77.)   The complexity of this case required organization by Class Counsel, including assignment of work and regular meetings and calls to ensure coordinated, productive work efforts to maximize efficiency and minimize duplication of effort.   (*Id.*) Class Counsel spent many hours investigating potential plaintiffs' claims.   (*Id.*)   Class Counsel also conducted considerable discovery on the practices at issue.   (*Id.*).

**7.   The Reaction of the Class.**

There have been only two objections and 26 valid opt-outs, which supports the fee request. *See Pinto*, 513 F. Supp. 2d at 1343; (Scott Decl. ¶ 45.).

**A.   A Service Award of $5,000 Is Appropriate.**

The Court should approve service awards of $5,000.  The detailed notice advised class members of the proposed award, and no class member has objected.  *See Saccoccio* Order at 17 (granting $5,000 service award).  The class representatives acted as private attorney generals seeking to remedy a public wrong. *See Pinto,* 513 F. Supp. 2d at 1344.  They aided in the investigation of these claims and settlement.  (Joint Decl. ¶¶ 64-68)  Approval of this award is warranted as a matter of policy and is appropriate under applicable precedents.

## <u>CONCLUSION</u>

Plaintiffs respectfully request the Court grant final approval of the settlement, as well as the applications for Class Counsel's fees and expenses and class representative service awards.

Respectfully submitted this 1st day of June 2015.

By: <u>/s/ Adam M. Moskowitz  </u>

| | |
|---|---|
| Adam M. Moskowitz, Esq.<br>amm@kttlaw.com<br>Tucker Ronzetti, Esq.<br>tr@kttlaw.com<br>Rachel Sullivan, Esq.<br>rs@kttlaw.com<br>Robert J. Neary, Esq. | Aaron S. Podhurst, Esq.<br>apodhurst@podhurst.com<br>Peter Prieto, Esq.<br>pprieto@podhurst.com<br>John Gravante, III, Esq.<br>jgravante@podhurst.com<br>Matthew Weinshall |

20

| | |
|---|---|
| rn@kttlaw.com<br>**KOZYAK, TROPIN, &**<br>**THROCKMORTON LLP**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:  (305) 372-1800<br>Facsimile:   (305) 372-3508<br>*Settlement Class Counsel* | mweinshall@podhurst.com<br>**PODHURST ORSECK, P.A.**<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, Florida 33130<br>Telephone: 305-358-2800<br>Facsimile: 305-358-2382<br>*Settlement Class Counsel* |
| Lance A. Harke, P.A.<br>lharke@harkeclasby.com<br>Sarah Engel, Esq.<br>sengel@harkeclasby.com<br>Howard M. Bushman, Esq.<br>hbushman@harkeclasby.com<br>**HARKE CLASBY & BUSHMAN LLP**<br>9699 NE Second Avenue<br>Miami Shores, Florida 33138<br>Telephone:      (305) 536-8220<br>Facsimile:      (305) 536-8229<br>*Settlement Class Counsel* | |

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was filed electronically via CM/ECF on the 1st day of June, 2015 and served by the same means on all counsel of record.

By:   /s/ Adam M. Moskowitz

362484.1