UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 14-cv-20726-JG

HOWARD BRAYNEN, TONI MURRAY, and
RONALD HUTCHINGS, on behalf of themselves
and all others similarly situated,

        Plaintiffs,

v.

NATIONSTAR MORTGAGE, LLC, HARWOOD
SERVICE COMPANY, LLC, NATIONSTAR
MORTGAGE HODLINGS, INC., ASSURANT,
INC., AMERICAN SECURITY INSURANCE
COMPANY, VOYAGER INDEMNITY
INSURANCE COMPANY, and STANDARD
GUARANTY INSURANCE COMPANY,

        Defendants.

_____/

**ANDREW AND TWILA URQHART'S OBJECTION TO PROPOSED SETTLEMENT
AND FEE REQUEST, AND OPPOSITION TO PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF CLASS ACTION SETTLEMENT, APPLICATION FOR SERVICE
AWARDS, AND CLASS COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND
EXPENSES**

SQUITIERI & FEARON, LLP
Stephen J. Fearon, Jr.
32 East 57th Street, 12th Floor
New York, New York 10022
Tel: (212) 421-6492
Fax: (212) 421-6553
stephen@sfclasslaw.com

**ATTORNEY FOR ANDREW AND
TWILA URQUHART**

**INFORMATION ABOUT OBJECTORS REQUIRED BY CLASS ACTION NOTICE**

a) The Case Name and Number:

   *Braynen, et al. v. NationstarMortgage, LLC, et al.*, Case No. 14-cv-20726-JG (S.D. Fla.).

b) The Objectors' names, addresses, and telephone numbers:

   <u>Andrew and Twila Urqhart</u>

   350 Skate Road
   Atlantic Beach, FL 32233
   (904) [redacted and will be provided by counsel below if necessary]

   Andrew and Twila Urquhart are members of the Settlement Class[1] and are plaintiffs in a force placed insurance action that is pending in the Southern District of New York against some of the same Defendants as in this action. *Urquhart v. Nationstar Mortgage, LLC, et. al.*, No. 1:14-cv-03383-JFK (S.D.N.Y.).

   Represented by Counsel:

   Stephen J. Fearon, Jr.
   SQUITIERI & FEARON, LLP
   32 East 57th Street, 12th Floor
   New York, New York 10022
   Tel:     (212) 421-6492
   Fax:    (212) 421-6553
   stephen@sfclasslaw.com

c) The basis for the objections:

   Detailed below.

d) A statement of whether you intend to appear at the Final Approval Hearing, either with or without counsel.

   Objectors Andrew and Twila Urquhart will appear by counsel.

---

[1] Capitalized terms have the meaning given to them in the Settlement Agreement [Doc. No. 91-1].

## INTRODUCTION

This is the type of settlement that courts and commentators frequently warn about. It promises large attorneys' fees to Class Counsel but will provide very little to the Class. Most class members will receive nothing. Yet, Defendants – who unquestionably made tens or even hundreds of millions of dollars from their force placed insurance scheme -- will be absolved from liability if the Court approves this proposed Settlement. The Court should not do so on this limited record.

Class Counsel touts the Settlement as providing more than $54 million[2] to the Class but that number is a fallacy. Defendants have not created an actual fund with $54 million in it and, if pressed, even the parties would have to admit that the Class will never receive $54million as a result of this Settlement. In fact, the Class will not get any amount close to $54 million. That number is an illusion. So too is the purported injunctive relief in the Settlement because whatever changes Defendants have agreed to were not the result of this Settlement but instead resulted from other factors, such as previous settlements and regulatory actions that required Defendants to change their practices.

Instead of relying on the parties' unsupported assertions about the value of this Settlement and how it is fair, this Court should require the parties to answer the important questions that the Urquharts ask here so that the Court can properly assess the pending motion for approval of the Settlement and an award of fees. The parties are obligated to provide that information (and should have previously provided it) because Rule 23 requires them to demonstrate that the Settlement and fee request are fair and reasonable. For example, there is nothing to substantiate the parties' claim that the Settlement provides $54 million to the Class. Nowhere in the motion

---

[2] Plaintiffs' Motion for Final Approval of Class Action Settlement, Application for Service Awards, Class Counsel's Application for Attorneys' Fees and Expenses, and Incorporated Memorandum of Law ("Plaintiffs' Mot. for Final Approval") at 1 [Doc. No. 91].

papers do the parties provide the Court with the details about how much Defendants actually will pay to the Class to settle these claims, even though the Urquharts have repeatedly asked for this important information. Instead, the parties have created the false impression that the Settlement "provides more than $54 million in meaningful monetary relief to the 380,404-member settlement class". Plaintiffs' Mot. for Final Approval at 1. That is simply not true. Nor do the motion papers provide the information necessary to assess whether the requested fee of $5 million is fair in light of the amount that Defendants actually will pay.

Some of the important questions that the parties should answer include:

1. Of the 380,404 Settlement Class Members,[3] how many have submitted claims for settlement proceeds? (Certainly if all 380,404 people submitted claims, the parties would have said so. But they have not indicated how many members of the Class will actually recover something here. That is an important fact, no matter what the answer.);

2. What is the actual dollar amount that Defendants will pay to the Settlement Class? (This is important to know for purposes of assessing the fairness of both the Settlement and the fee request.)

