# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

## CASE NO. 14-CV-20726-GOODMAN
### [Consent Case]

HOWARD BRAYNEN, *et al.*,
on behalf of themselves and
all others similarly situated,

    Plaintiffs,

v.

NATIONSTAR MORTGAGE, LLC, *et al.*,

    Defendants.

_____/

## ORDER GRANTING FINAL APPROVAL
## TO CLASS ACTION SETTLEMENT

On July 16, 2015, the Undersigned held a hearing on the parties' request that the

Court grant final approval to the proposed class action settlement, overrule the few

objections and grant Class Counsel's fee application (the "Final Fairness Hearing").  The

Court granted preliminary approval of the settlement on January 30, 2015. [ECF No. 88].

The Final Fairness Hearing was held pursuant to Federal Rule of Civil Procedure

23(e)(1)(A),  which mandates judicial review of any "settlement, voluntary dismissal, or

compromise of the claims, issues, or defenses of a certified class." The Court has

carefully considered the parties' written submissions, including post-hearing

memoranda and exhibits, the evidence and arguments presented, and the applicable

law.   For the reasons that follow, the proposed class action settlement and Class Counsel's fee application are **APPROVED** in their entirety, and all objections are hereby **OVERRULED.**

## FACTUAL BACKGROUND

Homeowners are required by the terms of their mortgage contracts to maintain insurance coverage on the properties securing their loans. If the homeowner does not maintain the required insurance, then the lender is authorized by the mortgage contract to obtain new insurance to cover its interest in the property and the loan. Lenders do this by contracting with insurance carriers for the insurance's automatic issuance. This is what is commonly referred to as "lender-placed insurance" [1] ("LPI").

On January 30, 2015, this Court granted preliminary approval to the proposed class action settlement set forth in the Stipulation and Settlement Agreement (the "Settlement Agreement")[2] between Plaintiffs Howard Braynen, Toni Murray, and Ronald Hutchings ("Named Plaintiffs" or "Plaintiffs"), on behalf of themselves and all members of the Settlement Class, and Defendants Nationstar Mortgage, LLC, Harwood Service Company, LLC, Nationstar Mortgage Holdings Inc. (collectively, "the

---

[1]   Class Counsel and Plaintiffs usually refer to the practice as force-placed insurance, while Defendants typically use the term lender-placed insurance ("LPI").

[2]   Unless otherwise indicated, all capitalized terms used herein have the same defined meaning assigned to them in the Settlement Agreement [ECF No. 91-1, ¶¶ 2.1-2.50], and all ECF citations refer to the Braynen Litigation docket.

Nationstar Defendants"), Assurant, Inc. ("Assurant"), American Security Insurance Company ("ASIC"), Standard Guaranty Insurance Company ("SGIC"), and Voyager Indemnity Insurance Company ("VIIC") (Assurant, ASIC, SGIC, and VIIC are, collectively, the "Assurant Defendants").

The Court also provisionally certified the Settlement Class for settlement purposes, approved the procedure for giving Class Notice to the members of the Settlement Class, and set a Final Fairness Hearing to take place on July 16, 2015. The Court finds that the Class Notice substantially in the form approved by the Court in its Preliminary Approval Order was given in the manner ordered by the Court, constitutes the best practicable notice, and was fair, reasonable, and adequate.

On July 16, 2015, the Court held a duly-noticed Final Fairness Hearing to consider: (a) whether the terms and conditions of the Settlement Agreement are fair, reasonable, and adequate; (b) whether a judgment should be entered dismissing the Named Plaintiffs' amended complaint on the merits and with prejudice in favor of the Defendants and against all persons or entities who are Settlement Class Members herein who have not requested exclusion from the Settlement Class; and (c) whether and in what amount to award Attorneys' Fees and Expenses to Class Counsel for the Settlement Class and whether and in what amount to award a Case Contribution Award to the Named Plaintiffs.

As described by Class Counsel, the Settlement before the Court would make more than $76 million[3] in monetary relief available to 380,404 Nationstar borrowers from across the country whom Plaintiffs have alleged were charged inflated amounts for LPI. According to Class Counsel (and  Defendants do not disagree), the monetary relief provided by the Settlement will likely offer each class member a better recovery than they could have won at trial, while the injunctive relief provided by the Settlement will enjoin all Defendants from engaging in specific practices complained of for five years. For their efforts, Class Counsel have requested a fee in an amount equal to 6.57% of the total monetary benefits that have been made available to the Class by the Settlement (and an even lower percentage when taking into account the value of the injunctive relief).

Class Counsel proudly tout this result as an extraordinary one for the Settlement Class. They point to the negligible opposition to the Settlement. From a class of almost 400,000 members nationwide, only two *pro se* class members have pending objections, neither of whom appeared at the Final Fairness Hearing.  After carefully reviewing the

---

[3]      Plaintiffs' motion for final approval of the class action settlement initially described the settlement as providing more than $54 million in monetary relief (plus the value of the injunctive relief). At the Final Fairness Hearing, however, Class Counsel explained that they are viewing the settlement as providing the potential of $76 million, plus the value of injunctive relief. Class Counsel advised that the value of the settlement was calculated by taking 12.5 percent of the net written premium (of $609,287,567), which yields $76.16 million. [ECF No. 108, pp. 15-16].

submissions, the Court finds that the two *pro se* objections are based on basic misunderstandings of either the terms of the Settlement or the law that applies to class action settlements. To the extent that these two objectors were not happy with the recovery that the Settlement offers or felt that it would not cover their individual losses, they were given the opportunity to opt out and pursue their own claims in separate litigation, an avenue that 107 other class members have chosen to undertake.

The soundness of the proposed Settlement is also confirmed by the approval that district courts have given substantially similar settlements in force-placed insurance litigation in this district and elsewhere. *See, e.g., Hamilton v. SunTrust Mortg., Inc.*, No. 13-cv-60749 (S.D. Fla.); *Fladell v. Wells Fargo Bank, N.A.*, No. 13-cv-60721 (S.D. Fla.); *Diaz v. HSBC Bank (USA), N.A.*, No. 13-cv-21104 (S.D. Fla.); *Hall v. Bank of Am., N.A.*, No. 12-cv-22700 (S.D. Fla.); *Saccoccio v. JPMorgan Chase Bank, N.A.*, No. 13-cv-21107 (S.D. Fla.); *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla.); *Casey v. Citibank, N.A.*, No. 13-cv-820 (N.D.N.Y.).

In fact, the Undersigned recently approved another force-placed insurance class action lawsuit involving most of the same attorneys for parties on both sides of the litigation. *See Lee v. Ocwen Loan Servicing, LLC*, No. 14-CV—60649, 2015 WL 5449813 (S.D. Fla. Sept. 14, 2015).

## History of LPI Litigation

Before assessing the reasonableness of the Settlement, it is important to understand some of the history of force-placed insurance litigation. LPI is purchased by the mortgage servicer when the homeowner allows his or her policy to lapse. The Southern District of Florida has been at the epicenter of the LPI litigation, having handled at least twenty separate LPI class action cases.

In early 2011, Class Counsel here filed the first of this wave of force-placed insurance class actions in the Southern District of Florida, *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233-RNS (S.D. Fla.), an action that was vigorously litigated before this Court. On February 21, 2012, this Court certified a Florida class of borrowers in *Williams* and also found that the plaintiffs' expert, Birny Birnbaum, was "qualified to proffer the testimony rendered in this case regarding the class-wide determination of whether the force-placed insurance premiums were excessive, and if so at what rates." *Williams*, No. 11-cv-21233-RNS, ECF No. 211, p. 5. The Defendants petitioned to appeal the class certification order, but certification to appeal was denied by the Eleventh Circuit on May 10, 2012. The parties ultimately settled the *Williams* action on behalf of a Florida-only hazard insurance class, and their settlement was granted final approval on September 11, 2013. *See id.*, ECF No. 356.

Class Counsel subsequently filed sixteen additional nationwide class actions in the Southern District of Florida against most of the major mortgage lenders and

servicers and their partner insurers, including this litigation against Assurant and Nationstar. They have now reached nationwide settlements in most of the cases. As in this case, there has been minimal or negligible opposition to these nationwide force-placed insurance settlements.

Although different judges in this district who have handled these cases have been uniform in allowing them to proceed past motions to dismiss, some of them have dismissed certain counts or otherwise questioned the viability of certain theories of relief. *See, e.g., Wilson v. Everbank, N.A.*, No. 14-22264, 2015 WL 1600549, at *2-6 (S.D. Fla. Apr. 9, 2015) (dismissing comparable mail and wire fraud-based claims in similar LPI case). In addition, many cases filed in other jurisdictions have been dismissed on the pleadings or denied class certification. *See, e.g., Johnson v. Green Tree Servicing LLC*, No. 15-cv-18-MPM-SAA, ECF No. 33 (N.D. Miss.) (dismissing all claims with prejudice and finding that "[i]n addition to being barred by the filed rate doctrine, the court also finds that Johnson has failed to state a claim for breach of contract or bad faith."); *Gustafson v. BAC Home Loans Servicing*, 294 F.R.D. 529 (C.D. Cal. 2013) (denying class certification).

Three LPI class action cases involving Class Counsel are still in litigation in this district, two of which are set for trial at the end of this year and are already in mediation.  *See Jackson v. U.S. Bank, N.A.*, No. 14-cv-21252 (S.D. Fla.); *Circeo-Loudon v. Green Tree Servicing, LLC*, No. 14-cv-21384 (S.D. Fla.). In fact, according to a November 3, 2015 filing, ECF No. 119, in *Jackson*, the parties advised District Judge Moreno that they

have "finalized the Settlement Agreement" and expect to submit it (along with a motion for preliminary approval of class action settlement) by November 9, 2015. Similarly, in an October 30, 2015 filing, ECF No. 116, the parties in *Cicero-Loudon* advised Judge Moreno that they, too, have "finalized the Settlement Agreement" and expect to submit it (and the accompanying motion for preliminary approval) by November 13, 2015.