3. Is that amount anywhere close to the $54 million that the parties suggest this settlement is worth?

4. What percentage of estimated damages is the amount that the Settlement actually will pay to Class members?

5. How does the requested $5 million fee compare to the actual payout? (Is it, as Class Counsel suggests, "only 9.26% of the monetary recovery to the class"? Plaintiff's Mot. for Final Approval at 2.?).

When the Urquharts raised these questions at the preliminary approval stage, the parties did not answer them. Amazingly, the parties continue to consciously avoid answering these questions. This is especially troubling because this Court previously found that although the concerns raised by the Urquharts in their preliminary objections were "premature," the objections were "suited for the second stage of the class action settlement approval process: the Final

---

[3] Plaintiffs' Mot. for Final Approval at 1.

Approval Hearing." Doc. No. 88 at 2 (Jan. 30, 2015). Since then, the parties have failed to provide the information that the Urquharts requested and until they do, the Court should deny the motion for final approval and the request for fees and expenses.

Class Counsel have settled other force-placed insurance cases like this, primarily in this District, and have obtained Court approval to do so. As they pursued approval for those settlements, Class Counsel carefully avoided disclosing the actual amount of payments to class members and, like here, consistently resisted requests to provide the type of basic information that the Urquharts seek here that would allow the Court to assess the fairness and adequacy of the proposed settlement and the related fee request. Disclosing the information would have revealed that the settlements resulted in paltry recoveries for the Class even when the fees to Class Counsel were enormous. Unfortunately, in those cases the parties' refusal to produce this type of information paid off for them because in each case the Court did not demand the information and instead approved the settlement and the requested fee. The fees to Class Counsel from those cases exceed $50 million and some of those approvals are now making their way through the appellate process before the Eleventh Circuit.[4]

To support their motion here, the parties hope that this Court too will blindly approve the settlement and fee request without requiring answers to the Urquharts' questions. But regardless of what happened in those other cases, including the cases that are now on appeal, this Court should analyze the facts of this proposed settlement to assess whether it is fair for purposes of Rule 23. To do so, the Court should require more information from the parties as described in

---

[4] For example, class members are appealing the District Court's approval of the settlement and fee request in a force placed insurance case involving Bank of America and another case involving Wells Fargo. The Bank of America case is *Hall v. Trapasso*, Case No. 14-15712-EE (11th Cir.) and the Wells Fargo case is *Nadeau v. Wells Fargo Bank, N.A.*, Case No. 14-15000-BB (11th Cir.).Briefing is complete in the *Wells Fargo* case and is continuing in the *Bank of America* case.

this Objection.

Until the parties come forward with proof demonstrating the adequacy and fairness of the Settlement and the requested fee, the Court should deny the motion. Alternatively, the Court should defer deciding the motion until after the Court of Appeals rules on the pending appeals in the *Bank of America*[5] and *Wells Fargo*[6] force placed insurance cases that raise similar issues.

1.   **The Parties Have Failed To Provide Important Information To Support Approving The Proposed Settlement**

It would be inappropriate to approve this Settlement before the parties have provided the details necessary for the Court to properly assess whether the Settlement is fair and reasonable under Rule 23. These fundamental questions go to the heart of the claims and to the fairness (or unfairness) of the proposed Settlement for purposes of the final approval motion. For example, the parties should support their motion with answers to the following questions:

1.   When did Defendants begin their force placed insurance practices that are at issue in this case? (Class Counsel and Nationstar should explain this information by state and by year and distinguish between hazard, flood, flood gap, and wind insurance.);

2.   When did Nationstar begin receiving kickbacks for force placing insurance on borrowers and when did it end that practice? (Class Counsel and Nationstar should provide this information by state and by type of insurance - - hazard, flood, flood gap, and wind insurance. The answer will help the Court assess the fairness of the proposed Class Period and the release in the Settlement.);

3.   What is the breakdown of the number of Settlement Class Members by state and how many claims have been received (or will be paid) from each state? (The Court should look skeptically on any claim by Class Counsel or Defendants that it is premature to provide this information because the claims deadline has not passed. After all, the parties themselves designed the claims structure of the settlement and the Urquharts object to the structure as intentionally designed to obscure the truth about the paltry recovery in this case.)

4.   What is the amount (by state and year) of the "net written premiums" that Nationstar charged Settlement Class Members, broken down by type of insurance (hazard, flood,

---

[5] *Hall v. Trapasso*, Case No. 14-15712-EE (11th Cir.).

[6] *Nadeau v. Wells Fargo Bank, N.A.*, Case No. 14-15000-BB (11th Cir.).

4

flood gap, and wind)? This will help the Court analyze whether the proposed Settlement and the payout are fair when compared to the profits that Defendants were generating from this scheme.

5.  What is the actual (or expected) dollar amount that Defendants will pay under the Settlement? Is it anywhere near $54 million?