By the parties' count, district courts have granted final approval to at least eight LPI class action settlements with the same structure as the Settlement here, as well as several others that are structured differently and provide much *less* monetary relief to class members. Indeed, one district court touted settlements like this -- that provide near-complete relief to class members on a claims-made basis -- as extraordinary, and particularly so when compared to direct-pay force-placed insurance settlements that compensate all members of a settlement class, but provide far less relief to each class member and with payments that bore little, if any, relation to the actual losses suffered by individual class members. *See Arnett v. Bank of Am., N.A.*, No. 3:11-cv-1372, 2014 U.S. Dist. LEXIS 130903, at *35-37 (D. Or. Sept. 18, 2014).

## The Underlying Litigation

The class action cases underlying this Settlement were filed in this district and in the Northern District of Ohio. *See Braynen v. Nationstar Mortg., LLC*, No. 1:14-cv-20726 (S.D. Fla.); *Murray v. Nationstar Mortg., LLC*, No. 13-cv-24280 (S.D. Fla.); *Hutchings v. Nationstar Mortg., LLC*, No. 13-cv-00569 (N.D. Ohio). All of the Named Plaintiffs and

their counsel joined forces after more than one year of litigation[4] to negotiate a global, nationwide settlement of all claims against the Defendants.

Plaintiffs in all three cases brought claims challenging the Defendants' LPI practices, which they alleged included inflating the amounts charged to borrowers for lender-placed coverage. Nationstar is authorized by contract to place coverage on borrowers' properties in the event of a lapse in their own coverage, but Plaintiffs allege that some of the costs are not properly charged to the borrower. According to Plaintiffs, these charges included kickbacks that Assurant and its subsidiaries paid to Nationstar to maintain their exclusive relationship with the mortgage lender, which took several forms. Plaintiffs allege that after Nationstar paid the Assurant Defendants a premium for borrowers' coverage, the insurers would return a portion of the premium to Nationstar (thereby paying an effective rebate), the benefit of which Nationstar would not then pass on to the borrower.

Plaintiffs also alleged that Nationstar and the Assurant Defendants entered into riskless reinsurance agreements that provided that the insurer would return significant percentages of the premiums charged borrowers by way of ceded reinsurance premiums to Nationstar affiliates or subsidiaries. Plaintiffs alleged that the ceded

---

[4] Ronald Hutchings and Toni Murray initiated suit in the Northern District of Ohio and in this district, respectively, in early 2013. Howard Braynen filed suit in this district in February 2014.

premiums were nothing more than a *de facto* kickback to Nationstar and another way for Defendants to profit from the forced placement of new coverage.

Defendants are also alleged to have profited illegitimately by inflating the amounts charged borrowers with subsidies for below-cost administrative services that Assurant had provided Nationstar. Plaintiffs claimed that the alleged misconduct violated their mortgage contracts, constituted a breach of Nationstar's fiduciary duties to its borrowers, and violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), the Truth in Lending Act ("TILA"), and the federal RICO statute. Plaintiffs also alleged that Defendants were unjustly enriched by these practices, and that the Assurant Defendants had tortiously interfered with borrowers' mortgage contract by participating in the alleged scheme.

All Defendants denied these claims, arguing that all of their actions were not only approved, but also authorized by borrowers' mortgage contracts, and asserting various other defenses. There is no dispute that Plaintiffs faced considerable hurdles had they proceeded with litigating their claims.  The Undersigned will discuss these legal obstacles in further detail in a later portion of this Order.

NOW, THEREFORE, IT IS HEREBY **ORDERED** THAT:

1.     The Court has personal jurisdiction over the Parties and the Settlement Class Members, venue is proper, the Court has subject-matter jurisdiction to approve the Settlement Agreement, including all exhibits thereto, and to enter this Final Order.

2.     The Court finds that the prerequisites for a class action under Federal Rule 23 have been satisfied for settlement purposes in that: (a) the number of Settlement Class Members is so numerous that joinder of all members thereof is impracticable; (b) there are questions of law and fact common to the Settlement Class; (c) the claims of the Named Plaintiffs are typical of the claims of the Settlement Class they seek to represent; (d) Named Plaintiffs have and will continue to fairly and adequately represent the interests of the Settlement Class for purposes of entering into the Settlement Agreement; (e) the questions of law and fact common to the Settlement Class Members predominate over any questions affecting any individual Settlement Class Member; (f) the Settlement Class is ascertainable; and (g) a class action settlement is superior to the other available methods for the fair and efficient adjudication of the controversy.

3.     Pursuant to Federal Rule 23, this Court hereby finally certifies the Settlement Class, as identified in the Settlement Agreement, which shall consist of the following:

> All borrowers in the United States who, within the Class Period (as defined below), were charged by the Nationstar Defendants under a hazard, flood, flood gap, or wind-only LPI Policy for residential property, and who, within the Class Period, either (a) paid to the Nationstar Defendants the Net Premium for that LPI Policy or (b) did not pay to and still owe the Nationstar Defendants the Net Premium for that LPI Policy.
>
> The Class Period shall commence on **January 1, 2008** and shall continue through and including **January 30, 2015.**
>
> Excluded from the Settlement Class are: (a) individuals who are or were during the Class Period officers or directors of the Defendants or any of

their respective Affiliates; (b) any justice, judge, or magistrate judge of the United States or any State, their spouses, and persons within the third degree of relationship to either of them, or the spouses of such persons; (c) borrowers whose LPI Policy was cancelled in its entirety such that any premiums charged and/or collected were fully refunded to the borrower or the borrower's escrow account; and, (d) all borrowers who file a timely and proper request to be excluded from the Settlement Class.

4.      The Court finally appoints the law firms of Kozyak, Tropin, & Throckmorton, P.A., Podhurst Orseck, P.A., and Harke Clasby & Bushman LLP as Class Counsel for the Settlement Class.

5.      The Court finally designates Named Plaintiffs Howard Braynen, Toni Murray, and Ronald Hutchings as the Class Representatives.

6.      The Court makes the following findings on notice to the Settlement Class:

(a)      Federal Rule 23(c)(2) requires that notice to Settlement Class Members be the "best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." However, "even in Rule 23(b)(3) class actions, due process does not require that class members actually receive notice." *Juris v. Inamed Corp.*, 685 F. 3d 1294, 1321 (11th Cir. 2012). Instead, notice need only be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985).

(b)     The Court finds that the Class Notice and methodology set forth in the Settlement Agreement, the Preliminary Approval Order, and this Final Order, including the distribution of the Mail Notice, Summary Publication Notice (published in *USA Today*), creation of the interactive voice response toll-free telephone number system, and creation of the Settlement Website (i) constituted the best practicable notice under the circumstances to Settlement Class Members, (ii) constituted notice that was reasonably calculated, under the circumstances, to apprise Settlement Class Members of the pendency of the Litigation, their right to object or to exclude themselves from the proposed Settlement, and their right to appear at the Final Approval Hearing, (iii) was reasonable and constituted due, adequate, and sufficient notice to all persons entitled to be provided with notice, and (iv) complied fully with the requirements of Federal Rule 23, the United States Constitution, the Rules of this Court, and any other applicable law.

7.     The Parties have complied with their notice obligations under the Class Action Fairness Act, 28 U.S.C. § 1715, in connection with the Settlement. Defendants timely sent notices of the proposed Settlement, including the materials required by that Act, to the appropriate state and federal officials.

8.     The Settlement Agreement is finally approved as fair, reasonable, and adequate pursuant to Fed. R. Civ. P. 23(e). The terms and provisions of the Settlement Agreement, including all exhibits thereto, have been entered into in good faith and are

hereby fully and finally approved as fair, reasonable, and adequate as to, and in the best interests of, each of the Parties and the Settlement Class Members.

9.      There is a strong judicial policy favoring the pretrial settlement of class actions.  *See, e.g.*, *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the pretrial settlement of class action lawsuits."); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("Particularly in class action suits, there is an overriding public interest in favor of settlement.").[5] A class settlement should be approved if it is "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e)(2), and "not the product of collusion." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).

While Federal Rule 23(e) itself does not particularize standards for approval, those standards have been articulated in the case law. They include "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved." *Id.*; *see also Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1240 (11th Cir. 2011).

---

[5]      All Fifth Circuit decisions issued prior to the close of business on September 30, 1981, are binding precedent upon the Eleventh Circuit. *Bonner v. Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

(a)     This Court, like others, "considers the reaction of the class, as well as the reaction of the various state attorney generals and regulators, to the proposed settlement to be an important indicator as to its reasonableness and fairness." *Hall v. Bank of Am., N.A.*, No. 12-22700, 2014 WL 7184039, at *5 (S.D. Fla. Dec. 17, 2014). Obviously, "a low number of objections suggests that the settlement is reasonable, while a high number of objections would provide a basis for finding that the settlement was unreasonable." *Saccoccio v. JPMorgan Chase Bank, N.A.*, 297 F.R.D. 683, 694 (S.D. Fla. 2014); *see also Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005).

(i)     This Settlement has met with near-universal approval. A total of 380,404 Mail Notices were sent to Class Members. [ECF No. 91-4, ¶ 6]. In any class of this size, it would be no surprise if a settlement produced numerous objections and exclusions. Yet here, just *two* Class Members objected (Marshell Easley, ECF No. 98, and Gladys Coleman, ECF No. 90) -- a trivial fraction of the Class.[6] A third putative objector (Ken Faver, ECF No. 95) is not a Class Member.  Neither the United States Attorney General, the Director of the Consumer Financial Protection Bureau, the Comptroller of the Currency, nor a single state attorney general or insurance commissioner objected, although they were all notified of the opportunity to do so.