6.  What is the actual (or expected) claims rate for the Settlement?

7.  Which portions of the Injunctive Relief (Settlement Agreement §§ 4.2-4.3) did Defendants agree to solely as a result of this proposed settlement? This will help the Court analyze whether the Injunctive relief is fair or whether it is fluff.

8.  Were there any gaps in the data that prevented the parties from identifying Settlement Class Members for any portion of the Settlement Class Period or for any state?

9.  Why does the claim form prevent recovery by Settlement Class Members who have filed for bankruptcy protection or had their loans "compromised" when the Settlement Agreement includes them within the Settlement Class?

Though the Urquharts previously raised these questions, the parties have not answered them. The Court should require this information so that it may properly assess the pending motion.

**2.      The Settlement Is Unreasonable Because The Vast Majority Of Class Members Will Receive Nothing**

Claims-made settlement like this have come under significant fire lately because they often return little to class members who must submit a claim form to seek benefits. The proposed Settlement guarantees that Nationstar will erase enormous liability to the Settlement Class in exchange for agreeing to pay $5 million in fees and costs to Plaintiffs' attorneys and some undetermined amount to the Class. The ultimate payout will be a fraction of the illicit profits Defendants have realized from their force-placed insurance scheme. It certainly will be nowhere near the $54 million in cash that the parties suggest.

This is exactly the type of troublesome settlement that courts have so often cautioned against because of its very real potential for abuse. Importantly, the Urquharts object to

5

more than just the "claims-made" nature of the settlement. Indeed, it is the combination of factors present here that make this Settlement unfair. A recent Ninth Circuit decision is instructive. In *Allen v. Bedolla,* No. 13-55106, 2015 WL 3461537 (9th Cir. June 2, 2015), the court cautioned lower courts to reject settlements like this one. The Ninth Circuit reversed the district court's settlement approval and fee award because the district court failed to probe deeper into the settlement's fairness where there were "subtle signs that class counsel ha[d] allowed pursuit of their own self-interests . . . to infect the negotiations." 2015 WL 3461537 at *5. Those three "subtle signs" were: (1) disproportionate attorneys' fees compared to actual class recovery; (2) a "clear-sailing" provision; and (3) a reversion of all unclaimed funds to the defendant. *Id.* Each of these signs is undeniably present here.

As Judge Posner recently wrote for the Court of Appeals for the Seventh Circuit, "we and other courts have often remarked the incentive of class counsel, in complicity with the defendant's counsel, to sell out the class by agreeing with the defendant to recommend that the judge approve a settlement involving a meager recovery for the class but generous compensation for the lawyers -- the deal that promotes the self-interest of both class counsel and the defendant and is therefore optimal from the standpoint of their private interests." *Eubank v. Pella,* 753 F.3d 718, 720 (7th Cir. 2014) (citing *Creative Montessori Learning Centers v. Ashford Gear LLC,* 662 F.3d 913, 918 (7th Cir. 2011) and *Plummer v. Chemical Bank,* 668 F.2d 654, 658 (2d Cir 1982)).

Settlements where courts calculate attorneys' fees by possible recovery, rather than actual recovery, pose an especially strong risk that class counsel will "connive with the defendant in formulating claims-filing procedures that discourage filing and so reduce the benefit to the class." *Pearson v. NBTY, Inc.,* 772 F.3d 778, 781 (7th Cir. 2014) (holding that district

6

court abused its discretion in approving settlement). Courts likewise reject proposed settlements where "[t]he settlement amount considered in the light of the Settlement Agreement as a whole raises the possibility that there was some collusion." *De Leon v. Bank of Am., N.A. (USA)*, No. 09-cv-1251-ORL-28, 2012 WL 2568142 (M.D. Fla. Apr. 20, 2012) *report and recommendation adopted*, 2012 WL 2543586 (M.D. Fla. July 2, 2012);[7] *See also Pella*, 753 F.3d at 726 (reversing final approval of a claims-made settlement where "class counsel sold out the class").

When asked to evaluate proposed settlements that include many of the same features as the proposed settlement here, other district courts have declined to approve them. For instance, in *De Leon*, the court reasoned that one factor that militated against granting approval was that while the proposed settlement was for an amount "up to $10,000,000," the total payment to all proposed class members could be a fraction of that and was unlikely to exceed $2,800,000. *Id.* The court was troubled by the relatively small amount of the actual payment compared with the broad release and the relatively large attorneys' fee. *Id.* at *15 ("Defendant also had an incentive to work with Plaintiffs' counsel to maximize their possible fee award because the Settlement Agreement will extinguish a vast array of claims that might have been brought against Defendant by class members who fail to opt-out of the class.").