---

[6]     Settlement Class Members Twila and Andrew Urquhart filed an objection [ECF No. 96] that they struck less than an hour later [ECF No. 97]. As the filing appears to have been inadvertent and withdrawn, the Court will not consider it.

(ii)   These are powerful indicia that the Settlement is fair, reasonable, and adequate and deserves final approval. *See Hall*, 2014 WL 7184039, at *5 (where objections from LPI settlement class members "equates to less than .0016% of the class" and "not a single state attorney general or regulator submitted an objection," "such facts are overwhelming support for the settlement and evidence of its reasonableness and fairness"); *Hamilton v. SunTrust Mortg, Inc.*, No. 13-60749, 2014 WL 5419507, at *4 (S.D. Fla. Oct. 24, 2014) (where "not a single state attorney general or regulator submitted an objection," and there were few objections to LPI class settlement, "such facts are overwhelming support for the settlement"); *Burrows v. Purchasing Power, LLC*, No. 12-22800, 2013 WL 10167232, at *7 (S.D. Fla. Oct. 7, 2013) ("No members of the Settlement Class oppose the settlement, nor have any governmental agencies filed opposition.").

(b)   "The next two *Bennett* factors are the range of possible recovery and the point on or below the range at which a settlement is fair, adequate and reasonable." *Lipuma*, 406 F. Supp. 2d at 1322.  "In considering the question of a possible recovery, the focus is on the possible recovery at trial." *Id.* "The Court's role is not to engage in a claim-by-claim, dollar-by-dollar evaluation, but to evaluate the proposed settlement in its totality." *Id.* at 1323. "'A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery.'" *Id.* (quoting *Behrens v. Wometco Enters.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988)).

(i)       This Settlement is generous to Class Members, providing relief approximating a trial win and, for many Class Members, exceeding a trial win. In LPI class actions like this, plaintiffs have not challenged the right to place LPI or sought the return of the entire LPI charge, but have sought only the portion of the charge allegedly "inflated" by defendants' compensation arrangements. In this Settlement, for each LPI Policy, Class Members may obtain a refund or credit of 12.5% of the LPI's Net Premium [ECF No. 91-1, ¶¶ 4.6.2, 4.6.3], a percentage that the Court finds not only approximates Class Members' alleged damages, but is comparable to or exceeds refund and credit percentages allowed in multiple LPI class settlements approved in this District and elsewhere. *See, e.g., Hamilton*, 2014 WL 5419507, at *4 (10.5%); *Fladell v. Wells Fargo Bank, N.A.*, No. 13-60721, 2014 WL 5488167, at *4 (S.D. Fla. Oct. 29, 2014) (7% or 11%); *Saccoccio*, 297 F.R.D. at 693 (12.5%). Unlike some consumer class settlements, this is not a low-dollar value or "coupon" settlement.  In many instances, perhaps most, the Claim Settlement Relief will be worth hundreds of dollars to the average Claimant.

(ii)      Even if a Class Member did not pay any portion of her LPI Premium, that Class Member is nevertheless still entitled to recover full Claim Settlement Relief, the only difference being the manner in which relief is provided.  And Class Members are eligible to receive Claim Settlement Relief merely by submitting a streamlined Claim Form and confirming their identity in one of several ways. Detailed information -- like coverage periods, total charges, or amounts paid -- need not be

supplied. [ECF No. 46-1, Ex. C]. To the contrary, although Defendants reserve the right to audit claims for evidence of fraud, the Parties will accept as truth Class Members' affirmations that they paid a portion of the Premium.

(iii) The Settlement also offers substantial injunctive relief. [ECF No. 91-1, ¶¶ 4.2-4.4]. For a five-year period, Nationstar will not receive commissions paid as a result of the placement of LPI, enter into any quota share reinsurance arrangements on new or renewal LPI policies, accept payments from any LPI insurer or LPI vendor for any administrative or other service associated with LPI, or place LPI through an insurer or vendor affiliated with Nationstar. [*Id.*, ¶ 4.2.1(i)-(iv)]. LPI policies will be dual interest for any coverage for which Nationstar attempts to recoup from borrowers the LPI premiums paid by Nationstar to the LPI insurer; "dual interest" means that the borrower will have the right to file a claim under the policy. [*Id.*, ¶ 4.2.1(v)]. And the Settlement requires other conduct from Nationstar.  [*Id.* ¶ 4.2.1(vi)-(viii)]. Similarly, the Settlement will prohibit the Assurant Defendants for a five-year period from providing to Nationstar or affiliates hazard LPI commissions, LPI quota share reinsurance arrangements, or payments for administrative or other services associated with hazard LPI or other LPI-related services. [*Id.*, ¶ 4.3.1(i)-(iii)]. Nor may the Assurant Defendants accept payments from Nationstar for below-cost or free outsourced services provided to Nationstar in connection with hazard LPI. [*Id.*, ¶ 4.3.1(iv)]. Similar LPI-related injunctive relief has been found to "have significant value

to the class members nationwide." *Hamilton*, 2014 WL 5419507, at *4; *see also Hall*, 2014 WL 7184039, at *5 ("The Court finds the injunctive changes provided in the Settlement Agreement are important and have significant value to the class members nationwide.").

(c)     The Court also must consider the likelihood and extent of any recovery from Defendants absent the Settlement.

(i)     The Settlement's terms were achieved notwithstanding many courts disagreeing about whether the underlying theories of liability even state valid claims for relief. Indeed, there is "no doubt that recent federal appellate decisions have changed the climate for Plaintiffs' class action attorneys pursuing force-placed insurance claims." *Montoya v. PNC Bank, N.A.*, No. 14-20474, 2014 WL 4248208, at *2 (S.D. Fla. Aug. 27, 2014). The Eleventh Circuit itself has rejected LPI-related claims similar to the ones alleged here. *See Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1110-11 (11th Cir. 2014); *Telfair v. First Union Mortg. Corp.*, 216 F.3d 1333, 1340-42 (11th Cir. 2000). And this Court emphasized in another LPI lawsuit that while plaintiffs' mail and wire fraud allegations may be "barely" sufficient to withstand a motion to dismiss by "a razor-thin margin," there are "strong headwinds" that will test plaintiffs' "less-than-obvious causation theory" and purported "fraudulent scheme" at later stages in the litigation. *Montoya*, 2015 WL 1311482, at *13-16, *24-26; *see also Wilson*, 2015 WL 1600549, at *2-6 (dismissing comparable LPI mail and wire fraud-based claims); *Hall*, 2014 WL

7184039, at *4 (noting that "a number of courts have dismissed" comparable LPI claims, so "there exists a potential that the class could endure a long and expensive trial only to come away with nothing"); *Saccoccio*, 297 F.R.D. at 692 (observing that "there is strong authority to suggest that Plaintiff may not have prevailed" in similar LPI class litigation).

(ii)    Defendants also have strong affirmative defenses. For example, Defendants made arguments based upon the filed rate doctrine that could have been dispositive at later stages of the Litigation. "The filed rate doctrine (also known as the 'filed tariff doctrine') 'forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority.'" *Hill v. BellSouth Telecommc'ns, Inc.*, 364 F.3d 1308, 1315 (11th Cir. 2004) (quoting *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981)). "Therefore, causes of action in which the plaintiff attempts to challenge the terms of a filed tariff are barred by the filed rate doctrine." *Id.* Moreover, "even if a claim does not directly attack the filed rate, an award of damages to the customer that would, in effect, result in a judicial determination of the reasonableness of that rate is prohibited under the filed rate doctrine." *Id.* at 1317. The filed rate doctrine applies to filed insurance premium rates like the LPI premium rates at issue here. *See, e.g.*, *Kunzelmann v. Wells Fargo Bank, N.A.*, No. 11-81373, 2013 WL 139913, at *12 (S.D. Fla. Jan. 10, 2013); *Morales v. Attorneys' Title Ins. Fund Inc.*, 983 F. Supp. 1418, 1426 (S.D. Fla. 1997).

(iii)    Numerous courts have applied the filed rate doctrine to dismiss comparable LPI claims, including fraud-based claims, at the pleadings stage.[7] And although Plaintiffs here survived an early motion to dismiss, it is "apparent that the filed rate doctrine is an issue that must be addressed" eventually, whether at summary judgment, trial, or in another posture. *Kunzelmann*, 2013 WL 139913, at *12. In the context of a nationwide class, ruling on the filed rate doctrine under the differing laws of the 50 states would be exceedingly complicated, and could yield disparate results. "To determine whether, and to what extent the filed-rate doctrine is applicable would require an analysis of each state's formulation of the doctrine and may require examination of the regulatory proceedings involved in approving the rate filed." *Id.*

(iv)    For these and other reasons, Plaintiffs' ability to obtain certification of a litigated class also is suspect. It does not appear that any court, state or federal, has granted a **contested** motion to certify a nationwide class of borrowers asserting comparable LPI claims. Many courts have declined to do so. *See Hall*, 2014 WL

---

[7]     *See, e.g., Rothstein v. Balboa Ins. Co.*, --- F.3d ---, No. 14-2250, 2015 WL 4460713, at *4-7 (2d Cir. July 22, 2015); *Johnson v. Green Tree Servicing LLC*, No. 15-18, 2015 WL 2452680, at *2 (N.D. Miss. May 22, 2015); *Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 553-54 (S.D.N.Y. 2014); *Curtis v. Cenlar FSB*, No. 13-3007, 2013 WL 5995582, at *3 (S.D.N.Y. Nov. 12, 2013); *Singleton v. Wells Fargo Bank, N.A.*, No. 12-216, 2013 WL 5423917, at *2 (N.D. Miss. Sept. 26, 2013); *Roberts v. Wells Fargo Bank, N.A.*, No. 12-200, 2013 WL 1233268, at *13 (S.D. Ga. Mar. 27, 2013); *Decambaliza v. QBE Holdings, Inc.*, No. 13-286, 2013 WL 5777294, at *6-7 (W.D. Wis. Oct. 25, 2013); *Stevens v. Union Planters Corp.*, No. 00-1695, 2000 WL 33128256, at *3 (E.D. Pa. Aug. 22, 2000).