Defendants are no doubt aware of the historically low claims rate in "claims-made" settlements and can be certain that their ultimate pay-out if this settlement is approved will be

---

[7] The "Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide" produced by the Federal Judicial Center found online at www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf (last visited June 15, 2015) (The "FJC Guide") lists factors that a court should consider when deciding whether or not a proposed notice and claims process is adequate. The FJC specifically counsels district court judges to consider, *inter alia*: whether there is "unbiased evidence supporting the notice plan is adequate;" "is a claims process necessary?;" or will it serve as a "choke" on the total amount paid to class members; and "Does the claims process avoid steps that deliberately filter valid claims." FJC Guide at 6. When viewed through this spectrum, the parties' proposed notice and claims process is unreasonable and unfair.

just a fraction of the premiums that they charged the class. *See Sylvester v. CIGNA Corp.*, 369 F. Supp. 2d 34, 53 (D. Me. 2005) ("'Claims made' settlements regularly yield response rates of 10 percent or less"); *see also Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 390-92. (C.D. Cal. 2007) (denying approval and finding that "much of what was attainable will go unpaid as a result of the claims-made process).

Recent empirical evidence bears this out. For example, in *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla.), which involved a "claims-made" settlement for a Florida class of Wells Fargo borrowers with force-placed insurance, the publicized settlement value was approximately $19.25 million with class members entitled to a return of 25% of their force-placed premiums – double the percentage provided here (12.5%). In *Williams*, the parties (represented by Class Counsel here) mailed Notice of the settlement to 36,464 Florida class members[8] but only 3,498 of them (9.59% of the class) submitted claim forms.[9] In light of the claims rate, the *Williams* defendants will pay out less than $2 million in claims.[10] In comparison, class counsel in *Williams* received $5,480,000 in fees and costs. *See Williams*, ECF No. 356.

Whether or not the Court approves of the claims-made mechanism used by the parties here, the Court still should demand information from the parties demonstrating that this Settlement is fair. In other words, even if the Court were to overrule the portion of this Objection that contests the propriety of using a claims-made process, the Court still must assess the fairness of the Settlement as a whole and should require the parties to submit the information that the Urquharts seek because doing so will reveal the fundamental problems

---

[8] *Williams*, ECF No. 3 54-2, Ex. B ¶ 6.

[9] There were also 120 late claim forms received. *Id.* ¶ 15. The net result is that over 30,000 Florida residents had their claims extinguished and received nothing in return.

[10] This assumes claims of roughly equal size, calculated as 9.59% of $19.25 million, which equals $1,846,075. Notably, the claims rate was less than 10%. (*Williams*, ECF No. 3 54-2, Ex.B ¶ 10.)

with the Settlement and the fee request.

### 3.   Requiring All Class Members To Submit Claims Forms Is An Unfair Impediment To Recovery, Especially Given The Information In Defendants' Possession

The claims-made process is particularly disturbing in this case because Defendants have the information available to them to automatically process the claims of the Settlement Class members. Where the borrowers are precisely known, requiring class members to submit a claim form is an unreasonable and inappropriate obstacle to recovery that will most assuredly lead to the great majority of class members not receiving any monetary relief. As in *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014), "The class members [are] known, the benefits of the settlement [have] been 'traced with some accuracy,' and costs could be 'shifted with some exactitude to those benefiting[]'" and therefore, here, as in *NBTY, Inc.*, this settlement falls outside the range of possible final approval. *Id.* at 782 (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 480-81 (1980)); s*ee also Managing Class Action Litig.: A Pocket Guide for Judges,* Fed. Judicial Ctr. (3d. ed. 2010), p. 30 ("If the claims process deters class members from filing claims, the settlement may have less value to the class than the parties assert . . . Avoid imposing unnecessary hurdles on potential claimants. First, consider whether a claims process is necessary at all. The defendant may already have the data it needs to automatically pay the claims of at least a portion of class members who do not opt out."). Furthermore, Nationstar could simply reduce Settlement Class members' indebtedness by the amount it owes them under the Settlement Agreement—thereby negating any risk of fraud.

Defendants have the necessary information. The Settlement Agreement contemplates that Defendants identify each Class member to mailing notice to Settlement Class Members. *See e.g.*, Doc. No. 91-4 (page 9 of 56), response to Question 1 (the class notice that identified every class member and informed them that the Notice was sent to them because "Defendants'

9

records" indicated that Defendants issued a force-placed insurance policy on their behalf). Thus, there is no legitimate reason for a claim form. This is especially true here because this case is brought against lenders and servicers who are required by law to maintain the data. *See* Real Estate Settlement Procedures Act, 12 U.S.C. §3500.17(i). ("[S]ervicer must submit to the borrower an annual statement for each escrow account item within thirty days of the completion of the computation year" including "the amount paid from the account for taxes, *insurance premiums,* and other charges.") (emphasis added).

Furthermore, the Settlement requires that Defendants calculate the amount owed to each claimant. The Parties suggest that a claims-made process is necessary is because Defendants cannot determine the amount of force-placed premiums paid or currently owed by a borrower and that the claims that are filed will provide that information for each claimant. But the claims form does not request this information. *See* Claim Form, Doc. No. 91-4 (pages 20-23 of 56) (requesting the class member to check a box if they have been "charged" a premium for force placed insurance, but not requiring them to identify the amount of the charge).

The Parties' purported reasons for implementing a claims-made process thus cannot stand. While Defendants may justifiably wish to reduce costs by having Class Members report the amount they paid, the claims process the Parties seek to implement does not do that. This Court should not approve a settlement that the Parties engineered to cut Defendants' costs by reducing the *number of Claimants* for whom Defendants must determine the amount Class Members owe or paid. The claims form is intended as a hurdle to recovery.