7184039, at *4 (noting that "most courts have denied class certification in lender-placed insurance cases, and none have certified a nationwide class"); *Kunzelmann*, 2013 WL 139913, at *4-12 (denying class certification of comparable LPI claims); *Gordon v. Chase Home Finance, LLC,* No. 11-2001, 2013 WL 436445, at *6-12 (M.D. Fla. Feb. 5, 2013) (same); *accord Rapp v. Green Tree Servicing LLC,* 302 F.R.D. 505, 509-20 (D. Minn. 2014) (same); *Gustafson v. BAC Home Loans Servicing, LP,* 294 F.R.D. 529, 535-50 (C.D. Cal. 2013) (same); *cf. Montoya,* 2015 WL 1311482, at *27 (recognizing "need to again confront the filed-rate doctrine argument when analyzing [a] class certification motion").

      (v)    This Settlement thus avoids fundamental uncertainties with Plaintiffs' claims. Put simply, the agreed Settlement relief here is nearly what (and in many cases, more than) Plaintiffs could have hoped to obtain in a contested resolution of the Litigation. That relief will be available immediately, without protracted proceedings. "Significantly, none of the objectors disputed that these obstacles exist and are formidable. In light of the recovery to the class, as well as the significant litigation risk Plaintiffs faced absent settlement, the settlement is fair, reasonable and adequate." *Hall*, 2014 WL 7184039, at *4.

      (d)    The complexity, expense, and duration of continued litigation is another factor weighing heavily in favor of final approval. Many of Plaintiffs' claims were highly complex. *See Saccoccio,* 297 F.R.D. at 692, 693 (characterizing comparable LPI claims as "highly complex" and "quite complex"). A massive effort would be

necessary to conclude the Litigation under the auspices of a jury, and have that result reviewed on appeal. To reach the trial stage, the Parties would engage in substantial motion practice, including discovery motions, briefs and expert opinions for and opposing certification of a class, motions for summary judgment, and motions *in limine*. The Court would be presented with numerous pre-trial disputes, both legal and evidentiary. Moreover, a trial would take substantial time, straining the patience of even the most engaged jurors. "Complex litigation – like the instant case – can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive." *U.S. Oil*, 967 F.2d at 493.

(e)     The Court considers the stage at which the Settlement was reached. "The stage of the proceedings at which a settlement is achieved is evaluated to ensure that Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation." *Lipuma*, 406 F. Supp. 2d at 1324. "Early settlements are favored," however, and "'vast formal discovery need not be taken.'" *Saccoccio*, 297 F.R.D. at 694 (quoting *Lipuma*, 406 F. Supp. 2d at 1324). "Information obtained from other cases may be used to assist in evaluating the merits of a proposed settlement of a different case." 406 F. Supp. 2d at 1325.

(i)     Class Counsel were well-positioned to evaluate the merits of Plaintiffs' claims, as well as the appropriate basis on which to settle them, as a result of their participation in years of similar LPI litigation in this District and elsewhere, and

review of more than 30 million pages of documents and more than 30 depositions in similar litigation, including depositions of corporate representatives of the Assurant Defendants. [ECF No. 91-2, ¶¶ 42-44].

(ii)   In this case, Class Counsel conducted extensive formal and informal discovery before and during the mediation. [*Id.*, ¶¶ 12, 14, 15, 36-38, 42]. Through depositions of their corporate representatives and through other sources, Defendants provided Class Counsel with details about the functions and capabilities of the systems on which they retain borrowers' financial data, including Defendants' inability to query those systems for information about which borrowers may have paid or still owe amounts for LPI charges. [*Id.*, ¶¶ 36-38; ECF Nos. 79-2, pp. 16:10-18:22, 20:16-21:17, 21:21-22:2; 79-3, pp. 21:17-22:17]. Defendants also provided Class Counsel with information concerning Defendants' hazard, flood, and wind LPI programs, including details regarding the compensation arrangements between Defendants, the number of LPI Policies in force, and aggregate Premiums. [*Id.*, ¶ 14].

(f)   The Court next considers whether the Parties colluded in negotiating the Settlement Agreement. "Collusion may not always be evident on the face of a settlement, and courts therefore must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations."

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011). The Court is satisfied that this Settlement is not the product of collusion, explicit or subtle.

        (i)     "Where the parties have negotiated at arm's length, the Court should find that the settlement is not the product of collusion." *Saccoccio*, 297 F.R.D. at 692. "There is a presumption of good faith in the negotiation process." *Id.* That presumption has not been rebutted here. The Settlement Agreement was the result of arm's-length negotiations, assisted by one of the leading mediators for class settlements, Rodney A. Max. Mr. Max has mediated to resolution other LPI class settlements that have received final approval in this District. "Parties colluding in a settlement would hardly need the services of a neutral third party to broker their deal." *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001). On May 13, 2014, the Parties participated in an in-person mediation session overseen by Mr. Max. [ECF Nos. 91-2, ¶¶ 12-14; 93-1, ¶¶ 11-12]. They reached an agreement in principle during that mediation session [ECF Nos. 91-2, ¶ 16; 93-1, ¶ 13], culminating in the 111-page Settlement Agreement. [ECF No. 46-1]. As Mr. Max has attested, there was no collusion among the Parties during the Braynen Mediation. [ECF No. 93-1, ¶¶ 11-12, 17-19]. "To the contrary, at each point during these negotiations, the settlement process was conducted at arm's-length and, while professionally conducted, was quite adversarial." [*Id.*, ¶ 16].

        (ii)     In addition, during the Litigation the Court had the opportunity to personally observe the Parties' respective counsel and has no reason to

doubt their professionalism or integrity. There is no evidence of self-dealing or other unethical behavior, want of skill, or lack of zealous advocacy. The Parties' respective counsel have significant class action experience.

(iii)     The Settlement Agreement's section on Attorneys' Fees and Costs contains a so-called "clear-sailing" provision, whereby Defendants agree not to oppose or otherwise object to an application by Class Counsel for an award of Attorneys' Fees and Expenses in an amount not to exceed $5 million. [ECF No. 91-1, ¶ 15.2]. Some courts have suggested that a clear-sailing provision may be a warning sign of a collusive bargain. "The inclusion of such a 'clear sailing' provision within the settlement agreement's terms, however, merely justifies the Court's application of heightened scrutiny when evaluating the class counsel's ultimate fee request; it should not be read as an independent ground for withholding approval of the entire settlement." *Matter of Skinner Group, Inc.*, 206 B.R. 252, 263 n.14 (Bankr. N.D. Ga. 1997). Indeed, while a clear-sailing provision could indicate that the settling parties compromised class members' interests to give class counsel favorable treatment on attorneys' fees, it could just as easily be included for purposes of finality and risk avoidance. *See Malchman v. Davis*, 761 F.2d 893, 905 n.5 (2d Cir. 1985) (a clear-sailing provision "is essential to completion of the settlement, because the defendants want to know their total maximum exposure and the plaintiffs do not want to be sandbagged").

(iv)     Even giving the Settlement heightened scrutiny, the Court finds the clear-sailing provision to be immaterial.  The Court has already found that the Settlement was negotiated at arm's-length. The Settlement's relief -- which replicates a model approved in multiple other LPI class settlements -- independently confirms the absence of collusion. Class Members here will receive the same sort of deal multiple judges have found to be fair. Furthermore, the Parties began negotiating attorneys' fees only *after* they had finished negotiating the Settlement itself [ECF Nos. 93-1, ¶ 17; 91-2, ¶ 69], another ground for rejecting the notion of collusion. *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 335 (3d Cir. 1998) (overruling objection to clear-sailing provision since there was "no indication the parties began to negotiate attorneys' fees until after they had finished negotiating the settlement agreement"); *Ingram*, 200 F.R.D. at 693 (finding no collusion where attorneys' fees were "negotiated separately from the rest of the settlement, and only after substantial components of the class settlement had been resolved").

(v)     Based on the factual record, there was no collusion. And absent collusion, a clear-sailing provision should not bar a class settlement's approval, as courts in this Circuit have repeatedly emphasized. *See, e.g., Poertner v. Gillette Co.*, No. 14-13882, 2015 WL 4310896, at *6 (11th Cir. July 16, 2015) (*per curiam*); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1293 n.4 (11th Cir. 1999); *Fladell*, 2014 WL 5488167, at *4; *Ingram*, 200 F.R.D. at 693.

10.     The Court has carefully considered the three objectors' arguments, and as explained below, those objections are hereby overruled.[8] In addition, on its own initiative, the Court required the Parties to answer additional questions the Court raised about the Settlement's claims-made structure and the materiality of the potential claims participation rate.