As a result, the claims-made nature of the Settlement for all class members is unreasonable, unnecessary, unjustified, and intended only to shield Defendants from making substantial payments to the Settlement Class. If the Court does not reject this proposed

Settlement, the Court should defer deciding the motion until the Court of Appeals rules on similar issues in the *Bank of America* and *Wells Fargo* appeals.

**4.     The Settlement Is Designed To Assure That Most Of The Settlement Class Will Receive No Recovery While Extinguishing Their Valuable Claims**

The Seventh Circuit Court of Appeals recently rejected a settlement in the *Pella* windows case and raised concerns similar to those that the Urquharts raise here. *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014). The Seventh Circuit (in a decision written by Judge Posner) noted that "from the selfish standpoint of class counsel and the defendant . . . the optimal settlement is one modest in overall amount but heavily tilted toward attorneys' fees." *Pella,* 753 F.3d at 720. There is "an incentive of class counsel, in complicity with the defendant's counsel, to sell out the class by agreeing with the defendant to recommend that the judge approve as settlement involving a meager recovery for the class but generous compensation for the lawyers -- the deal that promotes the self-interest of both class counsel and the defendant and is therefore optimal from the standpoint of their private interests." *Id.* (citations omitted)).

Settlements that favor the attorneys require harsher scrutiny. The *Pella* and *NBTY, Inc.* decisions from the Seventh Circuit and two recent Ninth Circuit cases are instructive. In *In re Magsafe Apple Power Adapter Litig.*, 571 F. App'x 560 (9th Cir. 2014), the Ninth Circuit reversed an order approving a class action settlement agreement and attorneys' fee award. In doing so the Ninth Circuit criticized the district court for failing to require information about the value of the settlement. *Id.* at 565. The Ninth Circuit found that having "conducted the fairness hearing before the claims-submission period closed" provided "no reliable way of estimating how many valid claims were submitted or the total amount that [defendant] intends to pay claimants. . . ." *Id.* Further, the Ninth Circuit additionally found that "the district court *erred* by not addressing the indicia of self-dealing or implicit collusion" because the court "did not assess with specificity

11

whether class counsel received a disproportionate share of the settlement, nor did it mention the clear-sailing provision or the implied revision clause." *Id.*

The Urquharts oppose final approval of this Settlement to protect the Settlement Class against a settlement that shares some of the same dangerous defects identified by the appellate courts in *Pella, NBTY, Magsafe and Laguna.* Class Counsel have settled other similar force placed insurance cases in this District and have been awarded more than $50 million in fees so far. This Settlement would provide another $5 million in fees to Class Counsel, raising some of the same concerns posed by the *Pella* court. Those concerns are even more apparent because here there is a serious question about how much the Settlement will provide class members. The Court should require the parties to identify how much they will pay to the Settlement Class.

The proposed Settlement also includes the features that the Ninth Circuit was concerned about in *Laguna*: (1) Class Counsel will be receiving a disproportionate fee award when compared to the actual, anticipated dollar amount of the settlement; (2) the parties negotiated a clear sailing provision and provided a separate provision for attorneys' fees and costs (Settlement Agreement ¶ 15.2); and (3) the Settlement Class will receive far less than the amount of the funds to which they might be entitled, leaving those funds in Defendants' hands. With these defects and without further explanation by the Parties, the Court should find that this Settlement falls outside the range of possible final judicial approval.

**5.     The Settlement Is Unfair To The Extent That It Required Objections And Opt-Outs Before The Parties Have Filed Supporting Papers Detailing The Claims Received, The Final Payout, And The Request For Attorneys Fees And Expenses**

The Urquharts oppose final approval of the Settlement to the extent that it requires Class members to opt-out or object to the Settlement before the parties disclose how much the Settlement actually will pay to the Settlement Class. *See* Doc. No. 91-1 at ¶¶ 2.34-35.

The Settlement Class members do not have the details they need in order to make an informed decision about whether to object, opt-out, or remain in the Settlement.[11] The Settlement Agreement places the claims deadline 60 days after appeals or petitions for certiorari have been disposed of, ensuring that Class Members cannot understand the value of the Settlement.

The Final Approval Hearing should occur after the claims deadline or at least after the parties disclose how many Class members have filed claims and how much Defendants will pay to the Settlement Class. That way, when the Court considers the Settlement, it will know exactly how many claims have been submitted and how much Defendants actually will pay out to Class members under the Settlement. Similarly, members of the Settlement Class will have information that they need in order to exercise their rights in a meaningful way.

6.    **The Settlement Is Unfair Because Final Approval Precedes The Claims Deadline**

The deadline to submit claims will not run until at least 60 days after the Settlement has been finally approved and any appeal period has expired. Doc. No. 91-1 at ¶ 2.8 (defining "Claim Deadline" to come 60 days after the "Final Settlement Date," as defined in ¶ 2.24). This gives the Parties the ability to represent that claims are still being filed even after the Final Approval hearing. But it also prevents the Court from fully understanding just how little this Settlement will pay to the Class.