(a)     As an initial matter, the Court finds that one of the three objectors, Ken Faver [ECF No. 95], is not a Settlement Class Member with standing to object. Only a "class member" may object to a propose class settlement. Fed. R. Civ. P. 23(e).  "Under Fed. R. Civ. P. 23(e), non-class members are not permitted to assert objections to a class action settlement." *Ass'n For Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 473

---

[8]     John and Connie Croston filed a motion [ECF No. 113] for an extension of time to opt out of the class settlement. Class Counsel took no position on the motion and Defendants objected to it. Technically, the Crostons are not "objecting;" they are merely asking for additional time to opt out of the settlement. They have already filed a separate lawsuit in the state circuit court for Clay County, Florida, and Defendants have filed a motion [ECF No. 114] for an order requiring them to show cause why they should not be held in contempt for violating the Court's preliminary injunction against relitigation. Those two motions have been briefed but the Undersigned recently required the parties to mediate these related disputes [ECF No. 124] and therefore has not issued a substantive ruling on either motion.

The Court does not view the pendency of these motions as preventing an order granting final approval of the class action settlement, and no party has advanced that argument either. The approval entered here, however, does not bind the Crostons. If they do not resolve their dispute in mediation, then the Court will substantively evaluate the two competing motions and issue a ruling.  If the ruling were to side with the Crostons, then the provisions of the Settlement Agreement inapplicable to class members who effectively opted-out would also be inapplicable for the Crostons.

(S.D. Fla. 2002). Mr. Faver is not a Class Member -- because he was not charged by Nationstar for an LPI Policy during the Class Period. He made no effort to prove otherwise or to even claim membership in the Class. The burden was squarely on Mr. Faver to prove -- not the Parties to disprove -- his Class membership. *See In re Deepwater Horizon*, 739 F.3d 790, 809 (5th Cir. 2014). Accordingly, the Court will disregard Mr. Faver's objection.

(b)   With no explanation or rationale as to why, the two remaining objectors, Ms. Coleman and Mr. Easley, contend that the Claim Settlement Relief -- an amount equaling 12.5% of the entire Net Premium each Claimant was charged -- is insufficient. [ECF Nos. 90 ("I am objecting to this settlement being offered of 12.5% of the net premiums charged because this amount barely covers one payment that I made to Nationstar for insurance."); 98 (disagreeing with "the percentage rate offered")].[9]

(i)   A generic desire to receive "more" money or a "better" result is not a proper objection. *See Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1382 (S.D. Fla. 2007) (overruling objections of class members who "desired to 'have a better

---

[9]   Mr. Easley also objects that the Class Period extends from January 1, 2008 to January 30, 2015. [ECF No. 98]. It appears his concern is that the Class Period is not broad enough. The objection fails because the Class Period need not cover claims barred by laches or the applicable statutory limitations periods. The objection also fails because Mr. Easley simultaneously complains that the Settlement is unfair, unreasonable, and inadequate. He is therefore taking an inconsistent and illogical position: complaining that a supposedly bad deal should cover an even larger group of persons.

deal'"). Such objections lack merit because the objectors could simply opt out and file their own individual lawsuits if they have concerns about releasing their claims. *See Diaz v. HSBC USA, N.A.*, No. 13-21104, 2014 WL 5488161, at *3 (S.D. Fla. Oct. 29, 2014); *see also Faught*, 668 F.3d at 1241-42 (objections that "the settlement is unreasonable because it strips class members of their class rights while failing to resolve their individual claims" and "that the settlement does not adequately compensate them" deemed "unconvincing" since class members were "free to opt out of the class and still have the option of . . . filing an individual suit"); *In re CP Ships Ltd., Secs. Litig.*, 578 F.3d 1306, 1318 (11th Cir. 2009) (rejecting objection "that the district court erred in approving the settlement because foreign class members have potential for a greater recovery" in Canadian litigation since settlement class members "wishing to pursue the Canadian Actions could opt out of the instant settlement").

        (ii)    That objection also ignores the actual claims and alleged damages in this case. The Named Plaintiffs and the Class do not challenge the right to place LPI based upon the applicable mortgage contract. Instead, they primarily challenge the reasonableness of the cost of the LPI policies to the borrower where a Nationstar-affiliated company purportedly receives a benefit in connection with the placement. As a result, Plaintiffs' relief model and settlement negotiations have focused upon quantifying the allegedly improper benefit purportedly received by Nationstar. This Settlement provides Class Members with the opportunity to recover essentially all

of the principal component of the damages they alleged, *i.e.*, 12.5% of the LPI Net Premium they were charged. Indeed, in many circumstances the Settlement provides the opportunity to recover *more* relief than Class Members could prove at trial. If a Class Member paid any LPI premium at all, upon submission of a valid claim that Class Member recovers 12.5% of the LPI Net Premium he or she was *charged* (not paid), **even if he or she paid only a fraction of the charged premium.**

(iii)    "Neither should it be forgotten that compromise is the essence of a settlement. The trial court should not make a proponent of a proposed settlement justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes." *Cotton*, 559 F.2d at 1330 (internal quotation marks omitted). A class settlement can thus "be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery." *Behrens*, 118 F.R.D. at 542.

(iv)    Finally, the objection ignores that a refund or credit of 12.5% of the LPI's Net Premium is comparable to or exceeds refund and credit percentages allowed in multiple LPI class settlements approved in this District. *See, e.g.*, *Hamilton*, 2014 WL 5419507, at *4 (10.5%); *Fladell*, 2014 WL 5488167, at *4 (7% or 11%); *Saccoccio*, 297 F.R.D. at 693 (12.5%). Class Members were unlikely to get a better deal than the one

31

provided here.  In short, there is no merit to the objectors' attack on the sufficiency of the Claim Settlement Relief.

(c)     The Settlement employs a claims process, and only Class Members who actually participate in that process by making claims will receive Claim Settlement Relief. The Court has independently considered whether: (1) an alternative direct-payment structure is feasible or desirable, (2) the Settlement's claims-made structure renders the Settlement unfair, unreasonable, or inadequate, and (3) whether the Court should defer giving final approval to the Settlement until after the final claims participation rate is known. As discussed more fully below, the Court finds that: (1) a direct-payment structured settlement is not feasible or even desirable; (2) a claims-made structured settlement is fair, reasonable, and adequate on its own terms; and (3) there is little reason to delay the Settlement's approval to learn the final claims rate, but there is substantial reason to avoid that delay.

(i)     Approving a claims-made structured class settlement, a panel of the Court of Appeals for the Eleventh Circuit recently found that even if "monetary relief was available to only those class members who submitted claims, the use of a claims process is not inherently suspect." *Poertner v. Gillette Co.*, No. 14-13882, 2015 WL 4310896, at *4 (11th Cir. July 16, 2015); *see also Hall*, 2014 WL 7184039, at *6; *Saccoccio*, 297 F.R.D. at 696. "Filing a claim form is a reasonable administrative requirement which generally does not impose an undue burden on members of a

settlement class." *Hamilton*, 2014 WL 5419507, at *6. This Court, along with other judges in this District and elsewhere, thus holds the view that "'criticism of the claims-made structure' does 'not impact the fairness, reasonableness, or adequacy of the proposed settlement.'" *Id.* (quoting *Casey v. Citibank, N.A.*, No. 12-820, 2014 WL 4120599, at *2 (N.D.N.Y. Aug. 21, 2014)).

        (ii)    "Perhaps there could have been an even more creative settlement or, alternatively, one that is more traditional.  But that is not the question we must resolve." *Uhl v. Thoroughbred Tech. & Telecommc'ns, Inc.*, 309 F.3d 978, 987 (7th Cir. 2002). After all, "whether another team of negotiators might have accomplished a better settlement is a matter equally comprised of conjecture and irrelevance." *Corrugated Container*, 643 F.2d at 212. "'While a direct payment structure would obviously result in more, and possibly all, class members receiving a share of the monetary relief in the settlement, there is no reason to believe the defendants would agree to such terms' and, in any event, the Court 'does not have the authority to impose a preferred payment structure upon the settling parties.'" *Fladell*, 2014 WL 5488167, at *4 (quoting *Casey*, 2014 WL 4120599, at *2-3).

        (iii)    This Settlement has been designed to incentivize Class Member participation. It is substantively fair, offering complete relief (or better) to every interested Claimant who submits a valid Claim Form. Settlement Claim Relief will be worth hundreds of dollars to the average Claimant. The Settlement also is

procedurally fair. The Claim Form should take no more than a few minutes for the average Claimant to complete and requires the submission of no supporting materials that would be required in an individual lawsuit. *See Hall*, 2014 WL 7184039, at *8 (similar claim form in LPI class settlement would take just "a few minutes" to complete); *Hamilton*, 2014 WL 5419507, at *5 (same); *see also Poertner*, 2015 WL 4310896, at *4 (the claims process, "completing a one-page form and submitting it either online or by mail," was not "particularly difficult or burdensome"). As District Judge James Cohn aptly stated in the context of a comparably structured LPI class settlement:

> Where, as here, a claims-made process is a reasonable method for providing prompt and substantial relief to the class, requiring class members to file claim forms also maximizes the relief available to class members who opt to submit a claim.  A settlement's fairness is judged by the opportunity created for the class members, not by how many submit claims.  What matters is the settlement's value to each class member – it is ultimately up to class members to participate or not.

*Hamilton*, 2014 WL 5419507, at *7.

(iv)    A hypothetical direct-payment structured settlement is not necessarily any fairer. Defendants have represented [ECF No. 101, p. 7], and the Court has no reason to believe otherwise, that such a settlement would have been negotiated to provide recovery at a much lower percentage of Settlement Class Members' LPI Net Premiums. Negotiating for a smaller amount to go to Class Members would, in effect, unfairly reward some Class Members for their own indifference at the expense of those

who would take the minimal step of returning the simple Claim Form to receive the larger amount.