---

[11] *See Cassese v. Williams*, 503 F. App'x 55, 57 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 2023 (2013) (in which class counsel divulged additional information regarding their billing rates, hours worked, and tasks performed and objectors then had two weeks to crystallize their objections and request further information before attending the fairness hearing). *See also In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 993-994 (9th Cir. 2010) (explaining the requirement for district courts to set deadlines for objections to counsel's fee request on a date after the fee motion and supporting documents have been filed); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 803 (3d Cir. 1995) (in which the Third Circuit discussed the importance of informing the class: "by endorsing a practice where the class is, for practical purposes, deprived of information concerning the fees, courts foster a situation where there will be fewer objectors."); *id.* at 821, n. 23 ("The information on fee agreements may prompt potential objectors to oppose not only the awards but, also, to the extent they conclude that arm's length negotiations were compromised, the adequacy of the settlement and the propriety of the class.").

This sort of arrangement led the Seventh Circuit to reverse the approval of the *Pella* settlement as an abuse of discretion. *Eubank v. Pella*, 753 F.3d 718 (7th Cir. 2014) (reversing the final approval where the district court did not have the benefit of the claims information before the final approval hearing, stating "Not only did the settlement agreement not quantify the benefits to the class members, but the judge approved it before the deadline for filing claims."). Nor can Class Members know exactly when the deadlines for submitting claims expires; they are left to guess, creating uncertainty that surely will lead to fewer claims.

The Settlement should set a date-certain for submitting all claims that is before any Final Approval Hearing so that the Court will know the claims ultimately paid before deciding whether to approve the Settlement as fair and reasonable and before it awards any fees and expenses.[12]

7.    **The Release Should Only Be Effective Against Class Members Whose Claims Are Paid**

Judge Posner in *Pella* recently explained, "Opting out of a class action is very rare. Virtually no one who receives notice that he is a member of a class in a class action suit opts out. He doesn't know what he could do as an opt-out. He's unlikely to hire a lawyer to litigate over a window [the case involved defective windows]." *Eubank v. Pella Corp.*, 753 F.3d 718, 729 (7th Cir. 2014). Defendants therefore have an incentive to push through a claims-made settlement that will result in a small number of claims, very few opt-outs and a broad release. In *Pella*, the appellate court rejected that approach and reversed the district court's order approving the settlement. This Court should deny final approval of this settlement until the parties provide additional information to support the fairness of the Settlement.

---

[12] *See De Leon v. Bank of Am.*, No. 09-cv-1251, 2012 WL 2568142, at * 15 (M.D. Fla. Apr. 20, 2012) and 2012 WL 2543586 (July 2, 2012) (adopting Mag. J Rec. & Op.) (denying approval of claims- made settlement with, among other things, a predictably low rate of claims); *Ferrington v. McAfee, Inc.*, No. 10-cv-01455, 2012 WL 1 156399, at * 13 (N.D. Cal. Apr. 6, 2012) (denying final approval of claims-made settlement involving "a low rate of claims participation, a small claims pay out, [and] a disproportionately large attorneys' fee award . . . .").

Alternatively, if the Court approves the Settlement, the release should only be effective against Settlement Class members who have been paid the settlement proceeds. Approving the release only against class members who have been paid protects the Class from overreaching by Defendants. It also accounts for the fact that very few class members would take the steps necessary to exclude themselves, especially where the opt-out period is so short.

8.    **The Settlement Is Unfair Because The Opt Out And Objection Periods Are Too Short And Improperly Restrict Each Class Member's Right <u>To Challenge The Settlement And To Pursue Existing Cases</u>**

The Settlement provides the class members with only approximately 70 days from the mailing of the Notice to opt out or object,[13] a period that is far too short given the important rights that would be released by this settlement and the Settlement Agreement's own recognition that some class members may not initially receive the notice. The suggested deadline for objections also is too short because it comes before the parties have submitted any evidence about the amount of the actual payout to Settlement Class members and how that amount compares to the attorneys' fees and expenses that Class Counsel seeks.

The Objection Deadline is also incorrect on the notice form. *Compare* Doc. No. 91-4 (page 14 of 56) ("Your objection must be filed with the Clerk of Court . . . postmarked no later than **June 15, 2015.**")(emphasis in original) *with* Preliminary Approval Order, Doc. No. 88 at 12, ¶ 12 (objections are due "no later than thirty (30) days before the Final Approval Hearing."); Doc. Entry 88 (setting Final Approval Hearing for July 16, 2015). Objections are due one day later than the claims form tells Class Members. Class Counsel made the same error for the Opt Out Deadline. *Compare* No. 91-4 (page 14 of 56) (stating "the exclusion deadline is June 15,

---

[13] Settlement Agreement, Doc. No. 91-1, at ¶ 2.35 (providing that class members must opt-out at least 30 days before the Final Approval Hearing); *see* Doc. No. 91-4 at ¶ 6 (providing that Notice was mailed on April 10, 2015).

2015") *with* Preliminary Approval Order, Doc. No. 88 at 11, ¶ 11 (a request for exclusion must be no later than thirty (30) days before the Final Approval Hearing.").