While a claims-made settlement structure does not guarantee an award to all class members, it does tend to maximize the opportunity available to each class member. *See Faught*, 668 F.3d at 1242 (affirming approval of claims-made settlement where class members could receive full compensation "rather than mere pennies on the dollar for a uniform cash payment"); *In re Cendant Corp. Litig.*, 264 F.3d 201, 250-51 (3d Cir. 2001) (explaining why a defendant can offer a higher percentage recovery in a claims-made class settlement).[10]

Moreover, employing a direct payment structure in these circumstances would not guarantee that every Class Member would receive monetary relief. The Settlement Administrator provided information that 60,313 of the 380,404 Notices distributed were returned as undeliverable (about 16% of the Class). [ECF No. 91-4, ¶¶ 5, 10]. Some had forwarding addresses and were re-mailed, but there were no viable addresses for 42,947 Class Members. *Id.* Not only were such persons no longer residing at the addresses in the Defendants' electronic records, but many would not have paid for LPI or otherwise

---

[10]   At the Final Fairness Hearing, Class counsel explained that, in his experience, the likelihood of obtaining a higher take rate increases if a live telephone operator is used to answer questions. In response to a question from the Court, he advised that a live telephone operator was used, and is being used, here -- both at the claims administrator consulting company and at counsel's law firm. [ECF No. 108, pp. 24-25].

be eligible for a direct settlement payment because of foreclosures, short sales, or deeds in lieu of foreclosure. A direct-payment structure without the Claim Form providing current addresses risks fraud and waste in administering the Settlement. *In re Educational Testing Serv. Praxis Principles of Learning & Teaching*, 2006 WL 3332829, at *2 (E.D. La. Nov. 15, 2006) (overruling objection that claims process is unneeded "because the names and addresses of [class members] are known," finding that a claims process prevents checks from being mailed to unverified and old addresses, reducing undeliverable mail and fraudulently cashed checks).

(v)     It is significant that, in the context of LPI class settlements, *no* court has disapproved this Settlement's relief model. Just the opposite is true.  Many courts have approved claims-made processes in LPI cases like this one. *See Hall*, 2014 WL 7184039, at *6. "Indeed, district courts routinely approve reasonable claims-made settlements, including those involving lender-placed insurance." *Hamilton*, 2014 WL 5419507, at *7. The Court finds no reason to deviate from those approved settlements, including a similar one which I recently approved in *Lee*. *See* 2015 WL 5449813.

(d)     A direct-payment structured settlement would be difficult to administer in this case. Using a claims process is the only practicable means of administering this Settlement.  The Settlement offers cash relief to borrowers who paid *any* portion of Premium charges assessed to their mortgage escrow accounts and a credit to those who did not and who still owe those charges.  But many Settlement Class

Members have not, and will never, pay or continue to owe Premiums. Those Class Members should not receive a windfall from the Settlement, but Defendants cannot query their systems to identify on a class-wide basis whether class members had paid or still owed some portion of the amounts they were charged for LPI (*i.e.*, showing that a claims-based process is necessary). Substantial evidence supports this finding. [ECF Nos. 91-2, ¶¶ 36-38; 79-2, pp. 16:10-18:22, 20:16-21:17, 21:21-22:2; 79-3, pp. 21:17-22:17]. "But even if it was possible to identify some unnamed class members, that does not mean that [a] district court lack[s] the discretion to approve the settlement as fair absent the identification of these class members." *Poertner*, 2015 WL 4310896, at *5.

        (e)        "And the Settlement Agreement's claims process is needed for other reasons, including to ensure that only aggrieved individuals receive monetary relief and to reduce the risk of fraud, waste, and abuse that might arise from sending unsolicited checks to unverified addresses and recipients." *Hall*, 2014 WL 7184039, at *6. "Sending unsolicited checks to unverified addresses and recipients increases the risk of misappropriation. Non-class members could endorse over to themselves misdirected settlement checks. Attempting to recover money from individuals who fraudulently cash checks is impracticable. This is particularly important where a case presents a class of this size, and determining the amounts to be paid under a direct-pay structure would potentially make settlement more costly than litigation." *Hamilton*, 2014 WL 5419507, at *6.

(f)     In addition, under a hypothetical direct-payment structure without the Claim Form, the risk of waste increases. From an administrative standpoint, disbursement activity in a direct-payment structured class settlement, including printing and mailing of checks, can be quite expensive. Checks in larger amounts (*e.g.*, over $100) are likely to be printed on higher-quality paper using security features. Returned checks can be expensive to process. And the accounting and bank fees associated with large volumes of returned and remailed checks also would be significant.  Unsolicited mail is more likely to be discarded or set aside. Printing and mailing checks to hundreds of thousands of Settlement Class Members who never asked for them could significantly increase the cost and effort of administering the Settlement. The Claim Form's verifications are thus the best chance at ensuring that the right persons receive the right payments at the right addresses.

(g)     The Claim Deadline will not run until 60 days after the Settlement has been finally approved or any resulting appeal has been resolved.  [ECF No. 91-1, ¶¶ 2.8, 2.24]. As a result, before it finally approves the Settlement, the Court will not know the final claims rate or exactly how much Defendants will distribute to Class Members. These are insufficient reasons, however, to withhold approval.

(i)     Courts in this Circuit have approved claims-made class settlements where the claims rate was low, including approving single-digit claims rates.  *See, e.g., Poertner*, 2015 WL 4310896, at *1-2 (approving 7.26 million-member

settlement class when just 55,346 -- less than 1% -- filed claims); *Saccoccio*, 297 F.R.D. at 696; *Perez*, 501 F. Supp. 2d at 1377 (approving 10.3 million-member settlement class when less than 119,000 -- approximately 1.1% -- filed claims). Single-digit claims rate settlements also are routinely approved outside this Circuit. *See, e.g., In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944-45 (9th Cir. 2015) (approving 35 million-member settlement class when only 1.183 million -- less than 4% -- filed claims; "settlements have been approved where less than five percent of class members file claims"); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (*en banc*) (noting evidence that claims rates in consumer class settlements "rarely" exceed 7%, "even with the most extensive notice campaigns").

(ii) In addition, "courts often grant final approval of class action settlements before the final claims deadline." *Hamilton*, 2014 WL 5419507, at *4; *see also Hall*, 2014 WL 7184039, at *7; *Fladell*, 2014 WL 5488167, at *4; *Casey*, 2014 WL 4120599, at *2; *Saccoccio*, 297 F.R.D. at 696; *Saccoccio*, 2014 WL 3738013, at *1. After all, "an LPI class settlement that offers significant monetary relief, as this one does, 'requiring only that class members submit a claim form,' can be 'fair and reasonable independent of the number of claims filed.'" *Hamilton*, 2014 WL 5419507, at *4 (quoting *Saccoccio*, 2014 WL 3738013, at *1); *Hall*, 2014 WL 7184039, at *7 ("The Court also rejects the objectors' argument that the Court cannot grant final approval without knowing the final number of claims that are submitted."). "The question for the Court at the Final Fairness

39

Hearing stage is whether the settlement provided to the class is 'fair, reasonable, and adequate,' not whether the class decides to actually take advantage of the opportunity provided." *Hamilton*, 2014 WL 5419507, at *5. Further, setting the Claim Deadline after the Final Fairness Hearing has the salutary effect of maximizing the claim period's duration.

(iii)    This Settlement is therefore fair, reasonable, and adequate independent of the number of Claim Forms submitted or Defendants' ultimate payout. LPI settlements like this one provide class members who paid or still owe their premiums the opportunity to obtain relief rivaling or, in many cases, exceeding what they could have obtained at trial.  Defendants will pay all valid Claimants without any liability cap, ensuring that any Class Member who submits a Claim Form will be made whole. *See Faught*, 668 F.3d at 1240-42 (affirming approval of claims-made settlement where final payout was unknown at time of approval); *Prudential Ins.*, 148 F.3d at 323 (although "the structure of the settlement and the uncapped nature of the relief provided make it difficult to determine accurately the actual value of the settlement," district court did not abuse its discretion "when it found that the remedies available under the proposed settlement provided extraordinary relief"); *Cotton*, 559 F.2d at 1334 (where a class settlement will make claimants whole, an objection "that the compromise must fall for lack of a specified sum for the settlement" of claims is "meritless").

(h)      Nor, at least in this instance, does the claims rate measure anything especially meaningful.

(i)      In LPI settlements like this one, class members may choose not to file claims for a variety of reasons irrelevant to the settlement's fairness.

> There may be many reasons or no reasons why class members decide to participate in a settlement, *e.g.*, a desire not to be involved in litigation, ideological disagreement with the justice system, their individual experiences with lender-placed insurance, or sympathy for the defendant. Further, class members may not have paid lender-placed insurance charges and therefore elected to forego the opportunity to submit a Claim Form.  Whatever the underlying reason, that is a decision to be made by each class member. Those decisions, however, do not affect whether the settlement provided to the Class is fair, adequate, and reasonable.

*Hall*, 2014 WL 7184039, at *8. Moreover, "based upon the claims filed in similar lender-placed insurance class settlements, a significant number of additional claims are expected, particularly from class members who are waiting to see if the settlement is finally approved." *Id.*, at *7; *see also id.*, at *8 ("many factors affect response rates and this ratio should not be given great significance") (internal quotation marks omitted).

(ii)      This Settlement's unique circumstances make the claims rate misleading. Here, the Parties cannot know which, or how many, Class Members are even *eligible* to seek Claim Settlement Relief.  Some Class Members paid some or all of their Premiums; others have not paid, but still owe, their Premiums; still others paid no Premiums and never will. The Parties cannot systematically distinguish between or tabulate these categories. In other words, an unknown number of "class members may

41

not have paid lender-placed insurance charges and therefore elected to forego the opportunity to submit a Claim Form." *Id.* Arithmetically speaking, dividing a numerator (Claim Forms submitted) by an over-inclusive denominator (*all* Settlement Class Members) will yield a deceptively low claims rate.