Furthermore, Docket Entry 91 states that responses to Plaintiff's Motion for Final Approval are due June 18, 2015. Because objections are due June 16, 2015, Class Members could be misled into filing objections up to two days late.

## 9.   The Claims Form Creates A Limitation On The Class Not Present In The Notice Or The Proposed Preliminary Approval Order

The Settlement Agreement and the Preliminary Approval Order specifically define the Settlement Class and do not exclude borrowers who had filed for bankruptcy or borrowers whose debt had been "compromised." *See* Doc. No. 88 at 5, ¶ 4(c). Yet in the Claim form the parties have unilaterally excluded from recovery borrowers who have filed a Chapter 7 petition, have had their mortgage discharged in bankruptcy, or had their debt "compromised." *See* Claim form (Doc. No. 91-4 (page 22 of 56) (in which the parties require the Class member to declare "under penalty of perjury" that "[s]ince the issuance of the LPI Policy, I have not filed a Petition under Chapter 7 of the United States Bankruptcy Code, and my indebtedness on my residence . . . has not been compromised or discharged in bankruptcy.").

It is unfair for the parties to define the class differently in the claim form than in the Settlement Agreement and in the Preliminary Approval Order. This discrepancy is troubling because Defendants' force placed insurance practices often caused borrowers to experience significant financial difficulties, including the need to file for bankruptcy protection or to "compromise" or modify their loans. The limiting language in the claim form does not explain why a  borrower ineligible for  recovery because of a loan modification or bankruptcy should have his claims be released, or what qualifies as a "compromise," or whether someone in the midst of a bankruptcy petition is excluded. Without clear answers to who is entitled to a claim,

16

the Court should reject the claim form.

**10.    The Injunctive Relief Provisions Purport To Impose Obligations And Eliminate Practices Already Addressed Under Regulations And Other Agency Settlements**

The Settlement purports to deliver additional benefits through injunctive relief provisions that enjoin or mandate specified practices by Defendants. However, much of this relief is illusory and is not a product of this Settlement. Instead, Defendants either previously changed their conduct or were obligated to by the terms of settlements they previously entered with state attorneys general and insurance departments, new federal regulations and proposed NYDFS regulations to refrain from the practices purportedly prohibited by this settlement and to comply with the guidelines that this settlement purports to establish. *See, e.g.*, NYDFS Proposed, 11 NYCRR 227 (Insurance Regulation 202), Regulation of Force-Placed Insurance; *see also* 12 C.F.R. § 1024.37(g)(effective date January 10, 2014). *See also* Federal Housing Finance Agency, No. 2013-05 Lender Placed Insurance, Terms and Conditions.

Class Counsel concedes, Plaintiff's Mot. for Final Approval at 14, that Assurant's Consent Order with NYDFS prohibits arrangements like those that it has with Nationstar, as well as payments to servicers for administrative services and provision of below-cost or free tracking services to servicers. The Settlement was not the impetus for these changes. Before approving a settlement that includes these terms, the Court should require the parties to explain what portion of the injunctive relief, if any, is attributable to the Settlement.[14]

---

[14] The parties submit a Declaration from Thomas Scott opines on the Settlement's injunctive relief. Doc. No. 91-3. The declaration does not disclose whether Mr. Scott considered that much of the injunctive relief was not a result of the Settlement. To the extent that the parties or the Court relies on Mr. Scott's Declaration, the Urquharts request the opportunity to cross-examine Mr. Scott about his opinions, including his opinions concerning the fairness of the Settlement and the fee request.

11.     **Objection To The Court Awarding Attorneys' Fees And Expenses As If There Were A Common Fund And Before The Parties Specify How Much Defendants Actually Will Pay Under The Settlement**

Usually in a class action settlement, the defendants create and fund a settlement account for the benefit of the class members. The defendant transfers the money to an escrow account and relinquishes control of the funds, which accrue interest for the benefit of the class. Then a settlement administrator either processes the claims automatically for the class members or, if it is a claims-made settlement, the class members submit claims. Any leftover amounts typically are then allocated to the class members in a supplemental distribution or are awarded through *cy pres* to a charitable organization. But the defendant retains no interest in the funds.

Here, there was no common fund established.[15] Defendants never transferred any money (much less $54 million) to plaintiffs' counsel or to a settlement administrator. *See* Doc. 91-1, ¶ 7.3.2. That is a tremendously important difference in this case from all of the cases that the parties cited to the District Court for the proposition that Plaintiffs are entitled to a fee on the benefit "made available" to the Class. For example, Class Counsel incorrectly asserts that it is entitled to a percentage of the total amount that the Class *could potentially* receive. Plaintiffs' Mot. for Final Approval at 16-20. That is not the law. Class Counsel cite a number of cases within the Eleventh Circuit where courts used a percentage of a common fund to calculate attorneys' fees. But in all but one of those cases defendants created an actual settlement fund.[16]

Class Counsel wrongly relies on a footnote in an unpublished decision, *David v. Am. Suzuki Motor Corp.*, No. 08-cv-22278, 2010 WL 1628362 (S.D. Fla. Apr. 15, 2010) in which the

---

[16] *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291 (11th Cir. 1999); *Camden I Condo. Aa'n v. Dunkle*, 946 F.2d 768 (11th Cir. 1991); *Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334 (S.D. Fla. 2007); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006).