11.     The Court finds factually distinguishable a pair of recent Seventh Circuit cases reversing the district courts' final approval of two consumer class settlements employing claims processes -- *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014), and *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014). In fact, at the fairness hearing, both Class Counsel and counsel for Assurant Defendants advised, in response to a question from the Court, that the settlement would pass muster under these two Seventh Circuit cases.

(a)     The Seventh Circuit's reversal of the *Eubank* settlement approval hinged on the fact that, unlike this Settlement, "almost every danger sign in a class action settlement" was present in that case. 753 F.3d at 728. There were "grave conflict[s] of interest," including that the lead class counsel was the son-in-law of the lead class representative (Saltzman). *Id.* at 721. Early in the case, lead counsel added four additional named plaintiffs and then removed these four plaintiffs when they opposed the settlement's approval; "naturally their replacements joined Saltzman in supporting it." *Id.* at 722. The conflict was heightened by the fact that lead class counsel was subject to misappropriation lawsuits and bar disciplinary proceedings, indicating

42

that counsel "may have been desperate to obtain a large attorney's fee in this case before his financial roof fell on him." *Id.* The financial needs resulting from these suits "drove the settlement of this case." *Id.* Moreover, the bar disciplinary proceedings culminated in lead class counsel's suspension from practicing law for 30 months. *Id.*

(b)    Moreover, unlike this Settlement, the *Eubank* settlement did not offer a complete (or better) recovery to class members, but imposed multiple caps on monetary relief. *Id.* at 724-25. The settlement "strew[] obstacles in the path" of every class member, imposing a convoluted claims process, requiring certain class members who submitted claims to arbitrate them and submit "a slew of arcane data." *Id.* The two claim forms used were 12 and 13 pages long. *Id.* at 725. For this, some claimants were entitled only to "coupons" -- "discounts on *future* purchases of Pella windows, discounts that may be worth very little to current owners of Pella's defective windows" -- "a warning sign of a questionable settlement." *Id.*

Further, the *Eubank* settlement ignored that two separate classes had been previously certified and instead "purport[ed] to bind a single nationwide class consisting of all owners of Pella Proline windows containing the defect, whether or not the owners have already replaced or repaired the windows." *Id.* at 721.

(c)    Not one of these "danger signs" is present here. The flawed *Eubank* settlement is simply not comparable to this Settlement, given that there are no conflicts of interest alleged and this Settlement offers complete (or better) relief under a simple

43

"check the box" claims process requiring minimal information readily known by the Class Members, but not Defendants. Class Counsel are not subject to any lawsuits or bar disciplinary proceedings that have clouded their judgment. While the Seventh Circuit admonished the district court for not quantifying the total benefits to class members, 753 F.3d at 723, it did so only in the context of the above conflicts and circumstances, without requiring such a quantification in *every* class settlement.

In addition, the Seventh Circuit did not explain how such a quantification would be meaningful where, as here, an unknowable number of class members might not submit claims because they never paid anything or lost money. The factually dissimilar *Eubank* decision does not guide the Court in connection with this Settlement. *See Hall*, 2014 WL 7184039, at *3 n.4 & *6 (distinguishing *Eubank*).

(d) The *Pearson* decision is not applicable here either. The settlement there did not remotely resemble this Settlement. The *Pearson* settlement offered only $3 for each bottle of glucosamine pills purchased up to four bottles, or $5 up to ten bottles if the class member provided proof of purchase. 772 F.3d at 783. Here, the average Settlement Class Members stands to recover hundreds of dollars of Claim Settlement Relief. And unlike this Settlement's comprehensive direct mail notice program and streamlined claims process, *Pearson* class members received only a postcard notice of the settlement and were required to provide detailed claim information, including "cash register receipts or other documentation indicating the date and place at which he

or she had bought the product." 772 F.3d at 783. For this, the Seventh Circuit chastised *Pearson* class counsel, who "must have known that the notice and claim forms, and the very modest monetary award that the average claimant would receive, were bound to discourage filings." *Id.*

(e)     No such criticism can be made here. By employing a robust Class Notice program and guaranteeing a generous monetary payout to each Class Member submitting a simple Claim Form, the Parties have *encouraged* participation in the Settlement. *See Poertner*, 2015 WL 4310896, at *4 (distinguishing *Pearson* on this basis by explaining that the claims process of that consumer class action settlement "appeared to have been designed 'with an eye toward discouraging the filing of claims'"). The Settlement here, however, is structured to offer every Class Member who submits the simple Claim Form the opportunity to receive a full recovery.  Finally, the *Pearson* court took to task that settlement's inclusion of a *cy pres* award and "superfluous" injunctive relief.  *See id.* at 784-86.  This Settlement, in contrast, does not include a *cy pres* component and its injunctive relief is not superfluous, but appears to have considerable value.

12.     Accordingly, the Parties are hereby directed to implement and consummate the Settlement Agreement according to its terms and provisions.

13.     Pursuant to Federal Rule 23(h), the Court hereby awards Class Counsel for the Settlement Class Attorneys' Fees and Expenses in the amount of **$5 million,**

payable pursuant to the terms of the Settlement Agreement. The Court also awards Case Contribution Awards in the amount of **$5,000 each** to the Named Plaintiffs payable pursuant to the terms of the Settlement Agreement.

14.     The terms of the Settlement Agreement and of this Final Order, including all exhibits thereto, shall be forever binding in all pending and future lawsuits maintained by the Named Plaintiffs and all other Settlement Class Members, as well as their family members, heirs, guardians, assigns, executors, administrators, predecessors, successors, and assigns.

15.     The Releases, which are set forth in Section 10 of the Settlement Agreement and which are also set forth below, are expressly incorporated herein in all respects and are effective as of the date of this Final Order; and the Released Persons (as that term is defined below and in the Settlement Agreement) are forever released, relinquished, and discharged by the Releasing Persons (as that term is defined below and in the Settlement Agreement) from all Released Claims (as that term is defined below and in the Settlement Agreement).

(a)     <u>Release and Waiver Definitions</u>

(i)     "Nationstar Defendants" means Nationstar Mortgage, LLC, Harwood Service Company, LLC, and Nationstar Mortgage Holdings Inc.

(ii)     "Assurant Defendants" means Assurant, Inc., American Security Insurance Company, Voyager Indemnity Insurance Company, and Standard Guaranty Insurance Company.

(iii)    "Defendants" means all named defendants in the Braynen Litigation, including the Nationstar Defendants and the Assurant Defendants.

(iv)    "Lender-Placed Insurance" means the placement of hazard, flood, flood gap, and/or wind insurance pursuant to a mortgage loan agreement, home equity loan agreement, or home equity line of credit serviced by the Nationstar Defendants to cover a borrower's failure to maintain the required insurance coverage on the residential property securing the loan.

(v)     "LPI Policy" means a lender-placed residential hazard, flood, flood gap, or wind-only insurance policy issued by the Assurant Defendants for a loan or line of credit serviced by the Nationstar Defendants.

(vi)    "Release" or "Releases" means the releases of all Released Claims by the Releasing Persons against the Released Persons.

(vii)   "Released Claims" means all claims, actions, causes of action, suits, debts, sums of money, payments, obligations, reckonings, promises, damages, penalties, attorney's fees and costs, liens, judgments, demands, and any other forms of liability released pursuant to this Final Order, the Judgment, and Section 10 of the Settlement Agreement.

(viii)   "Released Persons" means (a) the Nationstar Defendants, the Assurant Defendants, and each of their respective past or present divisions, parents, subsidiaries, predecessors, investors, parent companies, acquired companies, and affiliated companies (which shall include any person or entity which controls, is controlled by, or is under common control with any such party), including but not limited to the Nationstar Defendants, the Assurant Defendants and any direct or indirect subsidiary of any of Defendants and each of their respective past or present divisions, parents, subsidiaries, investors, parent companies, and affiliated companies, and all of the officers, directors, employees, agents, brokers, distributors, representatives, and attorneys of all such entities; and (b) any other insurance carriers that issued or may have issued LPI insuring real property owned by any Settlement Class Member for the Nationstar Defendants and/or for any of the Nationstar Defendants' past or present divisions, parents, subsidiaries, predecessors, investors, parent companies, acquired companies, and affiliated companies (which shall include any person or entity which controls, is controlled by, or is under common control with any such party), including but not limited to any direct or indirect subsidiary of any of them, and all of the officers, directors, employees, agents, brokers, distributors, representatives, and attorneys of all such entities.

(ix)   "Releasing Persons" means the Named Plaintiffs and all Settlement Class Members who do not properly and timely opt out of the Settlement,

and their respective family members, heirs, guardians, executors, administrators, predecessors, successors, and assigns.

(x)     "Settling Parties" means, collectively, Defendants, Named Plaintiffs, all Settlement Class Members, and all Releasing Persons.

(b)     <u>Released Claims of Settlement Class</u>.   Each member of the Settlement Class, and their family members, heirs, guardians, assigns, executors, administrators, predecessors, and successors, other than the Named Plaintiffs, shall, by operation of the Final Order, be deemed to have fully, conclusively, irrevocably, forever, and finally released, relinquished, and discharged the Released Persons from any and all claims, actions, causes of action, suits, debts, sums of money, payments, obligations, reckonings, promises, damages, penalties, attorney's fees and costs, liens, judgments, and demands of any kind whatsoever that each member of the Settlement Class may have or may have had in the past, whether in arbitration, administrative, or judicial proceedings, whether as individual claims or as claims asserted on a class basis, whether past or present, mature or not yet mature, known or unknown, suspected or unsuspected, whether based on federal, state, or local law, statute, ordinance, regulations, contract, common law, or any other source, that were or could have been sought or alleged in the Litigation or that relate, concern, arise from, or pertain in any way to the Released Persons' conduct, policies, or practices concerning LPI Policies placed or charged during the Settlement Class Period.