18

court stated that a settlement may be treated as a common fund settlement "even where the counsel fees are not taken from a common fund but are instead paid separately by a class-action defendant[.]" *David v. Am. Suzuki Motor Corp.*, No. 08-CV-22278, 2010 WL 1628362 (S.D. Fla. Apr. 15, 2010). The court in *David*, however, came to this conclusion by stating that it was "unlike other cases where the common fund approach has been rejected because the non-monetary settlement's value was inflated, difficult to calculate, or illusory because of the nature of the benefits. *David*, 2010 WL 1628362, at *8, n.14 (citing *Strong v. BellSouth Telecommunications, Inc.*, 137 F.3d 844, 853 (5th Cir.1998)). Indeed, in *Strong*, the district court denied the requested attorneys' fees because the purported $64 million settlement was an inflated figure; the settlement ultimately only paid out $1.7 million. *Strong v. BellSouth Telecommunications, Inc.*, 173 F.R.D. 167, 172 (W.D. La. 1997) *aff'd*, 137 F.3d 844 (5th Cir. 1998) ("A request for $6 million in attorneys' fees where counsel has provided no more than $2 million in benefits to the class is astonishing. It is a sad day when lawyers transmogrify from counselors into grifters. Suffice it to say that we find the request unreasonable."). While the amount Defendants will ultimately pay to the Class here is unknown, it is foreseeable that there will be a similar incongruity. Thus, this Court should not treat this settlement as if there were a common fund because the purported monetary value of the settlement is inflated and the actual payout is beyond difficult to calculate—it is unknowable.

The distinction between this settlement and settlements in which defendants create a common fund is significant. In true common fund settlements, the Class benefits from the Court's equitable power to redistribute unclaimed funds or distribute funds *cy pres*. Class Counsel are permitted to take a percentage of a common fund without regard to actual payout because the class is benefited by the entire fund—even where the claims rate is low—through

19

these equitable powers. Here, however, Defendants never relinquish possession of the entirety of the settlement funds. The Court may find this prevents the Class from gaining an equitable interest in the funds and thus prevents the Court from exercising equitable power over the funds.

This is an issue that is on appeal to the Eleventh Circuit in the *Bank of America* and *Wells Fargo* cases. The Urquharts suggest that the Court require the parties to provide the missing information so that the Court can assess the fairness of the fee request in light of the actual payments that will be made to the Class. To the extent that questions remain about the fairness of the fee, the Urquharts respectfully suggest that the Court defer ruling on the motion until the Court of Appeals rules on similar issues in the *Bank of America* and *Wells Fargo* cases.

It is also premature to consider the fee request until Plaintiffs' Counsel submits its lodestar information so that the Court can cross-check the fee application against the actual time that counsel devoted to the case.[17] Without that information, Class Members do not have sufficient information to object. That is unfair.

## CONCLUSION

Andrew and Twila Urquhart object to the proposed Settlement and fee request and they request that the Court deny the pending motion.

Dated: June 16, 2015                    Respectfully submitted,

                                        By: /s/ Stephen J. Fearon, Jr.
                                            Stephen J. Fearon, Jr.
                                            SQUITIERI & FEARON, LLP
                                            32 East 57th Street, 12th Floor
                                            New York, New York 10022

---

[17] *McDaniel v. County of Schenectady*, 595 F.3d 411, 417 (2d Cir. 2010); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007) (recognizing that courts may apply "the lodestar method as a cross check on the reasonableness of the requested percentage")(internal quotations marks omitted); *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) (opining that "the lodestar remains useful as a baseline even if the percentage method is eventually chosen" and "encourag[ing] the practice of requiring documentation of hours as a 'cross check' on the reasonableness of the requested percentage").

Tel: (212) 421-6492
Fax: (212) 421-6553
stephen@sfclasslaw.com

**ATTORNEY FOR ANDREW AND
TWILA URQUHART**

21

## CERTIFICATE OF SERVICE

      I hereby certify that on June 16, 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF. The undersigned further certifies that he caused to be served via USPS First Class Mail, postage prepaid, a copy of this Objection and Notice of Intention to Appear upon the following:

Clerk of the United States District
Court for the Southern District of Florida
400 North Miami
8th Floor
Miami, FL 33128

Frank G. Burt
Carlton Fields Jorden Burt, P.A.
1025 Thomas Jefferson St., NW
Suite 400 East
Washington, DC 20007

Adam M. Moskowitz
Kozyak, Tropin, & Throckmorton, P.A.
2525 Ponce de Leon Blvd.
9th Floor
Coral Gables, FL 33134

John B. Sullivan
Mary Kat Kamka
Severson & Werson,
A Professional Corporation
One Embarcadero Center,
Suite 2600
San Francisco, CA 94111


By: /s/ Stephen J. Fearon, Jr.
         Stephen J. Fearon, Jr.

Dated:        June 16, 2015

ANDREW URQUHART

Dated:          June 16, 2015

_____
TWILA URQUHART