(i)     The Release stated in Paragraph 15(b) above shall include, but not be limited to, all claims related to charges for the Nationstar Defendants' placement of LPI Policies during the Class Period; Nationstar's insurance requirements; and reinsurance agreements involving the Nationstar Defendants concerning the LPI Policies; the relationship, whether contractual or otherwise, between the Nationstar Defendants and the Assurant Defendants, including, but not limited to, the procuring, underwriting, placement, insurance tracking, or costs of LPI Policies; the coverage amount, duration, issue date, alleged "backdating," or alleged excessiveness of any LPI Policies placed or charged by the Nationstar Defendants; the payment or receipt of commissions, expense reimbursements, alleged "kickbacks," or any other compensation under any LPI Policies placed or charged by the Nationstar Defendants; any alleged "tying" arrangement involving the Nationstar Defendants and LPI; any alleged breach of fiduciary duty by the Nationstar Defendants concerning LPI Policies; any alleged tortious interference by the Assurant Defendants with mortgage contracts serviced by the Nationstar Defendants; the disclosure or non-disclosure of any payment, expenses, fees, charges, or features pertaining to or under any LPI Policies placed or charged by the Nationstar Defendants; the receipt or non-disclosure of any benefit under any LPI Policies placed or charged by the Nationstar Defendants; the content, manner, or accuracy of any communications regarding the placement of any insurance policy by the Nationstar Defendants; and to the regulatory approval or non-approval of any

50

insurance policy, or the premium thereon, placed or charged by the Nationstar Defendants.

> (ii)      The Release in Paragraph 15(b) above shall not cover claims arising after the Final Settlement Date (as defined in the Settlement Agreement), or claims for benefits made under any LPI Policy placed or charged by the Nationstar Defendants.  Nothing in Paragraph 15(b) shall be deemed a release of any Settlement Class Member's respective rights and obligations under this Agreement.

> (iii)     Except to the extent that any such obligation is being released pursuant to Paragraph 15(b) above, this Final Order shall not be deemed a release of Defendants from any existing obligation to any Settlement Class Member under any loan, note, mortgage, or deed of trust.  This provision is not meant to and does not limit the Releases in this Final Order or in the Settlement Agreement.

> (c)      <u>Released Claims of Named Plaintiffs</u>.  The Named Plaintiffs, on behalf of themselves, their family members, heirs, guardians, assigns, executors, administrators, predecessors, and successors, hereby release and discharge the Released Persons from any and all claims, actions, causes of action, suits, debts, sums of money, payments, obligations, reckonings, promises, damages, penalties, attorney's fees and costs, liens, judgments, and demands of any kind whatsoever that the Named Plaintiffs may have or may have had in the past, whether in arbitration, administrative, or judicial proceedings, whether as individual claims or as claims asserted on a class basis,

whether past or present, mature or not yet mature, known or unknown, suspected or unsuspected, whether based on federal, state, or local law, statute, ordinance, regulations, contract, common law, or any other source.  In agreeing to this Release, the Named Plaintiffs explicitly acknowledge that unknown losses or claims could possibly exist and that any present losses may have been underestimated in amount or severity.

(i)     The Release stated in Paragraph 15(c) above shall include, but not be limited to, all claims related to charges for the Nationstar Defendants' placement of LPI Policies; Nationstar's insurance requirements; the relationship, whether contractual or otherwise, between the Nationstar Defendants and the Assurant Defendants regarding LPI, including, but not limited to, the procuring, underwriting, placement, insurance tracking, or costs of LPI Policies; any reinsurance agreements involving the Nationstar Defendants related to LPI Policies; the coverage amount, duration, issue date, alleged "backdating," or alleged excessiveness of any LPI Policies placed or charged by the Nationstar Defendants; payment or receipt of commissions, expense reimbursements, alleged "kickbacks," or any other compensation under any LPI Policies placed or charged by the Nationstar Defendants; any alleged "tying" arrangement involving the Nationstar Defendants and LPI; any alleged breach of fiduciary duty by the Nationstar Defendants concerning LPI Policies; any alleged tortious interference by the Assurant Defendants with mortgage contracts serviced by the Nationstar Defendants to the extent related to LPI; the disclosure or non-disclosure

of any payment, expenses, fees, charges, or features pertaining to or under any LPI Policies placed or charged by the Nationstar Defendants; the receipt or non-disclosure of any benefit under any LPI Policies placed or charged by the Nationstar Defendants; the content, manner, or accuracy of any communications regarding the placement of any LPI Policy by the Nationstar Defendants; and the regulatory approval or non-approval of any LPI insurance policy, or the premium thereon, placed or charged by the Nationstar Defendants during the Class Period.

(ii)     The Release in Paragraph 15(c) above shall not cover claims arising after the Final Settlement Date (as defined in the Settlement Agreement), or claims for benefits made under any LPI Policy placed or charged by the Nationstar Defendants.  Nothing in Paragraph 15(c) shall be deemed a release of Named Plaintiffs' respective rights and obligations under the Final Order and the Settlement Agreement.

(d)     Without in any way limiting their scope, the Releases cover by example and without limitation, any and all claims for attorneys' fees, costs, expert fees, or consultant fees, interest, or litigation fees, or any other fees, costs, and/or disbursements incurred by Class Counsel, the Named Plaintiffs, or any Settlement Class Members in connection with or related in any manner to the Braynen Litigation, the settlement of the Braynen Litigation, the administration of such Settlement, and/or the Released Claims, except to the extent otherwise specified in the Final Order and the Settlement Agreement.

(e)     In connection with the foregoing Releases, the Named Plaintiffs and each Settlement Class Member expressly waive, and shall be deemed to have waived to the fullest extent permitted by law, any and all provisions, rights, benefits conferred by Section 1542 of the California Civil Code, and any statute, rule and legal doctrine similar, comparable, or equivalent to California Civil Code Section 1542, which provides that:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

The Named Plaintiffs and each Settlement Class Member agree that the provisions of all such principles of law or similar federal or state laws, rights, rules, or legal principles, to the extent they are found to be applicable herein, are hereby knowingly and voluntarily waived, relinquished, and released. The Named Plaintiffs recognize, and each Settlement Class Member will be deemed to recognize, that, even if they may later discover facts in addition to or different from those which they now know or believe to be true, they nevertheless agree that, upon entry of this Final Order, they fully, finally, and forever settle and release any and all claims covered by the Releases.

(f)     The Releases were bargained for and are a material element of the Settlement Agreement.

(g)     The Releases do not affect the rights of Settlement Class Members who timely and properly submitted a Request for Exclusion from the Settlement in accordance with the requirements of the Preliminary Approval Order and in Section 11 of the Settlement Agreement.

(h)     The administration and consummation of the Settlement as embodied in the Settlement Agreement shall be under the authority of the Court.

(i)     The Settlement Agreement shall be the exclusive remedy for any and all Settlement Class Members, except those who have properly requested exclusion (opted out), and the Released Persons shall not be subject to liability or expense for any of the Released Claims to any Settlement Class Member(s).

(j)     The Releases shall not preclude any action to enforce the terms of the Settlement Agreement, including participation in any of the processes detailed therein. The Releases set forth herein and in the Settlement Agreement are not intended to include the release of any rights or duties of the Settling Parties arising out of the Settlement Agreement, including the express warranties and covenants contained herein.

16.     Neither the Settlement Agreement, nor any of its terms and provisions, nor any of the negotiations or proceedings connected with it, nor any of the documents or statements referred to therein, nor this Final Order, nor any of its terms and

provisions, nor the final judgment to be entered pursuant to this Final Order, nor any of its terms and provisions, shall be:

(a)     offered by any person or received against the Defendants as evidence or construed as or deemed to be evidence of any presumption, concession, or admission by the Defendants of the truth of the facts alleged by any person or the validity of any claim that has been or could have been asserted in the Braynen Litigation or in any litigation, or other judicial or administrative proceeding, or the deficiency of any defense that has been or could have been asserted in the Litigation or in any litigation, or of any liability, negligence, fault or wrongdoing of the Defendants;

(b)     offered by any person or received against the Defendants as evidence of a presumption, concession, or admission of any fault, misrepresentation, or omission with respect to any statement or written document approved or made by the Defendants or any other wrongdoing by the Defendants;

(c)     offered by any person or received against the Defendants as evidence of a presumption, concession, or admission with respect to any liability, negligence, fault, or wrongdoing in any civil, criminal, or administrative action or proceeding;

(d)     offered or received in evidence in any action or proceeding against any Party hereto in any court, administrative agency, or other tribunal for any purpose whatsoever, other than to enforce or otherwise effectuate the Settlement Agreement (or

any agreement or order relating thereto), including the Releases, or the Final Order, or the final judgment to be entered pursuant to this Final Order.

17.     This Final Order, the final judgment to be entered pursuant to this Final Order, and the Settlement Agreement (including the exhibits thereto) may be filed in any action against or by any Released Person (as that term is defined herein and the Settlement Agreement) to support a defense of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any theory of claim preclusion or issue preclusion or similar defense or counterclaim.

18.     Without further Court order, the Parties may agree to reasonably necessary extensions of time to carry out any Settlement Agreement provision.

19.     This Final Order, and the final judgment to be entered pursuant to this Final Order, shall be effective upon entry. If the Final Order and the final judgment to be entered pursuant to this Final Order are reversed or vacated pursuant to a direct appeal in this Action or the Settlement Agreement is terminated pursuant to its terms, then all orders entered and releases delivered in connection herewith shall be null and void.

20.     A final judgment will be entered soon.

**DONE AND ORDERED** in Chambers, in Miami, Florida, November 9, 2015.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
All Counsel of Record